IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WALL CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 07-844-GMS |
| | ) | |
| BONDDESK GROUP, L.L.C., AND | ) | |
| BONDDESK TRADING, L.L.C., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO STAY PENDING THEIR REQUEST FOR *INTER PARTES REEXAMINATION***

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600
jshaw@ycst.com
kkeller@ycst.com

OF COUNSEL:

Michael W. Shore, Esquire
Alfonso Garcia Chan, Esquire
Patrick Traister, Esquire
SHORE CHAN BRAGALONE LLP
325 North Saint Paul Street
Suite 4450
Dallas, Texas 75201
(214) 593-9110

Dated: June 20, 2008

## TABLE OF CONTENTS

I.    NATURE AND STAGE OF PROCEEDINGS. ................................................. 1

II.   SUMMARY OF ARGUMENT ........................................................................ 1

III.  STATEMENT OF FACTS ............................................................................. 2

IV.   ARGUMENT AND AUTHORITIES ............................................................... 2

      A.    BONDDESK'S MOTION TO STAY IS PREMATURE . ................................... 2

      B.    STAY FOR REEXAMINATION WILL UNDULY PREJUDICE WALL CORP. AND CREATE
            A TACTICAL ADVANTAGE FOR BONDDESK . ......................................... 3

            1.   A Stay Will Delay This Case For 4 to 7 Years ................................. 4

            2.   Delaying Discovery and Trial Will Prejudice Wall Corp. and Create a
                 Tactical Advantage for BondDesk ................................. 6

            3.   BondDesk Has Not Demonstrated Hardship in Continuing Litigation . ........... 7

      C.    IT IS NOT AT ALL CLEAR WHETHER A REEXAMINATION WILL SIMPLIFY THE ISSUES
            ................................................................................................. 8

      D.    DEFENDANTS' REFUSAL TO BEGIN DISCOVERY WEIGHS AGAINST A STAY . ......... 10

V.    CONCLUSION ............................................................................................ 11

DB02:6913479.1                                                                    066964.1001

# <u>TABLE OF AUTHORITIES</u>

## <u>CASES:</u>

*Applied Materials, Inc. v. Negevtech, Inc.,* No. C-04-03656 SI, 2005 WL 1656894
(N.D. Cal. July 14, 2005) .................................................................................................. 3

*Cognex Corp. v. National Instruments Corp.,* No. 00-442-JJF, 2001 WL 34368283
(D. Del. June 29, 2001) ............................................................................................... 3, 6

*Comcast Cable Commc'ns Corp., L.L.C. v. Finisar Corp.,* No. C-06-04206 WHA, 2007 WL
1052883 (N.D. Cal. April 5, 2007) ............................................................................... 3

*Cooper Techs. Co. v. Thomas & Betts Corp.,* No. 2:06-CV-242, 2008 WL 906315 (E.D. Tex.
March 31, 2008) .................................................................................................. 7, 9, 10

*In Re Cronym,* 890 F.2d 1158 (Fed. Cir. 1989) ....................................................................... 10

*eSoft, Inc. v. Blue Coat Systems, Inc.,* 505 F. Supp. 2d 784 (D. Colo. 2007) .............................. 7

*Genoa Color Techs., Ltd. v. Samsung Elecs. Am., Inc.,* No. 6233 (PKC), 2008 WL 754681
(S.D.N.Y. March 12, 2008) ................................................................................... 7, 8, 11

*Gladish v. Tyco Toys, Inc.,* No. S-92-1666WBS/JFM, 1993 WL 65509
(E.D. Cal. Sept. 15, 1993) ............................................................................................ 6

*Gold v. Johns-Manville Sales Corp.,* 723 F.2d 1068 (3rd Cir. 1983) ........................................... 8

*Network Appliance Inc. v. Sun Microsystems Inc.,* No. C-07-06053 EDL,
2008 WL 2168917 (N.D. Cal. May 23, 2008) .......................................................... 5, 6, 7, 8, 11

*Saint-Gobain Performance Plastics Corp. v. Advanced Flexible Composites, Inc.,*
436 F. Supp. 2d 252 (D. Mass. 2006) ........................................................................... 3

*Telemac Corp. v. Teledigital, Inc.,* 450 F. Supp. 2d 1107 (N.D. Cal. 2006) ......................... 7, 11

*Texas MP3 Techs., Ltd. v. Samsung Electronics Co., Ltd.,* No. 2:07-CV-52,
2007 WL 3219372 (E.D. Tex. Oct. 30, 2007) ............................................................. 6, 8

*Voith Paper GMBH & Co. KG v. Johnsonfoils, Inc.,* No. 07-226-JJF, 2008 WL 874311
(D. Del. March 31, 2008) ............................................................................................. 8

*Xerox Corp. v. 3Com Corp.,* 69 F. Supp. 2d  404 (W.D.N.Y. 1999) ........................................... 3

**RULES AND STATUTES:**

35 U.S.C. § 102 ................................................................................................................ 9, 10

**OTHERS:**

Bibliographic Data for Reexamination No. 95/000,049, U.S. Patent and Trademark Office, June 13, 2008 ...................................................................................................................... 4

Bibliographic Data for Reexamination No. 95/000,062, U.S. Patent and Trademark Office, June 13, 2008 ...................................................................................................................... 4

Charles L. Fefferman, *available at* http://www.math.wm.edu/~klsmit/fefferman.pdf.................. 7

*Inter Partes Reexamination Filing Data,* U.S. Patent & Trademark Office, March 31, 2008 .. 4, 8

*Inter Partes Reexamination Filing Data,* U.S. Patent & Trademark Office, September 30, 2007 ................................................................................................................ 8

Manual of Patent Examining Procedure § 2616 ........................................................... 10

Manual of Patent Examining Procedure § 2673.02 ....................................................... 9

*Reexamining Inter Partes Reexam,* Institute for Progress, 2008, *available at* http://www.iam-magazine.com/blog/IAMBlogInterPartesReexamWhitepaper.pdf ............................................ 5

Request for Inter *Partes* Reexamination ................................................................. 9, 10

*U.S. District Courts—Median Time Intervals from Filing to Trial of Civil Cases in Which Trials Were Completed, by District, During 12-Month Period Ending September 30, 2007, available at* http://www.uscourts.gov/judbus2007/appendices/C10Sep07.pdf ......................................... 5

DB02:6913479.1                                   066964.1001

# I.

## NATURE AND STAGE OF PROCEEDINGS

This case concerns Defendants BondDesk Group, L.L.C.'s and BondDesk Trading, L.L.C's (collectively "BondDesk") infringement of Plaintiff Wall Corporation's ("Wall Corp.") U.S. Patent No. 7,231,363 ("'363 Patent"), entitled "Method and System for Rebrokering Order in a Trading System." All parties have answered in this case and await the Court's scheduling order to begin discovery.

# II.

## SUMMARY OF ARGUMENT

BondDesk's request for a stay is premature. To date, BondDesk has only requested that the U.S. Patent and Trademark Office ("PTO") reexamine the '363 Patent—the PTO has not granted the request. BondDesk's motion is merely a delay tactic to take advantage of the backlog of *inter partes* reexaminations pending in PTO. Even if the PTO granted the request, BondDesk understates both the expected length of an *inter partes* reexamination and the harm a stay will inflict upon Wall Corp. At the same time, BondDesk overstates the probability that the reexamination will simplify the issues for this case. In actuality, the reexamination will likely take at least four years to complete, not including time for appeals. Meanwhile, Wall Corp. will be unduly prejudiced by the deterioration of the evidentiary record and the delay in obtaining a recovery. These factors weigh heavily against BondDesk's request for a stay. The Court should deny BondDesk's motion and allow this case to proceed.

# III.

# STATEMENT OF FACTS

Plaintiff Wall Corp. filed this patent infringement suit against BondDesk on December 26, 2007.[1]  Subsequently, the parties engaged in several rounds of settlement negotiations.[2]  The last formal settlement negotiation occurred on April 11, 2008.[3]  That same day, BondDesk filed its Answer and Counterclaims.[4]

On April 16, 2008, Wall Corp. proposed a discovery plan, protective order, and date for a discovery conference.[5]  BondDesk, however, refused to meet for the Rule 26(f) discovery conference.  BondDesk argued that the conference was premature, but provided no alternative dates.[6]  On May 27, 2008, in the interest of expediting a resolution of this case, Wall Corp. provided advanced copies of requests for production and requests for admissions to BondDesk.[7]  On June 3, 2008, BondDesk filed its Request for *Inter Partes* Reexamination, and soon thereafter, its motion to stay the case.  The PTO has not ruled on BondDesk's request.

# IV.

# ARGUMENT AND AUTHORITIES

## A.    BONDDESK'S MOTION TO STAY IS PREMATURE.

BondDesk has requested a stay of this case before the PTO has even determined whether it will reexamine the '363 Patent.  A stay is premature until the PTO reviews BondDesk's request and determines that there is a substantial new question of patentability.  Without the

---

[1] Plaintiff's Original Complaint (D.I. 1).
[2] Ex. A, Declaration of Michael Shore ("Shore Decl."), at ¶6.
[3] Ex. A, Shore Decl., at ¶6.
[4] Defendants' Answer and Counterclaims (D.I. 7).
[5] Ex. B, Letter of April 16, 2008.
[6] Ex. C, Letter of April 17, 2008.
[7] Ex. D, Letter of May 27, 2008 (Wall Corp. expressly stated that responses to the discovery requests would not be due until thirty days after discovery began).

PTO's decision, there is no way to know what claims, if any, the PTO will reexamine or the basis of such reexamination. Premature motions to stay filed before the PTO has granted a reexamination request are routinely denied.[8] Also, the PTO will probably take about three months to decide whether to accept the reexamination,[9] during which time substantial discovery can be conducted. In accordance with the authority rejecting premature motions to stay, the Court should deny BondDesk's Motion.

> **B.    STAY FOR REEXAMINATION WILL UNDULY PREJUDICE WALL CORP. AND CREATE A TACTICAL ADVANTAGE FOR BONDDESK.**

There is no requirement that the Court stay these proceedings for BondDesk's ungranted reexamination request.

> "If litigation were stayed every time a claim in suit undergoes reexamination, federal infringement actions would be dogged by fits and starts. Federal court calendars should not be hijacked in this manner. From a case management perspective, the possible benefits must be weighed in each instance against the possible drawbacks."[10]

Accordingly, BondDesk bears a heavy burden of demonstrating that the benefits of the stay outweigh the prejudice Wall Corp. will suffer. The standard for evaluating a request for a stay is whether: 1) a stay will unduly prejudice or present a clear tactical disadvantage to the non-moving party; 2) whether a stay will simplify the issues raised by the parties; and 3) whether discovery is complete and a trial date has been set.[11] As detailed below, BondDesk has not

---

[8] *Applied Materials, Inc. v. Negevtech, Inc.*, No. C 04-03656 SI, 2005 WL 1656894, at *2 (N.D. Cal. July 14, 2005); *see also Xerox Corp. v. 3Com Corp.*, 69 F. Supp. 2d 404, 405 (W.D.N.Y. 1999); *see also Saint-Gobain Performance Plastics Corp. v. Advanced Flexible Composites, Inc.*, 436 F. Supp. 2d 252, 253 (D. Mass. 2006).

[9] *Saint-Gobain Performance Plastics Corp.*, 436 F. Supp. 2d at 253.

[10] *Comcast Cable Commc'ns Corp., L.L.C. v. Finisar Corp.*, No. C 06-04206 WHA, 2007 WL 1052883, at *1 (N.D. Cal. April 5, 2007).

[11] *Cognex Corp. v. National Instruments Corp.*, No. 00-442-JJF, 2001 WL 34368283, at *1 (D. Del. June 29, 2001).

3

demonstrated that a stay is appropriate in light of the severe prejudice it would inflict upon Wall Corp.

### 1.  A Stay Will Delay This Case 4 to 7 Years.

Even if the PTO grants BondDesk's request, staying the case for *inter partes* reexamination will delay this case for years and severely prejudice Wall Corp. According to PTO statistics, the average pendency of the *inter partes* reexamination having issued certificates is 31.4 months.[12] Those statistics, however, grossly underrepresent the expected pendency of this reexamination because they are based on only the seventeen *inter partes* reexaminations that have been completed since 1999.[13] Since 1999, 390 requests for *inter partes* reexaminations have been filed, and most of these were filed in the last two years.[14] Therefore, due to this recent spike of *inter partes* reexamination filings, this reexamination will likely take longer than 31.4 months. A brief review of the *inter partes* reexaminations currently pending supports this expected increase. For example, Reexamination No. 95/000,062 has been pending for 42 months[15] and Reexamination No. 95/000,0049 has been pending for 46 months.[16] The fact that the '363 Patent is subject to litigation will not expedite the reexamination since 52% of the patent in *inter partes* reexamination are also subject to litigation.[17] Thus, if granted, this *inter partes* reexamination is likely to take nearly four years.

---

[12] Ex. E, *Inter Partes Reexamination Filing Data*, U.S. Patent & Trademark Office, March 31, 2008 ("March 31, 2008 Filing Data").

[13] *Id*.

[14] *Id*.

[15] Ex. F, Bibliographic Data for Reexamination No. 95/000,062, U.S. Patent and Trademark Office, June 13, 2008.

[16] Ex. G, Bibliographic Data for Reexamination No. 95/000,049, U.S. Patent and Trademark Office, June 13, 2008.

[17] Ex. E, March 31, 2008 Filing Data.

Further, an appeal of any reexamination decision could add two or more years to the stay. At least one court has noted that it already takes up to five years from the filing of an *inter partes* reexamination to complete an appeal to the Board of Patent Appeals and Interferences ("BPAI"), and those reexams pre-date the spike in *inter partes* filings.[18]  An appeal to the BPAI would result in a total reexam period of up to **eight** years.[19]  It is impossible to know how much time an appeal to the Federal Circuit would add because no *inter partes* reexam has **ever** received an appealable final decision of the BPAI.[20]  Because either party may appeal an *inter partes* reexamination decision, it is likely that BondDesk would appeal a decision confirming the '363 Patent's claims—further increasing the delay of this case.[21]

Even if there is no appeal, the reexamination process is still likely to take much longer than the litigation.  Time to trial in this Court is approximately 28 months from filing.[22]  Wall Corp. filed its complaint six months ago and has already proposed a trial date of November 30, 2009 to BondDesk.[23]  If the stay is denied, the litigation may be over two years before the PTO completes the first stage of reexamination.  If a stay is granted, a trial in this case may not occur

---

[18] *Network Appliance Inc. v. Sun Microsystems Inc.*, No. C-07-06053 EDL, 2008 WL 2168917, at *5-6 (N.D. Cal. May 23, 2008) (denying stay for *inter partes* reexamination and allowing discovery to go forward where no office actions had issued).

[19] Ex. I, at 5, *Reexamining Inter Partes Reexam*, Institute for Progress, 2008, *available at* http://www.iam-magazine.com/blog/IAMBlogInterPartesReexamWhitepaper.pdf.

[20] Ex. I, at 4.

[21] Ex. I, at 4 (one-quarter of all *inter partes* reexamination decisions are appealed).

[22] Ex. J, *U.S. District Courts—Median Time Intervals from Filing to Trial of Civil Cases in Which Trials were Completed, by District, During 12-Month Period Ending September 30, 2007, available at* http://www.uscourts.gov/judbus2007/appendices/C10Sep07.pdf.

[23] Ex. B, Letter of April 16, 2008, at 8.

for nearly *seven years*. Where litigation is likely to be completed before the reexamination, the litigation should not be stayed.[24]

### 2.    Delaying Discovery and Trial Will Prejudice Wall Corp. and Create a Tactical Advantage for BondDesk.

If litigation is stayed in deference to BondDesk's request for reexamination, a four or five year delay in discovery will severely prejudice Wall Corp. With such an extended delay, documents will be lost, witnesses' memories will fade, and witnesses may become unavailable.[25] A delay in commencing discovery will prejudice Wall Corp. and creates an overwhelming tactical advantage for BondDesk.[26] Wall Corp. bears the burden of proving infringement, and it will suffer the most from the deterioration of the evidentiary record on the accused products. Such prejudice to Wall Corp. is exactly what BondDesk seeks.

Additionally, a delay of trial in this case will prejudice Wall Corp. by making it wait to collect infringement damages. BondDesk claims that a delay in collecting damages will not harm Wall Corp. But, if BondDesk is successful with its ploy to delay this case, it may be six years until this Court renders a decision. Wall Corp. will not receive any royalty payments for BondDesk's infringement during this period. There are no guarantees that BondDesk will even be solvent six years from now or that the technology at issue will still be in use. It is commonplace to find examples of firms in the financial service industry, like BondDesk, that

---

[24] *Cognex Corp.,* 2001 WL 34368283, at *2 ("Thus, given the current time tables for action in the PTO, the Court believes that the trial in this case will likely be completed prior to any action by the PTO.").

[25] *Gladish v. Tyco Toys, Inc.,* No. S-92-1666WBS/JFM, 1993 WL 65509 (E.D. Cal. Sept. 15, 1993) (finding stay would unduly prejudice non-movant because witnesses may become unavailable, their memories may fade, and evidence may be lost while PTO reexamination takes place); *see also Network Appliance Inc.,* 2008 WL 2168917, at *5 ("lapse of time during [*inter partes*] reexamination could result in the loss of evidence over time").

[26] *Tex. MP3 Techs., Ltd. v. Samsung Elecs. Co., Ltd.,* No. 2:07-CV-52, 2007 WL 3219372, at *1 (E.D. Tex. Oct. 30, 2007).

have vanished, leaving their creditors holding the bag.  A stay will prejudice Wall Corp. by preventing it from recovering the royalties to which it is entitled.[27]

Furthermore, a stay will effectively prevent an inventor of the '363 Patent, Dr. Charles Fefferman,[28] a Fields Medal-winning mathematician, and the other owners of Wall Corp., from enforcing the patent against other infringers for most of the patent's term.  Co-inventors Dr. Fefferman, a Fields Medal-winning mathematician, and Dr. Webster Hughes filed the application for this patent in 2000.  A five to seven year stay will result in nearly half the patent's term expiring before enforcement begins.   At that point, the '363 Patent's inventors will have already waited fifteen years to benefit from the fruits of their labor.

Based on the prejudice suffered by plaintiffs as a result of an extended delay, motions to stay for an *inter partes* reexamination are frequently denied.[29] Congress intended reexaminations to be expedient and referred to when practical.[30]   A five-year delay in commencing discovery and seven-year delay in resolving this case will be neither expedient nor practical.[31]   Thus, BondDesk's motion to stay for the *inter partes* reexamination should be denied.

### 3 .    BondDesk Has Not Demonstrated Hardship In Continuing Litigation.

"It is well settled that before a stay may be issued, the petitioner must demonstrate 'a clear case of hardship or inequity,' if there is 'even a fair possibility' that the stay would work

---

[27] *Telemac Corp. v. Teledigital, Inc.*, 450 F. Supp. 2d 1107,  1111 (N.D. Cal. 2006).

[28] Ex. K, Charles L. Fefferman, *available at* http://www.math.wm.edu/~klsmit/fefferman.pdf.

[29] *Network Appliance Inc.*, 2008 WL 2168917, at *5-6; *see also Cooper Techs. Co. v. Thomas & Betts Corp.*, No. 2:06-CV-242, 2008 WL 906315, at *2 (E.D. Tex. March 31, 2008); *see also Genoa Color Techs., Ltd. v. Samsung Elecs. Am., Inc.*, No. 6233 (PKC), 2008 WL 754681, at *1 (S.D.N.Y. March 12, 2008).

[30] *eSoft, Inc. v. Blue Coat Systems, Inc.*, 505 F. Supp. 2d 784, 787 (D. Col. 2007).

[31] *See Network Appliance Inc.*, 2008 WL 2168917, at *5.

damage on another party."[32]   As shown above, there is a high probability that Wall Corp. will

suffer irreparable harm from a stay.[33]   Further, BondDesk has failed to demonstrate what

hardship it would have to endure if this case is allowed to proceed.  It is unlikely that BondDesk

could present a clear case of hardship.  Indeed, the dual track of litigation and reexamination is

not a hardship.[34]

C.    IT IS NOT AT ALL CLEAR WHETHER A REEXAMINATION WILL SIMPLIFY THE ISSUES.

BondDesk's arguments that reexamination will simplify issues for this case are wrong.

The PTO statistics that BondDesk trumpets in support of a stay are dubious.  BondDesk's claim

that 82% of *inter partes* reexaminations result in cancellation of all claims is based on only

*eleven* reexamination certificates.[35]   These eleven reexaminations are statistically insignificant

given the 390 *inter partes* reexamination requests filed with the PTO.[36]   Such unreliable statistics

provide no basis for a prediction that the reexamination will "very likely" eliminate the need for

trial.[37]   Furthermore, these statistics do not account for the results of appeals of the PTO's

decisions, adding to their unreliability.

In reality, BondDesk has no idea what the PTO will decide.[38]   The PTO has not even

issued a formal office action specifying the basis of the reexamination.  Without knowing the

---

[32] *Gold v. Johns-Manville Sales Corp.*, 723 F.2d 1068, 1075-1076 (3rd Cir. 1983); *see also Voith Paper GMBH & Co. KG v. Johnsonfoils, Inc.* No. 07-226-JJF, 2008 WL 874311, at *2 (D. Del. March 31, 2008) (denying stay for reexamination where movant failed to show a clear case of hardship or inequity).

[33] *See supra* pp. 3-7.

[34] *Genoa Color Techs., Ltd,.* 2008 WL 754681, at *1.

[35] Ex. H, *Inter Partes Reexamination Filing Data*, U.S. Patent & Trademark Office, September 30, 2007.

[36] Ex. E, March 31, 2008 Filing Data.

[37] *Network Appliance Inc.*, 2008 WL 2168917, at *3.

[38] *Texas MP3 Techs., Ltd.*, 2007 WL 3219372, at *2; *Cooper Techs. Co.*, 2008 WL 906315, at *1.

8

PTO's reasoning, BondDesk is merely speculating on whether the reexamination will have any impact of the present district court action, and if so, to what degree. All the claims could just as easily be confirmed as cancelled.[39] If all or some of the claims are confirmed, the *inter partes* reexamination will not have simplified the case and a stay will only have served BondDesk's interest in delay.

In fact, at least some, if not all, the claims of the '363 Patent are very likely to survive BondDesk's reexamination attempt. The PTO is required to determine validity on a claim-by-claim basis.[40] Wall Corp. is currently asserting at least fourteen distinct claims of the '363 Patent against BondDesk. Thus, the likelihood that the PTO would invalidate all fourteen asserted claims of the '363 Patent is more remote than BondDesk suggests.

The weaknesses in BondDesk's reexamination request further reduce the probability of invalidating all the asserted claims. To make its case, BondDesk has found it necessary to cite thirteen references in eleven separate combinations,[41] meaning that none individually is invalidating. Several of these references cannot qualify as competent prior art under 35 U.S.C. § 102 and cannot be used to invalidate the '363 Patent.[42] U.S patents are prior art as of their earliest filing date—the priority date.[43] Two of the patents cited by BondDesk, U.S. Patent Nos. 7,222,089 and 7,333,952, are not prior art because their priority dates are *after* the priority date of the '363 Patent, December 29, 1999.[44] Additionally, BondDesk attempts to assert an

---

[39] *Cooper Techs. Co.*, 2008 WL 906315, at *1.
[40] *See* Manual of Patent Examining Procedure § 2673.02
[41] *See* Ex. L, Request for *Inter Partes* Reexamination, at 1-2, v-vi ("Reexam Request").
[42] *See* 35 U.S.C. §102.
[43] 35 U.S.C. §102(e).
[44] *See* Ex. L, Reexam Request, at 1, 35 (U.S. Patent No. 7,222,089, priority date of Sept. 11, 2000 and U.S. Patent No. 7,333,952, priority date of June 23, 2000).

unpublished reference against the '363 Patent,[45] but a reference must be published to qualify as prior art.[46] The *BondExchange Manual* was never published and is not prior art to the '363 Patent.[47]

BondDesk's alleged prior art evidence includes references other than prior art patents or printed publications, which are incompetent as prior art in *inter partes* reexamination.[48] Therefore, the PTO simply does not have the authority to consider BondDesk's evidence in determining the patentability of the '363 Patent's claims.[49]

BondDesk is grasping at straws to convince the PTO to reexamine the '363 Patent in hopes of delaying this case. The fact that BondDesk's reexamination request is a 900-page, disorganized submission also means that it will take much longer than normal for an examiner to plow through it. This is likely what BondDesk intended—delay.

It is speculative whether BondDesk's reexamination request will simplify the issues in this case.[50] This uncertainty weighs against a stay.[51] Thus, this factor should not outweigh the obvious prejudice the lengthy stay would cause Wall Corp.[52]

### D.    DEFENDANTS' REFUSAL TO BEGIN DISCOVERY WEIGHS AGAINST A STAY.

BondDesk's argument that the case should be stayed because discovery has not begun, has no merit. But for BondDesk's refusal, discovery would have started two months ago. Wall Corp. offered to begin discovery on April 16, 2008 and sent BondDesk a proposed schedule,

---

[45] Ex. L, Reexam Request, at 68-69
[46] 35 U.S.C. §102; *see In re Cronyn*, 890 F.2d 1158, 1160-1161 (Fed. Cir. 1989).
[47] *See* Ex. L, Reexam Request, at 68-69; *see In re Cronyn*, 890 F.2d at 1160-1161.
[48] *See* Ex. L, Reexam Request, at 68-69.
[49] Manual of Patent Examining Procedure § 2616.
[50] *Cooper Techs. Co.*, 2008 WL 906315, at *1-2.
[51] *Id.*
[52] *Id.* at *2.

discovery order, and protective order.[53]    BondDesk flatly refused to hold a discovery conference.[54]    BondDesk should not be allowed to take advantage of its refusal to submit to discovery as a basis for staying discovery.[55]    Other courts have held that discovery, while a reexamination is pending puts no great burden on the parties.[56]

Furthermore, BondDesk wrongly asserts that the parties have not expended substantial resources in this case because discovery has not begun.  This case was filed nearly six months ago.[57]    Wall Corp. has already conducted an extensive infringement investigation of BondDesk, prepared an infringement analysis, collected documents, and sent representatives from Texas to New York twice for settlement discussions.[58]    Wall Corp. has invested about 600 attorney hours and $68,000 in expenses into this case.[59]    Even when no documents have been produced and no trial date has been set, the stage of the case only slightly favors a stay where parties have obviously expended considerable resources.[60]    Thus, the stage of this case should not outweigh the prejudice that a stay would cause Wall Corp.

## V.

### CONCLUSION

BondDesk's motion for stay is premature because the PTO has not yet determined whether it will reexamine the '363 Patent.  Even if the reexamination request is granted, Wall Corp. will be greatly prejudiced by the five-year delay that would result from any litigation stay in favor of *inter partes* reexamination.  BondDesk has failed to demonstrate that a stay is

---

[53] Ex. B, Letter of April 16, 2008.
[54] Ex. C, Letter of April 17, 2008.
[55] *Telemac Corp. v. Teledigital, Inc.*, 450 F.Supp. 2d 1107, 1111 (N.D. Cal. 2006).
[56] *See, e.g.*, *Genoa Color Techs., Ltd*, 2008 WL 754681, at *1.
[57] Plaintiff's Original Complaint (D.I. 1).
[58] Ex. A, Shore Decl., at ¶3.
[59] Ex. A, Shore Decl., at ¶4, 5.
[60] *Network Appliance Inc.*, 2008 WL 2168917, at *2.

necessary or that it will be harmed by continuing this action while the PTO decides whether to entertain BondDesk's request.  For the foregoing reasons, Wall Corp. respectfully requests that Court deny BondDesk's motion.

Dated:  June 20, 2008          **YOUNG CONAWAY STARGATT & TAYLOR, LLP**

                    ___*/s/ Karen E. Keller*_____
                    John W. Shaw (No. 3362)
                    Karen E. Keller (No. 4489)
                    The Brandywine Building
                    1000 West Street, 17th Floor
                    Wilmington, Delaware 19801
                    (302) 571-6600
                    jshaw@ycst.com
                    kkeller@ycst.com

OF COUNSEL:

Michael W. Shore, Esquire
Alfonso Garcia Chan, Esquire
Patrick Traister, Esquire
SHORE CHAN BRAGALONE LLP
325 North Saint Paul Street
Suite 4450
Dallas, Texas 75201
(214) 593-9110

**EXHIBIT A**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **WALL CORPORATION** | § | |
| **Plaintiff,** | § | |
| | § | |
| **VS.** | § | **C.A. NO. 07-844 (GMS)** |
| | § | |
| **BONDDESK GROUP, L.L.C. and** | § | |
| **BONDDESK TRADING, L.L.C.** | § | |
| **Defendants** | § | |

---

## DECLARATION OF MICHAEL W. SHORE

---

1.      My name is Michael W. Shore.  I am over the age of 21 and am competent to make this declaration.  All of the statements set forth herein are true and correct and are based on my personal knowledge.

2.      I am the managing partner of Shore Chan Bragalone LLP, counsel for Wall Corporation in the above-referenced matter.

3.      Wall Corporation has expended significant financial resources preparing and prosecuting this case.  Since being retained by Wall Corporation to enforce U.S. Patent No. 7,231,363, attorneys and staff at Shore Chan Bragalone have, among other things, performed extensive infringement investigations of Defendants' electronic trading system, attended a conference on trading technology, prepared infringement and validity analyses, retained experts, traveled to New Jersey and North Carolina to collect documents and interview witnesses, and twice traveled from Texas to New York for settlement discussions with Defendants.

4.      My associates inform me that they estimate about 600 hours of attorney time has already been expended on this case.

**DECLARATION OF MICHAEL W. SHORE – Page 1**

5.      Additionally, my staff informs me that Wall Corporation has incurred about $68,000 in expenses in this case to date.

6.  I participated in settlement negotiations with the Defendants.  In-person settlement discussions between Wall Corporation and Defendants occurred on March 5, 2008 and April 11, 2008 in New York, New York.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 19th day of June, 2008.

/s/ Michael W. Shore
Michael W. Shore

DECLARATION OF MICHAEL W. SHORE – Page 2

**EXHIBIT B**

# SHORECHAN
# BRAGALONE LLP

Patrick A. Traister
Republic Center
325 North Saint Paul St., Suite 4450
Dallas, Texas 75201
214.593.9116 Direct Dial
214.593.9111 Facsimile
ptraister@shorechan.com

April 16, 2008

Ms. Rita Lin
Mr. Mark Jacobs
Morrison & Foerster LLP
425 Market Street
San Francisco, CA 94105

Ms. Mary Graham
Morris, Nichols, Arsht & Tunnell LLP
Chase Manhattan Centre, 18th Floor
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347

   RE: *Wall Corporation vs. BondDesk Group, L.L.C., et al.*, No. 07-844
      District of Delaware

Dear Counselors:

   Wall Corporation requests that counsel of record be available to meet and confer pursuant to Rule 26(f) on April 17, 2008 at 10:00 a.m. EDT. If 10:00 a.m. is not convenient, please propose an alternative time between 12:30 p.m. EDT and 3:30 p.m EDT. In the event that you are not available on April 17, please provide alternative dates and times as soon as possible.

   Additionally, enclosed for discussion are Wall Corporation's drafts of the Joint Status Report, Protective Order, and Electronic Discovery Order.

   We look forward to receiving your response.

Sincerely,

Patrick A. Traister

PAT:cj

cc: Karen Keller, Esq.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

WALL CORPORATION                )
                                )
            Plaintiff,           )
                                )
v.                              )          C.A. NO. 07-844
                                )
BONDDESK GROUP, L.L.C., AND      )
BONDDESK TRADING, L.L.C.,        )
                                )
            Defendants.          )

## [PROPOSED] JOINT STATUS REPORT

Pursuant to Fed. R. Civ. P. 26(f) and 16 and in anticipation of the Court issuing a Notice of Scheduling Conference, counsel for Wall Corporation ("Wall Corp.") and counsel for BondDesk Group, L.L.C. and BondDesk Trading, L.L.C. (collectively "BondDesk") submit this Joint Status Report in preparation for the Status and Scheduling Conference.

### I.    JURISDICTION AND VENUE

The parties agree that the Court has jurisdiction over the subject matter of, and the parties to, this action. No additional parties remain to be served. No party is contesting venue.

### II.    SUBSTANCE OF ACTION

Plaintiff Wall Corp. filed this action on December 26, 2007 against defendants BondDesk Group and BondDesk Trading charging the defendants with willful infringement of United States Patent No. 7,231,363 (the "'363 Patent").

1

Wall Corp. claims that certain BondDesk systems and products infringe the '363 Patent. The accused BondDesk systems and products include BondDesk's Alternative Trading System, Liaison Workstation, Trader Workstation, and Advisor Workstation.

BondDesk filed an Answer and Counterclaims on April 11, 2008. BondDesk denies it has infringed the '363 Patent and asserts counterclaims alleging that the '363 Patent is invalid and not infringed.

Wall Corp. filed a Reply to BondDesk's Answer and Counterclaims on April 18, 2008 contesting each and every counterclaim.

### III.    IDENTIFICATION OF ISSUES

To the extent known and understood at this early stage in the proceedings, the principal factual and legal issues in dispute in this matter are typical of those in most patent cases and include the following:

a.  infringement of the asserted claims of the '363 Patent;

b.  validity of the asserted claims of the '363 Patent;

c.  the defenses set forth in BondDesk's Answer and Counterclaims as summarized in section II above;

d.  the amount of damages should BondDesk be found liable;

e.  injunctive relief should BondDesk be found liable; and

f.  any further relief, including, without limitation, an award of attorneys' fees and costs under, *inter alia*, 35 U.S.C. § 285.

### IV.    NARROWING OF ISSUES

#### A. Can the issues in litigation be narrowed by agreement or by motions?

At the present time, the parties are unable to narrow the issues in litigation by agreement.

2

**B. Are there dispositive or partially dispositive issues appropriate for decision on motion?**

At the present time, the parties have not identified any dispositive or partially dispositive issues for decision on motion prior to discovery.

## V.    RELIEF

### A. What specific relief does plaintiff seek?

Wall Corp. seeks a permanent injunction, prohibiting BondDesk's continued infringement of the '363 Patent. Wall Corp. further seeks damages amounting to a reasonable royalty for infringement of its patent, trebled or increased damages due to BondDesk's willful infringement of Wall Corp.'s patent, and pre- and post-judgment interest on its damages awards. Wall Corp. also seeks an award of its attorneys' fees, costs, and expenses. In the event the Court does not, after a finding of infringement, issue a permanent injunction, Wall Corp. will ask for a compulsory royalty of the revenue, both direct and indirect, attributable to BondDesk's infringement of the '363 Patent.

### B. What is the amount of damages sought and generally how is it computed?

Based upon the limited information currently available, Wall Corp. believes that the factors expressed in *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970), *modified*, 446 F.2d 295 (2d Cir. 1971), *cert. denied*, 404 U.S. 870 (1971), as well as customary royalties in the applicable field call for a reasonable royalty on past income attributable to BondDesk's use of the '363 Patent. Wall Corp. seeks past damages in the form of a reasonable royalty as applied to each infringing product and/or process made, sold, offered for sale, used, or imported into the

3

United States, either directly or indirectly, by BondDesk. The same analysis would apply to future compulsory royalties should the Court determine that Wall Corp. has not, after a finding of infringement, demonstrated itself entitled to a permanent injunction.

## VI.    AMENDMENT OF PLEADINGS

The parties are not aware of an amendments needed to the pleadings at this time, but reserve the right to amend their pleadings by stipulation and/or leave of the Court should the need arise.

## VII.    JOINDER OF PARTIES

The parties are not aware of any additional parties that need to or should be joined in this action at this time, but reserve the right to join additional parties by stipulation and/or leave of the Court should the need arise. Wall Corp. believes it is likely that some of BondDesk's "clients" who extensively utilize BondDesk's infringing systems as a "captive provider" could be added as parties in the future.

## VIII.    DISCOVERY

### A. Discovery contemplated by each party and the amount of time it may take to complete discovery?

Discovery related to infringement issues in this case will likely be directed to the design, specifications, functions, implementation, and uses of the accused products, systems, and processes. The discovery will include electronically stored information discovery of the source code of BondDesk's accused instrumentalities. Discovery will likely be directed to BondDesk as well as third-party users of the accused products, systems, and processes. Damages discovery will include extensive third party discovery, including subpoenas and depositions in multiple other jurisdictions.

Discovery related to the patent validity issues will likely be directed to the conception and reduction to practice of the inventions disclosed in the '363 Patent and the prosecution of the applications that resulted in the '363 Patent before the U.S. Patent and Trademark Office.

Discovery related to the damages issues in this case will likely be directed to the parties' licensing experience, practices, strategies, and interactions between the parties, as well as to records reflecting the manufacture, use, sales, and offers for sale of the accused instrumentalities and BondDesk's revenues and profits from those activities.

As for the amount of time it may take to complete discovery, see the proposed schedule set forth in Section XII.

### B. Can discovery be limited?

At the present time, the parties do not believe that discovery should be limited beyond the limits already included in the Federal Rules of Civil Procedure.

### C. Are there less costly and time-consuming methods available to obtain necessary information?

The parties do not believe that other less costly or time consuming methods are available for the exchange of discovery materials. Except that electronically stored information should be produced in native format, resulting in decreased costs for discovery.

## IX.    ESTIMATED TRIAL LENGTH

### A. Is it feasible or desirable to bifurcate issues for trial?

The parties agree that it may be premature to address the order or structure of the trial at this early stage. Wall Corp. respectfully requests one (1) trial day for jury

selection and its opening statement, four (4) trial days for its case in chief, and two (2) trial days for rebuttal and closing.

**B. Is it possible to reduce the length of the trial by stipulation, use of summaries or statements, or other expedited means of presenting evidence?**

The parties will work together on ways to reduce the length of trial to the extent possible. At this early stage, it is premature to identify all the means the parties may utilize to accomplish this goal. But Wall Corp. intends to extensively use requests for admissions to reduce the amount of time required for trial.

**X.    JURY TRIAL**

Wall Corp. demands a jury trial on all issues so triable.

**XI.    SETTLEMENT**

**A. Have there been settlement discussions?**

The parties have engaged in two rounds of settlement discussions to try to reach a resolution of their disputes. The parties anticipate having further discussions, however no settlement has been reached at this time.

**B. What are the prospects for settlement?**

To date, the parties have been unable to resolve their differences. Based upon the parties' current positions, settlement does not appear to be imminent.

**D. Is referral to the Magistrate for mediation or other ADR mechanism appropriate?**

The parties believe that discussing settlement before the Magistrate Judge and/or a mediator would be appropriate after the parties have had the opportunity to take some discovery.

## XII.   OTHER MATTERS

### A.  Protective Order

Because confidential information will have to be exchanged in this action, the parties agree that a protective order will be necessary. Further, the parties have agreed to the form of such order and will submit the protective order to the Court in a separate motion.

### B.  Electronic Discovery Order

Because discovery of electronically stored information will be necessary the parties agree that an electronic discovery order will be necessary.  The parties have agreed to the form the electronic discovery order and will submit it to the Court in a separate motion.

### C.  Scheduling

The parties propose the following schedule for this case:

| Date | TASK |
| --- | --- |
| 4/17/08 | Rule 26(f) Conference |
| 5/2/08 | File Joint Report on 26(f) Conference |
| 5/2/08 | Exchange of Rule 26(a)(1) initial disclosures |
| 7/1/08 | Deadline to join other parties and amend pleadings |
| 7/22/08 | Exchange List of disputed claim terms |
| 8/1/08 | Deadline to inform plaintiff if relying on advice of counsel defense to willful infringement and produce opinions of counsel |
| 8/8/08 | Exchange proposed definitions for disputed claim terms |
| 8/22/08 | Parties meet and confer regarding disputed terms |
| 9/8/08 | Submission of joint claim chart |
| 9/8/08 | File claim construction briefs |
| 9/22/08 | File answering claim construction briefs |
| Week of 10/22/08 | Proposed date for Markman hearing |
| 4/15/09 | Close of fact discovery |
| 5/1/09 | Designation of experts |

| 5/1/09 | Serve expert reports on issues which parties bear burden of proof |
| 6/1/09 | Responsive expert reports |
| 6/11/09 | Reply expert reports |
| 7/10/09 | Close of expert discovery |
| 8/14/09 | Deadline to seek leave and file summary judgment motions |
| 9/1/09 | Joint agenda identifying *Daubert* issues |
| 10/15/09 | File motions in limine |
| 9/1/09 | Drafts of pretrial order |
| 9/15/09 | Responses to draft pretrial orders |
| 10/1/09 | Proposed pretrial order |
| 10/30/09 | Pre-trial conference |
| Week of 11/30/09 | Proposed Trial Date |

### D. Discovery Matters

The parties propose the following discovery terms:

(1) Each side should be permitted 70 hours of on-the-record deposition time, excluding deposition of experts; and

(2) Each side should be permitted to serve up to 50 interrogatories, including discrete subparts.

### XIII.  STATEMENT THAT COUNSEL HAVE CONFERRED ABOUT EACH OF THE ABOVE MATTERS

Counsel for the parties have conferred about each of the agenda items set forth above.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WALL CORPORATION | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. NO. 07-844 |
| | ) | |
| BONDDESK GROUP, L.L.C., AND | ) | |
| BONDDESK TRADING, L.L.C., | ) | |
| | ) | |
| Defendants. | ) | |

## [PROPOSED] PROTECTIVE ORDER

### Proceedings and Information Governed

1.      This Order ("Protective Order") is made under Fed. R. Civ. P. 26(c). It governs any document, information, or other thing furnished by any party to any other party, and it includes any non-party who receives a subpoena in connection with this action. The information protected includes, but is not limited to: answers to interrogatories; answers to requests for admission; responses to requests for production of documents; deposition transcripts and videotapes; deposition exhibits; and other writings or things produced, given or filed in this action that are designated by a party as "Confidential Information" or "Confidential Outside Attorney Eyes Only Information" in accordance with the terms of this Protective Order, as well as to any copies, excerpts, abstracts, analyses, summaries, descriptions, or other forms of recorded information containing, reflecting, or disclosing such information.

### Designation and Maintenance of Information.

2.      For purposes of this Protective Order, (a) the "Confidential Information" designation means that the document is comprised of trade secrets or commercial information that is not publicly known and is of technical or commercial advantage to its possessor, in accordance with Fed. R. Civ. P. 26(c)(7), or other information required by law or agreement to

be kept confidential and (b) the "Confidential Outside Attorney Eyes Only" designation means that the document is comprised of information that the producing party deems especially sensitive which may include, but is not limited to, confidential research and development, financial, technical, marketing, any other sensitive trade secret information, or information capable of being utilized for the preparation or prosecution of a patent application dealing with such subject matter. Confidential Information and Confidential Outside Attorney Eyes Only Information does not include, and this Protective Order does not apply to, information that is already in the knowledge or possession of the party to whom disclosure is made unless that party is already bound by agreement not to disclose such information, or information that has been disclosed to the public or third persons in a manner making such information no longer confidential.

   3.  Documents and things produced during the course of this litigation within the scope of paragraph 2(a) above, may be designated by the producing party as containing Confidential Information by placing on each page and each thing a legend substantially as follows:

**CONFIDENTIAL INFORMATION**
**SUBJECT TO PROTECTIVE ORDER**

   Documents and things produced during the course of this litigation within the scope of paragraph 2(b) above may be designated by the producing party as containing Confidential Outside Attorney Eyes Only Information by placing on each page and each thing a legend substantially as follows:

**CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER**

   A party may designate information disclosed at a deposition as Confidential Information or Confidential Outside Attorney Eyes Only Information by requesting the reporter to so

designate the transcript or any portion of the transcript at the time of the deposition. If no such designation is made at the time of the deposition, any party will have fourteen (14) calendar days after the date of the deposition to designate, in writing to the other parties and to the court reporter, whether the transcript is to be designated as Confidential Information or Confidential Outside Attorney Eyes Only Information. If no such designation is made at the deposition or within this fourteen (14) calendar day period (during which period, the transcript must be treated as Confidential Outside Attorney Eyes Only Information, unless the disclosing party consents to less confidential treatment of the information), the entire deposition will be considered devoid of Confidential Information or Confidential Outside Attorney Eyes Only Information. Each party and the court reporter must attach a copy of any final and timely written designation notice to the transcript and each copy of the transcript in its possession, custody or control, and the portions designated in such notice must thereafter be treated in accordance with this Protective Order. It is the responsibility of counsel for each party to maintain materials containing Confidential Information or Confidential Outside Attorney Eyes Only Information in a secure manner and appropriately identified so as to allow access to such information only to such persons and under such terms as is permitted under this Protective Order.

**Qualified Persons.**

4.    "Qualified Persons," as used herein means:

(a)    Outside Counsel for the parties in this litigation and employees of such attorneys to whom it is necessary that the material be shown for purposes of this litigation. Such outside counsel shall be limited to law firms that are outside counsel and who have made, or make, a formal appearance in this litigation.

(b)    Actual or potential independent experts who have been designated in writing by notice to all counsel prior to any disclosure of "Confidential" or "Outside Counsel's Eyes Only"

**PROTECTIVE ORDER – Page 3**

information to such persons or consulting experts, and who have signed **Exhibit A** hereto and thereby agreeing to be bound by the terms of this Protective Order and qualified pursuant to paragraph 12 of this Protective Order.

**Computer Code, Including Executable and Source Code.**

5.    Notwithstanding anything herein to the contrary, any source code produced will be an authentic copy and may not be copied, transmitted, used or accessed by Plaintiffs except as described in this section. A receiving party may copy the source code of a producing party into the hard drive and/or into the RAM of up to three stand-alone (e.g., neither networked nor connected to the Internet) computers (the locations of such computers will be disclosed to the producing party) for the purposes of conducting analyses of the source code, but not otherwise copied except to make "excerpts" as described below. Source code shall be handled as follows:

(a)    Source code may be used by Qualified Persons as set forth in paragraph 4 above and each of which have agreed to be bound by this Protective Order and clerical staff solely for the purposes of this litigation. Said source code is to be kept secure throughout the litigation by means of being stored on the stand-alone computer where it resides, with access to said source code limited to those persons designated under this Protective Order as having access to said source code.

(b)    With the exception of transitory copies created in the RAM or other internal operating circuitry of a computer, a producing Party's source code or portions thereof ("Source Code Excerpts") shall be copied onto paper or electronic media only for the purposes of and to the extent necessary for creating submissions to the Court or for presentation to the Court at the hearings or at trial. Once having been made, all such copies of a producing party's Source Code Excerpts shall be marked as "Outside Counsel's Eyes Only" in the name of the producing party, and shall only be filed under seal.

**PROTECTIVE ORDER – Page 4**

(c)     Within 60 days of the conclusion of the litigation the original produced version must be returned to the producing party and all copies of the source code must be verified as completely erased and obliterated from the corresponding storage media.

(d)     This provision does not govern source code produced or produced to outside counsel for any Defendants in this action by any other defendant or by a producing third party. Defendants will submit a separate protective order to this Court governing the use of any source code produced or provided amongst the Defendants or by third parties to this litigation. Any produced source code designated as "Outside Counsel's Eyes Only" and produced under this Protective order may not be copied, transmitted, used or accessed by Defendants' Qualified Persons in section 4 above prior to the entry of such separate protective order.

(e)     Producing party will identify the programming language(s) used in any source code that it is producing. Once the languages have been identified, the receiving party will be better able to determine which software tools or programs it will need to view the source code.

(f)     Producing party will identify any and all software tools and software programs that are used by the authors of the source code.

(g)     Producing party will inform receiving party if any files are compressed, encrypted or otherwise modified, and identify the proper decompressing or unzipping software to open and extract the compressed files.

**Inadvertent Production of Privileged Materials and Failure to Designate.**

6.     It is agreed that inadvertent production of materials subject to the attorney-client privilege or work-product immunity does not waive the attorney-client privilege or work-product immunity with respect to such production or with respect to other materials or information referred to in the materials produced if a request for return of such materials is made promptly after the disclosing party learns of its inadvertent production. Nothing in this paragraph shall

**PROTECTIVE ORDER – Page 5**

prejudice the right of any party to seek discovery of communications, documents, electronically stored information, and things as to which a claim of privilege has been made. Upon receiving a notification of inadvertent disclosure and request for return of inadvertently disclosed materials, the receiving party shall immediately return the inadvertently disclosed materials, without further review of those materials, and without prejudice to the right to subsequently challenge the claim of privilege as to those inadvertently disclosed materials. Within 5 (five) business days of the return of the inadvertently disclosed materials, the party who sought the return shall provide the receiving party with a privilege log identifying with reasonable specificity the inadvertently disclosed materials that contains the following information: (1) an aggregate listing of the numbers of the withheld documents; (2) an identification of the time periods encompassed by the withheld documents; (3) a declaration containing the representation(s) that: (a) the withheld documents were: (i) either prepared to assist in anticipated or pending litigation, or (ii) contain information reflecting communications between counsels or counsels' representatives, and the party seeking the return or such party's representatives, for the purpose of facilitating the rendition of legal services to such party; and, (b) intended to be confidential communications.

The inadvertent failure to designate or withhold any information as confidential or privileged will not be deemed to waive a later claim as to its confidential or privileged nature, or to stop the producing party from designating such information as confidential at a later date in writing and with particularity. The information must be treated by the receiving party as confidential from the time the receiving party is notified in writing of the change in the designation.

**Challenge to Designations.**

7.     A receiving party may challenge a producing party's designation at any time. Any receiving party disagreeing with a designation may request in writing that the producing party

**PROTECTIVE ORDER – Page 6**

change the designation. The producing party will then have five (5) business days after receipt of challenge notice to advise the receiving party whether or not it will change the designation. If the parties are unable to reach agreement after the expiration of this five (5) business day timeframe, and after the conference required under Fed. R. Civ. P. 37(a)(1) and L.R. 7.1.1, the receiving party may at any time thereafter seek an order to alter the confidential status of the designated information. Until any dispute under this paragraph is ruled upon by the presiding judge, the designation will remain in full force and effect, and the information will continue to be accorded the confidential treatment required by this Protective Order.

**Disclosure and Use of Confidential Information.**

8.    Information designated as Confidential Information or Confidential Outside Attorney Eyes Only Information may only be used for purposes of preparation, trial, and appeal of this action. Confidential Information or Confidential Outside Attorney Eyes Only Information may not be used under any circumstances for prosecuting any patent application, for patent licensing, or for any other purpose.

9.    Subject to paragraph 10 below, Confidential Information may be disclosed by the receiving party only to the following individuals, provided that such individuals are informed of the terms of this Protective Order: (a) three (3) employees of the receiving party (or in the alternative, up to two contractors in place of two employees) who are required in good faith to provide assistance in the conduct of this litigation, including any settlement discussions, and who are identified as such in writing to counsel for the designating party in advance of the disclosure; (b) outside counsel for the receiving party; (c) supporting personnel employed by (b), such as paralegals, legal secretaries, data entry clerks, legal clerks, and private photocopying services; (d) experts or consultants; and (e) any persons requested by counsel to furnish services such as document coding, image scanning, mock trial, jury profiling, translation services, court reporting

**PROTECTIVE ORDER – Page 7**

services, demonstrative exhibit preparation, or the creation of any computer database from documents.

10.    Subject to paragraph 11 below, Confidential Outside Attorney Eyes Only Information may be disclosed by the receiving party only to the following individuals, provided that such individuals are informed of the terms of this Protective Order: (a) outside counsel for the receiving party; (b) supporting personnel employed by outside counsel, such as paralegals, legal secretaries, data entry clerks, legal clerks, private photocopying services; (c) experts or consultants; and (d) those individuals designated in paragraph 13(c). Such documents may also be disclosed to individuals identified on the face of the document as an author or recipient of the document, but unless such individual is otherwise permitted to receive the information, such person shall not be permitted to retain a copy of the document. Documents produced under this Protective Order shall not be produced to any other party to this litigation without the express written permission of the producing party.

11.    Further, prior to disclosing Confidential Information or Confidential Outside Attorney Eyes Only Information to a receiving party's proposed expert, consultant, or employees, the receiving party must provide to the producing party a signed Confidentiality Agreement in the form attached as **Exhibit A**, the resume or curriculum vitae of the proposed expert or consultant, the expert or consultant's business affiliation, and any current and past consulting relationships in the industry. The producing party will thereafter have ten (10) business days from receipt of the Confidentiality Agreement to object to any proposed individual. The objection must be made for good cause and in writing, stating with particularity the reasons for the objection. Failure to object within ten (10) business days constitutes approval. If the parties are unable to resolve any objection, the receiving party may apply to the presiding judge to resolve the matter. There will be no disclosure to any proposed individual during the ten (10)

**PROTECTIVE ORDER – Page 8**

business day objection period, unless that period is waived by the producing party, or if any objection is made, until the parties have resolved the objection, or the presiding judge has ruled upon any resultant motion.

12.    Counsel is responsible for the adherence by third-party vendors to the terms and conditions of this Protective Order. Counsel may fulfill this obligation by obtaining a signed Confidentiality Agreement in the form attached as **Exhibit B**.

13.    Confidential Information or Confidential Outside Attorney Eyes Only Information may be disclosed to a person who is not already allowed access to such information under this Protective Order if:

(a)    the information was previously received or authored by the person or was authored or received by a director, officer, employee or agent of the company for which the person is testifying as a designee under Fed. R. Civ. P. 30(b)(6);

(b)    the designating party is the person or is a party for whom the person is a director, officer, employee, consultant or agent; or

(c)    counsel for the party designating the material agrees that the material may be disclosed to the person. In the event of disclosure under this paragraph, only the reporter, the person, his or her counsel, the presiding judge, and persons to whom disclosure may be made and who are bound by this Protective Order, may be present during the disclosure or discussion of Confidential Information. Disclosure of material pursuant to this paragraph does not constitute a waiver of the confidential status of the material so disclosed.

**Non-Party Information.**

14.    The existence of this Protective Order must be disclosed to any person producing documents, tangible things, or testimony in this action who may reasonably be expected to desire confidential treatment for such documents, tangible things or testimony. Any such person may

**PROTECTIVE ORDER – Page 9**

designate documents, tangible things, or testimony confidential pursuant to this Protective Order.

**Sensitive Financial Information.**

15.    A party shall produce any responsive sensitive financial information to the requesting party but need not produce such information to any other party.

**Filing Documents with the Court.**

16.    If any party wishes to submit Confidential Information to the court, the submission must be filed only in a sealed envelope bearing the caption of this action and a notice in the following form:

**CONFIDENTIAL INFORMATION**
[caption]
This envelope, which is being filed under seal,
Contains documents that are subject to a Protective
Order governing the use of confidential discovery material.

**No Prejudice.**

17.    Producing or receiving confidential information, or otherwise complying with the terms of this Protective Order, will not: (a) operate as an admission by any party that any particular Confidential Information contains or reflects trade secrets or any other type of confidential or proprietary information; (b) prejudice the rights of a party to object to the production of information or material that the party does not consider to be within the scope of discovery; (c) prejudice the rights of a party to seek a determination by the presiding judge that particular materials be produced; (d) prejudice the rights of a party to apply to the presiding judge for further protective orders; or (e) prevent the parties from agreeing in writing to alter or waive the provisions or protections provided for in this Protective Order with respect to any particular information or material.

**Conclusion of Litigation.**

18.    Within sixty (60) calendar days after final judgment in this action, including the

**PROTECTIVE ORDER – Page 10**

exhaustion of all appeals, or within sixty (60) calendar days after dismissal pursuant to a settlement agreement, each party or other person subject to the terms of this Protective Order is under an obligation to destroy or return to the producing party all materials and documents containing Confidential Information or Confidential Outside Attorney Eyes Only Information, and to certify to the producing party that this destruction or return has been done. However, outside counsel for any party is entitled to retain all court papers, trial transcripts, exhibits, and attorney work provided that any such materials are maintained and protected in accordance with the terms of this Protective Order. Any party receiving Confidential Outside Attorney Eyes Only Information in the form of code under paragraph 4 shall return the production copy of the code to the producing party and completely erase (i.e., fully reformat) the storage media of the stand alone computer on which such code resides.

**Other Proceedings.**

19.    By entering this Protective Order and limiting the disclosure of information in this case, the presiding judge does not intend to preclude another court from finding that information may be relevant and subject to disclosure in another case. Any person or party subject to this Protective Order who may be subject to a motion to disclose another party's information designated Confidential pursuant to this Protective Order must promptly notify that party of the motion so that the party may have an opportunity to appear and be heard on whether that information should be disclosed.

**Remedies.**

20.    It is Ordered that this Protective Order will be enforced by the sanctions set forth in Fed. R. Civ. P. 37(b) and any other sanctions as may be available to the presiding judge, including the power to hold parties or other violators of this Protective Order in contempt. All other remedies available to any person injured by a violation of this Protective Order are fully

reserved.

21.    Any party may petition the presiding judge for good cause shown if the party

desires relief from a term or condition of this Protective Order.


Date:_____          _____
                               HONORABLE GREGORY M. SLEET
                               UNITED STATES DISTRICT JUDGE

**PROTECTIVE ORDER – Page 12**

**EXHIBIT A**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WALL CORPORATION | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. NO. 07-844 |
| | ) | |
| BONDDESK GROUP, L.L.C., AND | ) | |
| BONDDESK TRADING, L.L.C., | ) | |
| | ) | |
| Defendants. | ) | |

**CONFIDENTIALITY AGREEMENT FOR EXPERT,
CONSULTANT OR EMPLOYEES OF ANY PARTY**

I hereby affirm that:

Information, including documents and things, designated as "Confidential Information" or "Confidential Outside Attorney Eyes Only Information," as defined in the Protective Order entered in the above-captioned action ("Protective Order"), is being provided to me pursuant to the terms and restrictions of the Protective Order.

I have been given a copy of and have read the Protective Order.

I am familiar with the terms of the Protective Order and I agree to comply with and to be bound by its terms.

I submit to the jurisdiction of this Court for enforcement of the Protective Order.

I agree not to use any Confidential Information or Confidential Outside Attorney Eyes Only Information disclosed to me pursuant to the Protective Order except for purposes of the above-captioned litigation and not to disclose any of this information to persons other than those specifically authorized by the Protective Order, without the express written consent of the party who designated the information as confidential or by order of the presiding judge. I also agree to

**PROTECTIVE ORDER – Page 13**

notify any stenographic, clerical or technical personnel who are required to assist me of the terms of this Protective Order and of its binding effect on them and me.

I understand that I am to retain all documents or materials designated as or containing Confidential Information or Confidential Outside Attorney Eyes Only Information in a secure manner, and that all such documents and materials are to remain in my personal custody until the completion of my assigned duties in this matter, whereupon all such documents and materials, including all copies thereof, and any writings prepared by me containing any Confidential Information or Confidential Outside Attorney Eyes Only Information are to be returned to counsel who provided me with such documents and materials.

Dated:_____

Signature: _____
Name: _____
Address: _____
_____

**PROTECTIVE ORDER – Page 14**

**EXHIBIT B**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WALL CORPORATION | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. NO. 07-844 |
| | ) | |
| BONDDESK GROUP, L.L.C., AND | ) | |
| BONDDESK TRADING, L.L.C., | ) | |
| | ) | |
| Defendants. | ) | |

<u>**CONFIDENTIALITY AGREEMENT FOR THIRD-PARTY VENDORS**</u>

I hereby affirm that:

Information, including documents and things, designated as "Confidential Information," or "Confidential Outside Attorney Eyes Only Information," as defined in the Protective Order entered in the above-captioned action ("Protective Order"), is being provided to me pursuant to the terms and restrictions of the Protective Order.

I have been given a copy of and have read the Protective Order. I am familiar with the terms of the Protective Order and I agree to comply with and to be bound by its terms. I submit to the jurisdiction of this Court for enforcement of the Protective Order.

I agree not to use any Confidential Information or Confidential Outside Attorney Eyes Only Information disclosed to me pursuant to the Protective Order except for purposes of the above-captioned litigation and not to disclose any of this information to persons other than those specifically authorized by the Protective Order, without the express written consent of the party who designated the information as confidential or by order of the presiding judge.

Dated:_____                        Signature: _____
                                      Name:     _____
                                      Address:  _____
                                                _____

<u>**PROTECTIVE ORDER – Page 15**</u>

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

WALL CORPORATION                    )
                                    )
            Plaintiff,              )
                                    )
v.                                  )        C.A. NO. 07-844
                                    )
BONDDESK GROUP, L.L.C., AND         )
BONDDESK TRADING, L.L.C.,           )
                                    )
            Defendants.             )

## [PROPOSED] ORDER REGARDING ELECTRONIC DISCOVERY

In furtherance of the management of the Court's docket under Fed. R. Civ. P. 16, and based on the agreement of the parties to this action regarding electronic discovery, it is ORDERED AS FOLLOWS:

1.    **Source:** The parties agree to produce relevant, non-privileged electronic documents that are responsive to discovery requests and are located after a reasonable search.

2.    **Scope:** The parties agree that the scope of discoverable electronic data and documents shall include active data and information purposely stored in the ordinary course of business. The parties agree that resort to disaster recovery media or storage methods not used in the ordinary course of business shall be determined on a case-by-case basis, based on the requesting party's ability to demonstrate a need and relevance for such discovery that outweighs the cost, burden, and disruption of retrieving and processing the data from such sources.

3.    **Privilege:** The parties agree that privileged information that is inadvertently produced does not constitute a waiver of privilege with respect to that information, and documents containing such information shall be returned immediately to the producing party upon demand as further detailed in Paragraph 6 of the Protective Order.

4.    **Format:** The parties agree that electronic documents, including emails, spreadsheets, HTML files, and .exe files, shall be produced in native format when possible. When production in native format is not possible, documents shall be produced as a TIFF image having optical character recognition capability. The parties agree to use reasonable efforts to provide a corresponding load file to accompany the images to facilitate the use of the produced images by a document management or litigation support system. The parties agree that if a document is more than one page, to the extent possible, the load file shall contain unitization of the document and any attachments (including email attachments) or affixed notes shall be maintained as they existed in the original file or computer of the producing party.

HONORABLE GREGORY M. SLEET
UNITED STATES DISTRICT JUDGE

**EXHIBIT C**

**MORRISON** | **FOERSTER**

425 MARKET STREET
SAN FRANCISCO
CALIFORNIA 94105-2482

TELEPHONE 415.268.7000
FACSIMILE 415.268.7522

WWW.MOFO.COM

MORRISON & FOERSTER LLP

NEW YORK, SAN FRANCISCO,
LOS ANGELES, PALO ALTO,
SACRAMENTO, WASHINGTON D.C.

NORTHERN VIRGINIA,
ORANGE COUNTY, DENVER,
SACRAMENTO, WALNUT CREEK

TOKYO, LONDON, BEIJING,
SHANGHAI, HONG KONG,
SINGAPORE, BRUSSELS

April 17, 2008

Writer's Direct Contact
415.268.7466
RLin@mofo.com

*Via Facsimile*

Patrick Traistor
Shore Chan Bragalone LLP
325 North Saint Paul Street, Suite 4450
Dallas, TX 75201

Re:    Wall Corp. v. BondDesk et al.

Dear Patrick:

We received your letter of yesterday, proposing a Rule 26(f) conference today.  We think it is premature at this point to hold a Rule 26(f) conference.

Best regards,

Rita F. Lin

cc:    Michael Jacobs
       Mary Graham

# EXHIBIT D

# SHORECHAN
# BRAGALONE LLP

Patrick A. Traister
Republic Center
325 North Saint Paul St., Suite 4450
Dallas, Texas 75201
214.593.9116 Direct Dial
214.593.9111 Facsimile
ptraister@shorechan.com

May 27, 2008

**<u>Via Email and First Class Mail</u>**
Ms. Rita Lin
Morrison & Foerster LLP
425 Market Street
San Francisco, CA 94105

RE:    *Wall Corporation vs. BondDesk Group, L.L.C., et al.,* No. 07-844
District of Delaware

Dear Ms. Lin:

Enclosed please find the following discovery propounded to Defendants in the above-referenced matter:

1)    Wall Corporation's First Set of Requests for Admissions Nos. 1-220 to Defendants BondDesk Group, L.L.C., and BondDesk Trading, L.L.C.; and

2)    Wall Corporation's First Set of Requests for Production Nos. 1-67 to Defendants BondDesk Group, L.L.C., and BondDesk Trading, L.L.C.

Responses to these requests will not be due until thirty days after the Rule 26(f) Conference, but we thought you might want to begin working on them now. Since you are a delaying this process by refusing to meet for the Rule 26(f) Conference, we will not grant any extensions for discovery responses.

Sincerely,

Patrick Traister

PAT:cj

cc:    Mark Jacobs, Esq.
Mary Graham, Esq.
Karen Keller, Esq.

**EXHIBIT E**

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

*Inter Partes* Reexamination Filing Data  - March 31, 2008

1.  Total requests filed since start of *inter partes* reexam on 11/29/99 ............................... 390[1]

2.  Number of filings by discipline

    a.  Chemical Operation                   91    23%
    b.  Electrical Operation               151    39%
    c.  Mechanical Operation           148    38%

3.  Annual Reexam Filings

| Fiscal Yr. | No. | Fiscal Yr. | No. | Fiscal Yr. | No. |
|---|---|---|---|---|---|
| 2000 | 0 | 2003 | 21 | 2006 | 70 |
| 2001 | 1 | 2004 | 27 | 2007 | 126 |
| 2002 | 4 | 2005 | 59 | 2008 | 82 YTD |

4.  Number known to be in litigation..............................................212..................54%

5.  Decisions on requests ............................................................................... 346

    a.  No. granted ................................................................. 328 ................... 95%

        (1)  By examiner             328
        (2)  By Director (on petition)      0

    b.  No. not granted ................................................................. 18 ................... 5%

        (1)  By examiner             15
        (2)  Reexam vacated         3

6.  Overall reexamination pendency  (Filing date to certificate issue date)

    a.  Average pendency               31.4 (mos.)
    b.  Median pendency               29.7 (mos.)

7.  Total inter partes reexamination certificates issued (1999 - present) ................................. 17

    a.  Certificates with all claims confirmed      1        6%
    b.  Certificates with all claims canceled     13      76%
    c.  Certificates with claims changes       3      18%

---

[1]Of the requests received in FY 2008, 3 requests have not yet been accorded a filing date, and 7 requests had preprocessing terminated, for failure to comply with the requirements of 37 CFR 1.915. See Clarification of Filing Date Requirements for *Ex Parte* and *Inter Partes* Reexamination Proceedings, Final Rule, 71 Fed. Reg. 44219 (August 4, 2006).

**EXHIBIT F**

| 95/000,062 | IMMUNOTOXINS, COMPRISING AN INTERNALIZING ANTIBODY, DIRECTED AGAINST MALIGNANT AND NORMAL CELLS | 06-13-2008::16:15:24 |

## Bibliographic Data

| | | | |
|---|---|---|---|
| Application Number: | 95/000,062 | Customer Number: | - |
| Filing or 371 (c) Date: | 12-03-2004 | Status: | Ready for examiner action after response/comments after nonfinal |
| Application Type: | Re-Examination | Status Date: | 10-03-2007 |
| Examiner Name: | TURNER, SHARON L | Location: | ELECTRONIC |
| Group Art Unit: | 3991 | Location Date: | - |
| Confirmation Number: | 5745 | Earliest Publication No: | - |
| Attorney Docket Number: | 015280-325300US | Earliest Publication Date: | - |
| Class / Subclass: | 361/686 | Patent Number: | - |
| First Named Inventor: | 6653104 , , | Issue Date of Patent: | - |

| Title of Invention: | IMMUNOTOXINS, COMPRISING AN INTERNALIZING ANTIBODY, DIRECTED AGAINST MALIGNANT AND NORMAL CELLS |

**Close Window**

| 95/000,062 | IMMUNOTOXINS, COMPRISING AN INTERNALIZING ANTIBODY, DIRECTED AGAINST MALIGNANT AND NORMAL CELLS | 06-13-2008::16:10:32 |

## Transaction History

| Date | Transaction Description |
|------|------------------------|
| 03-10-2008 | Reexam Litigation Search Conducted |
| 03-03-2008 | Case Docketed to Examiner in GAU |
| 02-19-2008 | Case Docketed to Examiner in GAU |
| 10-03-2007 | Ready for Examiner Action after Nonfinal |
| 11-10-2005 | Reexam - Change in Power of Attorney (May Include Associate POA) for Third Party Requester |
| 10-31-2005 | Receipt of Petition in a Reexam |
| 10-06-2005 | Reexam - Affidavit(s), Declaration(s) and/or Exhibit(s) Filed by Third Party Requester |
| 10-06-2005 | Reexam - Affidavit(s), Declaration(s) and/or Exhibit(s) Filed by Third Party Requester |
| 10-06-2005 | Reexam - Affidavit(s), Declaration(s) and/or Exhibit(s) Filed by Third Party Requester |
| 10-06-2005 | Receipt of Petition in a Reexam |
| 08-31-2005 | Receipt of Petition in a Reexam |
| 08-31-2005 | Miscellaneous Incoming Letter |
| 08-15-2005 | Third Party Requester Comments after Non-final Action |
| 08-10-2005 | Notification of Informal or Nonresponsive Amendment |
| 08-10-2005 | Mailing of Petition Decision - Granted |
| 07-15-2005 | Miscellaneous Incoming Letter |
| 07-15-2005 | Informal / NonResponsive Amendment after Examiner Action |
| 08-08-2005 | Case Docketed to Examiner in GAU |
| 04-05-2005 | Receipt of Petition in a Reexam |
| 04-27-2005 | Extension of Time Period for Response Granted |
| 04-27-2005 | Correspondence Address Change |
| 04-27-2005 | Change in Power of Attorney (May Include Associate POA) |
| 04-08-2005 | Request for Extension of Time |
| 03-31-2005 | Change in Power of Attorney (May Include Associate POA) |
| 03-17-2005 | Reexam Non-Final Action Mailed |
| 02-28-2005 | Determination -- Reexam Ordered |
| 01-19-2005 | Date Forwarded to Examiner |
| 01-19-2005 | Case Docketed to Examiner |
| 01-19-2005 | Case Docketed to Examiner in GAU |
| 01-11-2005 | Completion of Preprocessing - Released to Assigned GAU |
| 01-11-2005 | Application Is Now Complete |
| 02-15-2005 | Notice of Reexam Published in Official Gazette |
| 01-11-2005 | Notice of assignment of reexamination request |
| 01-11-2005 | Notice of reexamination request filing date |
| 01-11-2005 | Title Report |
| 01-10-2005 | Miscellaneous Incoming Letter |
| 01-05-2005 | Miscellaneous Incoming Letter |
| 12-21-2004 | Miscellaneous Letter Mailed |
| 12-14-2004 | Miscellaneous Incoming Letter |
| 12-13-2004 | Miscellaneous Incoming Letter |
| 12-03-2004 | Receipt of Original Inter Partes Reexam Request |

**Close Window**

**EXHIBIT G**

| 95/000,049 | AIR AND FUEL SYSTEM FOR COMBUSTION ENGINE | 06-13-2008::16:05:20 |
| --- | --- | --- |

## Bibliographic Data

| | | | |
| --- | --- | --- | --- |
| Application Number: | 95/000,049 | Customer Number: | - |
| Filing or 371 (c) Date: | 08-27-2004 | Status: | Ready for examiner action after response/comments after nonfinal |
| Application Type: | Re-Examination | Status Date: | 04-18-2008 |
| Examiner Name: | GRAHAM, MATTHEW C | Location: | ELECTRONIC |
| Group Art Unit: | 3993 | Location Date: | - |
| Confirmation Number: | 8921 | Earliest Publication No: | - |
| Attorney Docket Number: | E025 7001 | Earliest Publication Date: | - |
| Class / Subclass: | 123/305 | Patent Number: | - |
| First Named Inventor: | 6651618 , , | Issue Date of Patent: | - |

| Title of Invention: | AIR AND FUEL SYSTEM FOR COMBUSTION ENGINE |
| --- | --- |

**Close Window**

| 95/000,049 | AIR AND FUEL SYSTEM FOR COMBUSTION ENGINE | 06-13-2008::16:04:53 |
|---|---|---|

## Transaction History

| Date | Transaction Description |
|---|---|
| 04-18-2008 | Date Forwarded to Examiner |
| 12-28-2007 | Miscellaneous Incoming Letter |
| 12-28-2007 | Certificate of Service |
| 11-19-2007 | Notice of concurrent proceeding(s) |
| 11-19-2007 | Certificate of Service |
| 10-25-2007 | Information Disclosure Statement (IDS) Filed |
| 10-25-2007 | Notice of Appeal- Owner |
| 10-25-2007 | Information Disclosure Statement Filed |
| 10-25-2007 | Certificate of Service |
| 09-25-2007 | Right of Appeal Notice |
| 08-15-2007 | Information Disclosure Statement (IDS) Filed |
| 08-15-2007 | Certificate of Service |
| 08-15-2007 | Information Disclosure Statement Filed |
| 06-28-2007 | Information Disclosure Statement (IDS) Filed |
| 06-28-2007 | Certificate of Service |
| 06-28-2007 | Information Disclosure Statement Filed |
| 11-15-2006 | Information Disclosure Statement Filed |
| 07-31-2006 | Information Disclosure Statement Filed |
| 05-26-2006 | Information Disclosure Statement Filed |
| 03-17-2006 | Certificate of Service |
| 03-17-2006 | Information Disclosure Statement Filed |
| 03-03-2006 | Case Docketed to Examiner in GAU |
| 01-20-2006 | Information Disclosure Statement Filed |
| 11-29-2005 | Ready for Examiner Action after ACP |
| 11-25-2005 | Reexam - Affidavit(s), Declaration(s) and/or Exhibit(s) Filed by Third Party Requester |
| 11-25-2005 | Reexam - Affidavit(s), Declaration(s) and/or Exhibit(s) Filed by Third Party Requester |
| 11-25-2005 | Third Party Requester Comments after Action Closing Prosecution |
| 10-24-2005 | Affidavit(s), Declaration(s) and/or Exhibit(s) Filed |
| 10-24-2005 | Affidavit(s), Declaration(s) and/or Exhibit(s) Filed |
| 10-24-2005 | Patent Owner Comments after Action Closing Prosecution |
| 09-22-2005 | Action Closing Prosecution. |
| 02-25-2005 | Reexam - Affidavit(s), Declaration(s) and/or Exhibit(s) Filed by Third Party Requester |
| 02-25-2005 | Reexam - Affidavit(s), Declaration(s) and/or Exhibit(s) Filed by Third Party Requester |
| 02-25-2005 | Third Party Requester Comments after Non-final Action |
| 01-25-2005 | Correspondence Address Change |
| 01-24-2005 | Information Disclosure Statement Filed |
| 01-24-2005 | Change in Power of Attorney (May Include Associate POA) |
| 01-24-2005 | Affidavit(s), Declaration(s) and/or Exhibit(s) Filed |
| 01-24-2005 | Affidavit(s), Declaration(s) and/or Exhibit(s) Filed |
| 01-24-2005 | Response after Non-Final Action |
| 11-23-2004 | Reexam Non-Final Action Mailed |
| 11-23-2004 | Determination -- Reexam Ordered |

| 09-21-2004 | Case Docketed to Examiner in GAU |
| 08-31-2004 | Completion of Preprocessing - Released to Assigned GAU |
| 08-31-2004 | Application Is Now Complete |
| 09-28-2004 | Notice of Reexam Published in Official Gazette |
| 08-31-2004 | Notice of assignment of reexamination request |
| 08-31-2004 | Notice of reexamination request filing date |
| 08-30-2004 | Title Report |
| 08-27-2004 | Receipt of Original Inter Partes Reexam Request |
| 08-27-2004 | Receipt of Original Ex Parte Reexam Request |

**Close Window**

# EXHIBIT H



UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

_Inter Partes_ Reexamination Filing Data  - September 30, 2007

1.  Total requests filed since start of _inter partes_ reexam on 11/29/99 ................................ 308[1]

2.  Number of filings by discipline

    a.  Chemical Operation                         76   25%
    b.  Electrical Operation                       114   37%
    c.  Mechanical Operation                   118   38%

3.  Annual Reexam Filings

| Fiscal Yr. | No. | Fiscal Yr. | No. | Fiscal Yr. | No. | Fiscal Yr. | No. |
|---|---|---|---|---|---|---|---|
| 2000 | 0 | 2002 | 4 | 2004 | 27 | 2006 | 70 |
| 2001 | 1 | 2003 | 21 | 2005 | 59 | 2007 | 126 |

4.  Number known to be in litigation................................................155...................50%

5.  Decisions on requests ........................................................................... 272

    a.  No. granted ......................................................... 261 ................. 96%

        (1)  By examiner                      261
        (2)  By Director (on petition)        0

    b.  No. not granted ................................................. 11 ................... 4%

        (1)  By examiner                      8
        (2)  Reexam vacated              3

6.  Overall reexamination pendency  (Filing date to certificate issue date)

    a.  Average pendency                    28.6 (mos.)
    b.  Median pendency                     29.7 (mos.)

7.  Total inter partes reexamination certificates issued (1999 - present) .................................. 11

    a.  Certificates with all claims confirmed        1          9%
    b.  Certificates with all claims canceled        9        82%
    c.  Certificates with claims changes          1          9%

---

[1]Of the requests received in FY 2007, 3 requests have not yet been accorded a filing date, and preprocessing of one request was terminated, for failure to comply with the requirements of 37 CFR 1.915. See Clarification of Filing Date Requirements for _Ex Parte_ and _Inter Partes_ Reexamination Proceedings, Final Rule, 71 Fed. Reg. 44219 (August 4, 2006).

# EXHIBIT I

# INSTITUTE for PROGRESS

**Reexamining *Inter partes* Reexam**

Beginning in 1981, U.S. patent law set up patent reexamination as an administrative alternative to litigation for addressing patent validity concerns. The idea was to create a less expensive and speedier alternative to decide questions of patent validity. Although the level of scrutiny of the U.S. patent system has risen dramatically in light of the ongoing debate over patent reform, reexamination has received relatively little attention. Recently however, we have observed a number of trends that suggest that it might be time to carefully reexamine patent reexamination, particularly *inter partes* reexamination.

In doing so, we have discovered the following:
- *Inter partes* reexaminations requests are rising rapidly – a 6X increase between 2003 and 2007
- Reexamination, particularly *inter partes* reexamination is not simply used as an alternative to litigation, but an integral part of litigation strategy – more than half (52%) of patents in *inter partes* reexams are known to be in litigation during their reexamination
- Virtually all requests for *inter partes* reexamination are granted – 95% of *inter partes* reexam requests are granted, and this statistic may actually understate the effective grant rate
- To date, there has never been a single *inter partes* reexamination that has gone through the entire reexamination process (including appeal) and made it to completion – only three have ever received a decision by the Board of Patent Appeals and Interferences
- Despite a mandate for "special dispatch", the time required to complete an *inter partes* reexamination is much longer than commonly believed
  - Without appeal, the average pendency period for *inter partes* reexam is 43.5 months, much longer than the 28.5 months reported by the USPTO – a 95% confidence interval would put the pendency between 34 and 53 months
  - Although no *inter partes* reexam has ever been completed after being appealed, the average pendency for appealed *inter partes* reexams is 78.4 months (assuming no rework by the patent office or secondary appeal) - a 95% confidence interval would put the pendency between 5 and 8 years

**Why reexamine *inter partes* reexams?**
Over the last several years, the number of reexamination requests at the USPTO has been rising rapidly. This is particularly true for *inter partes* reexams. The number of requests for *inter partes* reexam had increased 6X from 24 in calendar 2003 to 142 in calendar 2007. (Note: Our analysis is based on calendar years rather than the USPTO's fiscal year.) This increase appears to be a result of the increasing use of reexamination as an integral part of litigation strategy by defendants or potential defendants in patent

# INSTITUTE
## *for*
# PROGRESS

litigation. According to USPTO statistics, more than half (52%) of all patents subject to *inter partes* reexamination are known to be in litigation during the reexamination process.

The story of Microsoft and Avistar is a particularly telling example. After six months of licensing negotiation, Microsoft has requested reexamination of 24 of Avistar's 29 U.S. patents. Although Avistar's key patents have previously survived two significant litigations, Microsoft's actions have delayed its licensing program and placed the company into financial distress resulting in a 25% reduction in its U.S. and European workforce.

Although the reexamination statute in the U.S. may have been intended to provide an alternative to litigation, the actual use of reexamination appears to be an augmentation of litigation strategy rather than an alternative. In many cases, patent litigation in U.S. courts and 337 actions at the International Trade Commission (investigations of unfair trade practices related to IP infringement) run simultaneously with reexamination at the Patent Office. Simultaneous litigation and reexamination raise serious questions for U.S. courts about whether to wait for the results of a pending reexamination or continue with their court proceedings.

The conclusions so far have been mixed. In some cases, patent litigation has been stayed pending the results of reexam, while in others, the cases have continued. Many people will remember for example that Judge Spencer who presided over the contentious patent battle between NTP and RIM over the "Blackberry patents" famously refused to stay the litigation proceedings despite the fact that the PTO had issued an initial rejection of the claims at issue.

These difficult and often critical decisions by circuit court judges and administrative law judges depend heavily on their understanding and expectations of what will happen in the reexamination process at the PTO. How reliable are initial office actions as a predictor of final results in a reexamination? How long will the process take? How often are the patent examiner's finding upheld on appeal? For judges, these questions are critical in determining whether a request for a stay should be granted. For litigants, these questions can strongly influence litigation strategy.

*Ex parte* reexamination was established by statute in 1981, and more than 9,000 reexamination requests have been filed with more than 6,000 reexamination certificates issued (signaling the completion of the process). The *ex parte* reexamination process is well established. Much less is known about *inter partes* reexams. Established by statute in November of 1999, the first *inter partes* reexamination was not requested until 2001. Through mid-April of 2008, there have been 396 requests for *inter partes* reexamination at the USPTO, and only 16 of those have received reexamination certificates.

# INSTITUTE
## *for*
# PROGRESS

Given the rising importance of reexaminations in general, and the relative scarcity of information about *inter partes* reexam specifically, we decided to take a closer look to discover what can be learned about this relatively little understood process.

**What did we do?**
To examine the *inter partes* reexamination process, we copied transaction level data for every *inter partes* reexamination from the USPTO's PAIR database. These transactions reveal both the sequence and the timing of each step through the process. The database we created all cases and transactions through April 16, 2008.

We noted and corrected a number of anomalies in the PTO data including:
-   Several reexaminations appeared to proceed without the initial "Request for *Inter partes* Reexamination" transaction in the PTO data – we investigated and manually filled in this missing data
-   Several reexaminations included references to "*ex parte*" reexamination despite the fact that they were "*inter partes*" reexams – we manually reviewed and resolved each discrepancy
-   Duplicate transactions (same reexam number, same transaction, same date) were eliminated – these were generally not errors, but represent instances where the documents were uploaded into the PAIR system in multiple parts

We then extracted the key milestone transactions in the reexamination process and mapped the process and timeline for every *inter partes* reexamination to discover what path each case had taken through the process, and how long each step in the process takes. The results of our analysis are briefly described below, and more fully captured in the attached presentation slides.

**What did we find?**
Requests for *inter partes* reexamination are rising rapidly
As described above, the number of *inter partes* reexamination requests is rising rapidly. In 2007, there were 142 requests for *inter partes* reexams, three times as many as in 2005, and nearly six times as many as in 2003. *Inter partes* reexam requests have risen nearly 90% per year (CAGR) over the last five years.

Nearly all *inter partes* reexamination request are granted
Granting a request for reexamination is not automatic. The standard for granting a reexamination request requires that a "significant new question" of patentability must be presented by the requestor. Since their inception in 2001, there have been 396 requests for *inter partes* reexamination requested at the USPTO. Of these, 354 have reached a decision about whether the reexamination request will be granted. Over this period, ninety-five percent of all *inter partes* reexam requests have been granted. With so few requests being denied (19), we reviewed each case where a reexamination was denied, and found that the effective denial rate may actually be overstated. A number of the

3

# INSTITUTE
## *for*
# PROGRESS

nineteen requests for reexamination that were denied are from a small number of inventions where multiple patent reexams were requested. Still others were not for utility patents, but were request for reexamination of design patents. It is fair to say that virtually all requests for *inter partes* reexamination are granted. Whatever threshold has been established by the Patent Office for determining a "significant new question" of patentability, few requestors have been unable to clear it.

### The *inter partes* reexamination process is not linear

By tracing every single *inter partes* reexamination through the process, we were able to discover the path through reexamination that is actually followed by real patents in process. While the majority of patents follow the main sequence (Request → Grant → Non-final Office Action → ACP → Reexam Certificate), some cases skip steps, and others repeat steps multiple times. For example, some reexams skip over multiple steps and proceed quickly to a Reexam Certificate. This happens most often when the patent holder fails to respond to the Patent Office within the statutory timeframe, and the PTO proceeds to issue a certificate. Still other times, patents repeat steps multiple times. About one-quarter of the time *inter partes* reexams include multiple "Non-final Office Actions", and about one-tenth of the time they receive multiple "Actions Closing Prosecution".

### One-quarter of all *inter partes* reexam decisions are appealed, but none has ever proceeded through appeal to the end of the process

One of the major challenges in examining the *inter partes* reexam process is that very few cases have proceeded all the way through the process. Through mid-April 2008, only nineteen cases have ever proceeded past the Notice of Right to Appeal. Of these, approximately one-quarter (5 cases - 26%) have been appealed to the Board of Patent Appeals and Interferences (BPAI), one case (~5%) went back for another Action Closing Prosecution, and the remaining 13 cases (68%) moved on to "Intent to Issue a Reexam Certificate".

Of the cases that have gone on to appeal, only three have received a decision by the BPAI. None of the three decisions represents a final decision by the BPAI that can be appealed to the Federal Circuit as in each case, the Board added new grounds for rejection and remanded the cases to the Patent Office for further action. None of the three cases has reached a final Reexamination Certificate, and it has taken 4, 4, and 5 years for the cases to get to the initial BPAI decision.

### The average pendency of 28.5 months reported by the USPTO is highly skewed

The USPTO regularly publishes statistics about *inter partes* reexaminations. According to their latest publication (December 31, 2007), the average pendency (Filing date to certificate issue date) is 28.5 months. This calculation is based on only 12 *inter partes* reexaminations that had reached a final certificate by that date. In our analysis which is up to date as of April 16, 2008, we found 16 reexaminations that had reached a final

4

# INSTITUTE
### *for*
# PROGRESS

certificate. Our calculation of average pendency for those cases was only slightly longer at 30.1 months.

However, in carefully examining the 16 cases that have received final certificates, we note that 10 of the completed reexams skipped directly from the "First Non-final Action" to the "Intent to Issue a Reexam Certificate". Upon closer inspection, each of these cases skipped multiple steps because the patent owner failed to respond to the office action. The average pendency of these cases was 24 months, while the average for the remaining six cases that followed the basic process (Non-final Action → ACP → Right of Appeal → Notice of Intent to Issue a Reexam Certificate → Reexam Certificate) was ~39 months. It should be noted that NONE of the cases that have received a final Reexam Certificate have gone to appeal.

While mathematically accurate, the pendency statistic provided by the USPTO is highly misleading. An appropriate reading of the statistic is that the Patent Office takes two years to dispose of a patent through *inter partes* reexam if the patent holder doesn't care to defend its rights. It takes significantly longer to get to a resolution if the patent holder participates in the process.

Average pendency for an un-appealed *inter partes* reexam is more than 3.5 years
Given the small number of cases that have proceeded through the *inter partes* reexam process, a more appropriate way to estimate average pendency is to calculate the time required for cases to proceed through each step in the process and sum them up. We calculated an average time and a 95% confidence interval for each step in the main sequence. Based on our calculations, it takes more than 3 ½ years (43.5 months) for the average case to proceed through the basic reexam process to a final conclusion – this assumes that the case is not appealed to the BPAI or beyond. A 95% confidence interval suggests a range of between 34 and 53 months for average pendency for an un-appealed *inter partes* reexam.

Expected pendency for appealed *inter partes* reexams is at least 6.5 years
*Inter partes* cases that go through the appeal process can be expected to take much longer than the 3 ½ years described above. Calculating average pendency for appealed cases is difficult because as we have noted, there has never been an appealed *inter partes* case that has completed the process. However, if we make a conservative assumption that all cases that go through the appeal process will receive a decision by the BPAI and immediately move to "Intent to Issue a Reexam Certificate", then we can calculate an average expected pendency. The result of this calculation is that average pendency (assuming no "rework" by the patent office and no secondary appeals to the BPAI, the Federal Circuit, or the Supreme Court) is 78.4 months – slightly longer than 6.5 years. A 95% confidence interval suggests an average pendency for appealed cases (again, assuming no rework) is between 5 and 8 years (60-97 months)! Given that the only three *inter partes* reexam cases that have received a BPAI decision all require further "rework" and are subject to further appeal, these estimates may be highly conservative.

# INSTITUTE *for* PROGRESS

According to statute, reexam cases are to be handled with "special dispatch". This means that reexam cases are to receive priority over all other cases. The Patent Office has reportedly set a target of 24 months to complete the reexam process, but so far, the actual time to conclude an *inter partes* reexam is far beyond this target. This can not help but raise significant concern to anyone who is interested in the efficient administration of justice in the U.S. patent system.

## Conclusion

The *inter partes* reexam process requires special attention by the U.S. Patent Office. At present, the time to complete these cases far exceeds the expectation of "special dispatch" embodied in the patent statute. Federal judges, administrative law judges, and litigants should take special note of these facts as they can significantly impact the progress of patent litigation.

**EXHIBIT J**

## Table C-10.
### U.S. District Courts—Median Time Intervals from Filing to Trial of Civil Cases in Which Trials Were Completed, by District, During the 12-Month Period Ending September 30, 2007

| Circuit and District | Total Trials | | Nonjury Trials | | Jury Trials | |
|---|---|---|---|---|---|---|
| | Number of Trials | Median Time Interval in Months [a] | Number of Trials | Median Time Interval in Months [a] | Number of Trials | Median Time Interval in Months [a] |
| TOTAL | 3,366 | 24.6 | 1,109 | 21.0 | 2,257 | 25.2 |
| DC | 28 | 44.0 | 12 | 44.0 | 16 | 42.0 |
| 1ST | 167 | 29.7 | 54 | 28.0 | 103 | 29.4 |
| ME | 9 | . | 3 | . | 6 | . |
| MA | 94 | 33.5 | 33 | 36.0 | 61 | 30.0 |
| NH | 7 | . | 1 | . | 6 | . |
| RI | 12 | 23.0 | 6 | . | 6 | . |
| PR | 35 | 28.0 | 11 | 21.0 | 24 | 32.0 |
| 2ND | 336 | 31.0 | 108 | 25.5 | 228 | 33.0 |
| CT | 52 | 27.0 | 13 | 30.0 | 39 | 26.0 |
| NY,N | 27 | 40.5 | 4 | . | 23 | 40.0 |
| NY,E | 84 | 34.6 | 23 | 33.0 | 61 | 35.0 |
| NY,S | 161 | 25.6 | 61 | 21.0 | 90 | 26.0 |
| NY,W | 11 | 57.0 | 4 | . | 7 | . |
| VT | 11 | 19.0 | 3 | . | 8 | . |
| 3RD | 321 | 28.4 | 78 | 27.5 | 243 | 28.0 |
| DE | 29 | 27.0 | 9 | . | 20 | 28.0 |
| NJ | 57 | 36.0 | 17 | 33.5 | 40 | 38.5 |
| PA,E | 104 | 19.4 | 25 | 15.0 | 79 | 19.5 |
| PA,M | 75 | 26.3 | 10 | 23.5 | 65 | 26.5 |
| PA,W | 50 | 33.8 | 15 | 33.0 | 35 | 34.0 |
| VI | 6 | . | 2 | . | 4 | . |
| 4TH | 229 | 17.0 | 110 | 15.4 | 119 | 18.0 |
| MD | 40 | 21.5 | 21 | 17.0 | 19 | 24.0 |
| NC,E | 44 | 16.5 | 41 | 14.0 | 3 | . |
| NC,M | 6 | . | 5 | . | 1 | . |
| NC,W | 11 | 21.0 | 3 | . | 8 | . |
| SC | 48 | 18.5 | 11 | 22.0 | 37 | 18.0 |
| VA,E | 33 | 9.0 | 16 | 9.0 | 17 | 8.2 |
| VA,W | 25 | 14.5 | 6 | . | 19 | 16.0 |
| WV,N | 8 | . | 2 | . | 6 | . |
| WV,S | 14 | 21.0 | 5 | . | 9 | . |

## Table C-10. (September 30, 2007—Continued)

| Circuit and District | Total Trials | | Nonjury Trials | | Jury Trials | |
|---|---|---|---|---|---|---|
| | Number of Trials | Median Time Interval in Months* | Number of Trials | Median Time Interval in Months* | Number of Trials | Median Time Interval in Months* |
| **5TH** | 460 | 20.2 | 177 | 20.1 | 283 | 20.6 |
| LA,E | 71 | 19.7 | 42 | 18.0 | 29 | 19.5 |
| LA,M | 15 | 38.0 | 6 | - | 9 | - |
| LA,W | 38 | 34.0 | 20 | 36.0 | 18 | 25.0 |
| MS,N | 27 | 23.0 | 5 | - | 22 | 22.5 |
| MS,S | 47 | 23.4 | 9 | - | 38 | 20.5 |
| TX,N | 49 | 19.4 | 20 | 16.5 | 29 | 21.0 |
| TX,E | 50 | 18.0 | 10 | 20.0 | 40 | 17.0 |
| TX,S | 103 | 20.3 | 41 | 20.0 | 62 | 19.7 |
| TX,W | 60 | 15.8 | 24 | 15.4 | 36 | 16.4 |
| **6TH** | 267 | 26.0 | 60 | 20.0 | 207 | 27.2 |
| KY,E | 15 | 24.0 | 1 | - | 14 | 24.0 |
| KY,W | 20 | 31.0 | 2 | - | 18 | 31.0 |
| MI,E | 74 | 25.8 | 14 | 16.0 | 60 | 28.7 |
| MI,W | 13 | 28.0 | 5 | - | 8 | - |
| OH,N | 27 | 20.0 | 6 | - | 21 | 19.0 |
| OH,S | 21 | 28.4 | 3 | - | 18 | 28.7 |
| TN,E | 31 | 23.0 | 11 | 18.0 | 20 | 25.0 |
| TN,M | 32 | 28.5 | 11 | 14.0 | 21 | 32.0 |
| TN,W | 34 | 23.5 | 7 | - | 27 | 23.0 |
| **7TH** | 232 | 27.8 | 66 | 27.0 | 166 | 28.0 |
| IL,N | 105 | 29.7 | 36 | 27.5 | 69 | 33.0 |
| IL,C | 24 | 29.0 | 3 | - | 21 | 31.0 |
| IL,S | 35 | 31.5 | 9 | - | 26 | 37.0 |
| IN,N | 16 | 21.5 | 1 | - | 15 | 21.5 |
| IN,S | 19 | 24.0 | 4 | - | 15 | 25.0 |
| WI,E | 9 | - | 6 | - | 3 | - |
| WI,W | 24 | 10.4 | 7 | - | 17 | 10.0 |
| **8TH** | 207 | 22.1 | 57 | 21.5 | 150 | 22.3 |
| AR,E | 64 | 19.7 | 23 | 19.0 | 41 | 20.0 |
| AR,W | 16 | 13.0 | 2 | - | 14 | 13.5 |
| IA,N | 9 | - | 3 | - | 6 | - |
| IA,S | 6 | - | - | - | 6 | - |
| MN | 27 | 29.0 | 2 | - | 25 | 31.0 |
| MO,E | 28 | 22.5 | 11 | 20.0 | 17 | 22.5 |
| MO,W | 20 | 22.0 | 5 | - | 15 | 22.0 |
| NE | 23 | 22.0 | 5 | - | 18 | 20.0 |
| ND | 3 | - | 3 | - | - | - |
| SD | 11 | 34.0 | 3 | - | 8 | - |

# Table C-10. (September 30, 2007—Continued)

| Circuit and District | Total Trials | | Nonjury Trials | | Jury Trials | |
|---|---|---|---|---|---|---|
| | Number of Trials | Median Time Interval in Months * | Number of Trials | Median Time Interval in Months ** | Number of Trials | Median Time Interval in Months * |
| **9TH** | 557 | 25.4 | 212 | 21.5 | 345 | 27.6 |
| AK | 6 | - | 2 | - | 4 | - |
| AZ | 55 | 30.5 | 21 | 27.0 | 34 | 34.0 |
| CA,N | 73 | 24.9 | 23 | 20.5 | 50 | 28.0 |
| CA,E | 46 | 38.0 | 11 | 48.0 | 35 | 38.0 |
| CA,C | 186 | 21.3 | 78 | 18.7 | 108 | 24.8 |
| CA,S | 39 | 24.0 | 14 | 21.0 | 25 | 27.0 |
| HI | 10 | 17.0 | 5 | - | 5 | - |
| ID | 11 | 25.7 | 2 | - | 9 | - |
| MT | 11 | 18.0 | 3 | - | 8 | - |
| NV | 34 | 29.5 | 19 | 29.5 | 15 | 38.0 |
| OR | 38 | 25.0 | 11 | 23.0 | 27 | 27.0 |
| WA,E | 13 | 23.0 | 5 | - | 8 | - |
| WA,W | 32 | 18.0 | 17 | 18.4 | 15 | 19.0 |
| GUAM | 3 | - | 1 | - | 2 | - |
| NMI | | | | | | |
| **10TH** | 178 | 22.3 | 51 | 26.5 | 127 | 22.5 |
| CO | 49 | 29.0 | 9 | - | 40 | 29.0 |
| KS | 27 | 23.0 | 7 | - | 20 | 22.0 |
| NM | 25 | 20.4 | 8 | - | 17 | 19.5 |
| OK,N | 12 | 17.0 | 4 | - | 8 | - |
| OK,E | 8 | - | 5 | - | 3 | - |
| OK,W | 18 | 15.0 | - | - | 18 | 15.0 |
| UT | 25 | 28.0 | 11 | 31.0 | 14 | 21.7 |
| WY | 14 | 14.5 | 7 | - | 7 | - |
| **11TH** | 394 | 21.8 | 124 | 18.5 | 270 | 23.0 |
| AL,N | 52 | 25.0 | 2 | - | 50 | 26.0 |
| AL,M | 22 | 16.0 | 6 | - | 16 | 16.0 |
| AL,S | 21 | 14.5 | 3 | - | 18 | 14.0 |
| FL,N | 19 | 22.0 | 8 | - | 11 | 22.0 |
| FL,M | 84 | 19.0 | 33 | 18.3 | 51 | 22.0 |
| FL,S | 116 | 17.9 | 53 | 17.0 | 63 | 17.4 |
| GA,N | 49 | 27.9 | 17 | 27.4 | 32 | 27.5 |
| GA,M | 8 | - | 2 | - | 6 | - |
| GA,S | 23 | 31.0 | 2 | - | 23 | 31.0 |

NOTE: INCLUDES TRIALS CONDUCTED BY DISTRICT AND APPELLATE JUDGES ONLY. ALL TRIALS CONDUCTED BY MAGISTRATE JUDGES ARE EXCLUDED. EXCLUDES THE FOLLOWING TRIALS: LAND CONDEMNATION; FORFEITURES AND PENALTY CASES; PRISONER PETITIONS (HABEAS CORPUS), MOTIONS TO VACATE SENTENCE UNDER 28 U.S.C. 2255, HEARINGS ON EVIDENTIARY MATTERS); BANKRUPTCY PETITIONS; AND THREE-JUDGE COURT CASES. FOR CIVIL CASES RESULTING IN A COMPLETED TRIAL, THE MEDIAN TIME IS BASED ON THE ORIGINAL FILING DATE AND THE DATE THE TRIAL WAS COMPLETED. FOR REOPENED CIVIL CASES RESULTING IN A SECOND COMPLETED TRIAL, THE MEDIAN TIME REMAINS BASED ON THE ORIGINAL FILING DATE AND THE DATE THE TRIAL WAS COMPLETED.

* TIME INTERVALS COMPUTED ONLY FOR 10 OR MORE TRIALS.

# EXHIBIT K

# $\{ F(Ef)(fE)^r [man] \}$

## The College of William and Mary is proud to announce a Distinguished Lecture Series by



# Charles L. Fefferman

## Herbert Jones University Professor, Princeton University

### *May 5-6, 2005, William & Mary Campus*

Professor Fefferman is one of the most outstanding and influential mathematicians of modern times. His fundamental contributions and ideas have great impact on the development of modern Analysis, Differential Equations, Mathematical Physics and Geometry. His work has been recognized by numerous prestigious awards including the Fields Medal (1978), the Bergman Prize (1992), the Alan T. Waterman Award (first recipient, 1976), and the Salem Prize (1971). He is a member of the National Academy of Science (1979), the American Academy of Arts and Sciences (1972), and the American Philosophical Society (1989). He has been awarded numerous honorary doctorates by American and foreign universities.

Charles Fefferman received his B.S. degree in Mathematics and Physics (with the highest distinction) from the University of Maryland in 1966, at the age of 17. Three years later he was awarded a Ph.D. degree by Princeton University. In 1971, at the age of 22, he became the youngest Full Professor ever appointed in the United States (at the University of Chicago). Since 1973 he has been a Professor of Mathematics at Princeton. He is also the youngest-ever recipient of the Fields Medal (which is generally regarded as the "Nobel Prize" in Mathematics) earning it at the age of 29.



WILLIAM & MARY

---

**Lecture 1:**
*Whitney's extension problems*

*Thursday, May 5, 2005 3-4 p.m. Jones 301.*

**Abstract:** This talk answers the following questions: Let $f$ be a given function on an arbitrary (given) subset $E$ of the Euclidean $n$-dimensional space. Let $m$ be a given positive integer. How can we tell whether $f$ extends to an m-times continuously differentiable function $F$ on the whole space? If such an $F$ exists, then how small can we take its norm? What can we say about the Taylor polynomial of $F$ at a given point? Can we take $F$ to depend linearly on $f$?

**Lecture 2:**
*Sharp front singularities for fluids*

*Friday, May 6, 2005 3-4 p.m. Jones 301.*

**Abstract:** This talk defines a class of fluid flows that develop singularities in finite time ("sharp fronts"). Numerical simulations suggest the possibility that sharp front singularities may occur in solutions of interesting equations from fluid mechanics. The talk presents these examples, and then gives a (very simple) theorem which essentially rules out the formation of sharp fronts in the examples simulated. The theorem is joint work with Diego Cordoba.

**For information contact** Nahum Zobin, (757) 221-2024, zobin@math.wm.edu

# EXHIBIT L

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re U.S. Patent No.: 7,231,363 B1

Patentee:        Webster Hughes *et al.*

Serial No.:      09/706,678

Filing Date:     November 6, 2000

Issue Date:      June 12, 2007

For:             Method and System for Rebrokering Orders in a Trading System

## REQUEST FOR INTER PARTES REEXAMINATION;

## REQUESTERS' DETAILED STATEMENT PURSUANT TO 37 C.F.R. § 1.915

MS *Inter Partes* Reexam
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

Requesters BondDesk Group LLC and BondDesk Trading LLC (the "Requesters")
request *inter partes* reexamination of claims 1-15 of U.S. Patent No. 7,231,363 for "Method and
System for Rebrokering Orders in a Trading System," issued to Webster Hughes and Charles
Fefferman on June 12, 2007, and filed on November 6, 2000 (the "'363 Patent"), and presently
assigned to Wall Corp., in view of the substantial new questions of patentability raised against
the '363 Patent by the prior art submitted with this Request.

This Request is made in light of several newly-located patents and publications that were
not before the United States Patent and Trademark Office when it examined the application
leading to the '363 Patent. Requesters respectfully submit that the references individually or in

combination present substantial new questions of patentability because (i) the references are highly material to patentability, (ii) the references disclose features that the applicants asserted were missing from the prior art cited in prosecution, and (iii) the references were not considered by the Patent Office in the original examination.

(i)     The references are highly material to patentability

The first primary reference, U.S. Patent No. 6,408,282 to Buist, discloses an electronic system that allows an intermediated exchange of financial instruments using broker-dealers. Buist discloses that a seller transmits a sell order to his or her broker and, if the sale is approved by the seller's broker, that broker sends the order to a server. A potential buyer can see and accept the sell order by sending a matching buy order. If the purchase is approved by the buyer's broker, the buyer's broker sends an approval to the server. Subsequently, the exchange of securities and money takes place between the buyer's broker and the seller's broker. Thus, the securities are serially exchanged between the seller, the seller's broker, the buyer's broker, and the buyer. (Ex. A (Buist) at 10:42-11:62.)

The second primary reference, a U.S. General Accounting Office Report ("U.S. Government Securities: An Examination of Views Expressed About Access to Brokers' Services"), discloses a traditional voice system for trading bonds in which a customer calls in a bid or offer to the customer's broker. The GAO Report discloses a method for trading bonds that is substantially similar to the system claimed in the '363 Patent. While the GAO Report does not describe orders being received over a computerized system, as discussed below, it would have been obvious to modify the method described in the GAO Report to receive orders by computer rather than by phone.

The third primary reference, the Spear, Leeds & Kellogg Fixed Income On Line Trading Manual, discloses a complete system for receiving offers to sell bonds or bids to buy bonds at a computerized system using an intermediary. The Manual further discloses that intermediaries can view offerings and place orders to resell the securities to other parties. The Manual, created for Spear, Leeds & Kellogg by BondExchange, was widely disseminated.

Patent No. 7,231,363
Client Reference No. 65024-2

Each of these references discloses a method for receiving orders pertaining to a financial instrument from multiple parties and transferring the financial instrument between those parties through an intermediary. As discussed in more detail below, these references teach features that applicants repeatedly insisted were not taught by the prior art. Claim charts in Exhibits Q - Y illustrate how the references alone and in combination disclose each feature of all of the claims of the '363 Patent.

(ii) The references disclose features that the applicants asserted were missing from the art cited in prosecution

In the last rejection made over prior art, the Examiner rejected the claims over a reference teaching an auction system.[1] The applicants responded to the rejection by arguing that the reference failed to disclose "a serial chain of transactions" and that the reference differed in that it sought to "eliminate intermediaries of the type that make intermediate offers and rebrokering transactions."[2] Applicants had earlier argued that "intermediate offers are the keystone of the invention."[3] The Examiner agreed that the prior art then of record did not disclose (a) a plurality of intermediate parties or (b) a serial chain of transactions.[4] Requesters respectfully submit that the newly discovered prior art teaches both of those features. As discussed in more detail below and in the attached claim charts, the primary references teach precisely these features—an intermediated exchange of commodities that are processed in a serial chain of transactions.

(iii) The references were not considered by the Patent Office during the original prosecution of the '363 Patent

Buist was filed on April 15, 1999, before the first provisional application to which the '363 Patent claims priority. Therefore, Buist is prior art under 35 U.S.C. § 102(e) and qualifies as a printed publication. The GAO Report was published in December 1987, is prior art under

---

[1] Office Action of April 13, 2006, page 5.

[2] Amendment filed June 13, 2006, page 11.

[3] Amendment filed January 26, 2006, pgs. 11-12.

[4] Notice of Allowability dated February 15, 2007, page 5.

Patent No. 7,231,363
Client Reference No. 65024-2

35 U.S.C. § 102(b), and also qualifies as a printed publication. The BondExchange Manual was widely disseminated before December 29, 1998, is prior art under 35 U.S.C. § 102(b), and also qualifies as a printed publication. None of these references was cited by the applicants or by the USPTO during prosecution of the '363 Patent. In fact, none of the other references cited herein were cited during prosecution, although all qualify as printed publications under either 35 U.S.C. § 102(e) or 35 U.S.C. § 102(b).

In addition, the '363 Patent was allowed on February 15, 2007, before the Supreme Court decided *KSR Int'l Co. v. Teleflex, Inc.*, 127 S. Ct. 1727, 1739, 82 U.S.P.Q.2d 1385, 1395 (2007), and before the U.S. Patent and Trademark Office issued its new guidelines for obviousness in light of the *KSR* decision.

Pursuant to 35 U.S.C. § 312, the below-listed prior art references raise substantial new questions of patentability with respect to all of the claims of the '363 Patent.

iv

Patent No. 7,231,363
Client Reference No. 65024-2

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| I. | STATEMENT UNDER 37 C.F.R § 1.915(b)(3) POINTING OUT SUBSTANTIAL NEW QUESTIONS OF PATENTABILITY | 1 |
| | A.   Introduction | 1 |
| | B.   Summary of the Law Governing Reexamination | 2 |
| II. | BACKGROUND INFORMATION REGARDING THE '363 PATENT | 3 |
| | A.   Factual Background of the '363 Patent | 3 |
| III. | THE CLAIMS OF THE '363 PATENT ARE NOT ENTITLED TO THE FILING DATE OF THE PARENT PROVISIONAL APPLICATIONS | 10 |
| | A.   To Avoid Prior Art During Prosecution, the Applicant Amended the Claims to Require that a First Order, an Intermediate Order, *and* a Second Order Be Used to Identify the Chain of Transactions | 11 |
| | B.   The Provisional Applications Do Not Disclose the Identification of a Serial Chain of Transactions Using a First Order, Intermediate Order, and Second Order. | 12 |
| IV. | DETAILED EXPLANATION UNDER 37 C.F.R. § 1.915(b)(3) OF THE PERTINENCY AND MANNER OF APPLYING THE CITED REFERENCES TO EVERY CLAIM FOR WHICH REEXAMINATION IS REQUESTED | 16 |
| | A.   U.S. Patent No. 6,408,282 to Buist ("Buist") Anticipates Claims 1-8, 11-12, and 14-15 of the '363 Patent Under 35 U.S.C. § 102 (Exhibit Q). | 16 |
| | B.   Buist in Combination with Harpale Renders Obvious Claims 9, 10, and 13 of the '363 Patent Under 35 U.S.C. § 103 (Exhibit R). | 34 |
| | C.   Buist in Combination with Minton Renders Obvious Claims 9, 10, and 13 of the '363 Patent Under 35 U.S.C. § 103 (Exhibit S). | 38 |
| | D.   Buist in Combination with Cohen Renders Obvious Claims 9, 10, and 13 of the '363 Patent Under 35 U.S.C. § 103 (Exhibit T). | 40 |
| | E.   Buist in Combination with Gutner Renders Obvious Claims 9, 10, and 13 of the '363 Patent Under 35 U.S.C. § 103 (Exhibit U). | 43 |
| | F.   Buist in Combination with the Bond Market Association Survey Renders Obvious Claims 9, 10, and 13 of the '363 Patent Under 35 U.S.C. § 103 (Exhibit V). | 46 |
| | G.   The Post-*KSR* Examination Guidelines for Determining Obviousness Support a Determination that Claims 9, 10, and 13 Are Obvious as Discussed in Sections IV.B-F, *Supra* | 48 |

Patent No. 7,231,363
Client Reference No. 65024-2

va-238097

H.    Even if Terms in the '363 Patent Were Given a Narrower Interpretation
      than the Broadest Reasonable Meaning Consistent with the Specification,
      Claims 1-15 Would Still Be Rendered Obvious Under 35 U.S.C. § 103 as
      Discussed in Sections IV.A-G, *Supra*................................................................... 49

I.    The U.S. General Accounting Office Report Renders Obvious Claims 1-3,
      6, 8, 11, 12, 14, and 15 of the '363 Patent under 35 U.S.C. § 103(a)
      (Exhibit W). .......................................................................................................... 56

J.    The U.S. General Accounting Office Report in Combination with Weiss
      Renders Obvious Claims 4, 5, 7, 9, 10, and 13 of the '363 Patent under 35
      U.S.C. § 103(a) (Exhibit X). ................................................................................ 65

K.    BondExchange, Spear, Leeds & Kellogg Fixed Income On Line Trading
      Manual Renders Obvious Claims 1-15 of the '363 Patent Under 35 U.S.C.
      § 103(a) (Exhibit Y).............................................................................................. 68

V.    CERTIFICATION AND STATEMENT PURSUANT TO 37 C.F.R. § 1.915............... 82

VI.   CONCLUSION.................................................................................................................... 83

Patent No. 7,231,363
Client Reference No. 65024-2

va-238097

I.    **STATEMENT UNDER 37 C.F.R § 1.915(b)(3) POINTING OUT SUBSTANTIAL NEW QUESTIONS OF PATENTABILITY**

A.    **Introduction**

Requesters believe that the '363 Patent warrants reexamination. The claims for which Requesters seek reexamination recite a method for receiving orders pertaining to a financial instrument from multiple parties and transferring the financial instrument between at least two of those parties. Some claims further recite that some of the orders have differing sets of terms. Other claims recite tracking a path of parties involved in the transactions.

Requesters respectfully submit that the prior art discloses all of the limitations of the claims for which Requesters seek reexamination. In particular, the following patents and printed publications raise substantial new questions of patentability regarding the above-identified claims:

1.    U.S. Patent No. 6,408,282 to Buist ("Buist") (Exhibit A),

2.    U.S. Patent No. 7,222,089 to Harpale ("Harpale") (Exhibit B),

3.    U.S. Patent No. 6,014,643 to Minton ("Minton") (Exhibit C),

4.    Marilyn Cohen, "Bond Trading Goes On-Line", *Forbes*, at 100 (Jan. 25, 1999) ("Cohen") (Exhibit D),

5.    Toddi Gutner, "How to Seal a Great Bond Deal", *BusinessWeek*, at 110 (May 24, 1999) ("Gutner") (Exhibit E),

6.    Bond Market Association, *The 1998 Review of Electronic Transaction Systems in the U.S. Fixed Income Securities Markets* (Nov. 1998) ("Bond Market Association Survey") (Exhibit F),

7.    Smith, Selway, and McCormick, *The Nasdaq Stock Market: Historical Background and Current Operation*, NASD Working Paper 98-01 (Aug. 24, 1998) ("1998 NASD Working Paper") (Exhibit G),

8.    National Association of Securities Dealers, Notice to Members 86-67, at 6 (Oct. 2, 1986) ("1986 NASD Notice") (Exhibit H),

9.    Financial Information eXchange Protocol, Version 4.1 (Mar. 31, 1998, with errata from Jun. 30, 1999) ("FIX Protocol") (Exhibit I),

10.    U.S. Patent No. 7,333,952 to Neyman ("Neyman") (Exhibit J),

1

11. U.S. General Accounting Office, *U.S. Government Securities: An Examination of Views Expressed About Access to Brokers' Services*, GAO/GGD-88-8 (Dec. 1987) ("GAO Report") (Exhibit K),

12. Weiss, *After the Trade Is Made: Processing Securities Transactions* (1993) ("Weiss") (Exhibit L), and

13. BondExchange, Spear, Leeds & Kellogg—Fixed Income On Line Trading Manual (April 1998) ("BondExchange Manual") (Exhibit M).

None of these references was before the Patent Office during the prosecution of the '363 Patent.

The patents and printed publications listed above, when considered alone or in combination with other references, anticipate or render obvious all of the claims of the '363 Patent under 35 U.S.C. § 102 or 35 U.S.C. § 103. Therefore, these references present substantial new questions of patentability regarding the claims of the '363 Patent that warrant its reexamination.

Throughout this Request, reference is made to the attached Declaration of Joseph Rosen ("Rosen Decl."), which further explains the significance of certain prior art references and their impact on the patentability of the claims of the '363 Patent. *See, e.g.,* MPEP §§ 2616, 2617(II), and 2258(I)(E).

B. **Summary of the Law Governing Reexamination**

In determining whether a "substantial new question of patentability" exists so as to make reexamination appropriate, "the PTO must apply the broadest reasonable meaning to the claim language, taking into account any definitions presented in the specification." *In re Bass*, 314 F.3d 575, 577, 65 U.S.P.Q.2d 1156, 1157, 1158 (Fed. Cir. 2002) (citing *In re Yamamoto*, 740 F.2d 1569, 1571, 222 U.S.P.Q. 934, 936 (Fed. Cir. 1984)); *accord In re Am. Acad. of Sci. Tech Ctr.*, 367 F.3d 1359, 1369, 70 U.S.P.Q.2d 1827, 1834 (Fed. Cir. 2004) ("PTO is obligated to give claims their broadest reasonable interpretation during examination."). Thus, during reexamination (as in an original or reissue examination), claims should be given the broadest reasonable interpretation, rather than the narrower interpretation appropriate in an infringement suit. One rationale for this rule is that in a reexamination, unlike an infringement action, the

2

patent owner may amend the claims. *See Yamamoto*, 740 F.2d at 1571-72, 222 U.S.P.Q. at 936-37.

Thus, in the analysis and discussion that follows, the identified claims are given their broadest reasonable interpretation consistent with the '363 Patent specification, even though a narrower interpretation may be adopted by the court in an infringement suit.

The prior art references upon which the Requesters rely—in some cases individually, and in other cases in combinations that the references themselves or the knowledge of one skilled in the art suggest—are references that a reasonable examiner would consider important in deciding whether the claims of the '363 Patent are patentable.[5] Moreover, applying the preponderance of the evidence standard[6] for anticipation or obviousness in light of these references leads to only one reasonable conclusion; namely, that all of the claims of the '363 Patent are invalid.

## II.    BACKGROUND INFORMATION REGARDING THE '363 PATENT

### A.    Factual Background of the '363 Patent

#### 1.    Litigation Concerning the '363 Patent

The '363 Patent is now in litigation brought by its current assignee, Wall Corp., against Requesters in the United States District Court for the District of Delaware (C.A. No. 1:07-CV-00844-GMS) in a case styled *Wall Corporation v. BondDesk Group L.L.C. and BondDesk Trading, L.L.C.* In the patent infringement lawsuit, Wall Corp. has contended that the BondDesk Alternative Trading System, Liaison Workstation, Trader Workstation, and Advisor Workstation services infringe at least one claim of the '363 Patent. A copy of the Complaint is attached as Exhibit Z.

---

[5] *See* MPEP § 2242 ("It is not necessary that a '*prima facie*' case of unpatentability exist as to the claim in order for 'a substantial new question of patentability' to be present as to the claim . . . .") (citing *In re Etter*, 756 F.2d 852, 857 n.5, 225 U.S.P.Q. 1, 4 n.5 (Fed. Cir. 1985)).

[6] *See Xerox Corp. v. 3Com Corp.*, 69 F. Supp. 2d 404, 407 (W.D.N.Y. 1999) ("[I]n a reexamination proceeding before the PTO, there is no presumption of validity and there must only be a preponderance of the evidence to show nonpatentability before the PTO may reject the patent claim(s)."); *Bruning v. Hirose*, 161 F.3d 681, 685, 48 U.S.P.Q.2d 1934, 1938 (Fed. Cir. 1998) (patents do not "retain the presumption of validity during reexamination proceedings"); *see also Etter*, 756 F.2d at 857-58, 225 U.S.P.Q. at 4 (statutory presumption of patent validity does not apply in patent reexamination proceedings, such that the examiner need not satisfy the "clear and convincing" evidentiary burden to reject a claim).

Patent No. 7,231,363
Client Reference No. 65024-2

2.    **The Subject Matter of the '363 Patent**

The '363 Patent is directed to a method for receiving orders pertaining to a financial instrument from multiple parties and transferring the financial instrument between those parties. While the specification notes the method is applicable to a wide variety of financial instruments ('363 Patent at 3:30-35) and the claims are not limited to the trading of bonds, the preferred embodiment relates to bond trading. Therefore, a review of certain bond brokering concepts and terms may assist in understanding the '363 Patent.

Bonds are long-term debt offered to investors by companies, usually at a stated interest rate. Bonds are "issued" by entities looking to raise money and are ultimately purchased by investors looking for a return on the invested capital at the stated interest rate. The seller and purchaser involved in a bond transaction are termed the "counterparties."

Historically, bonds, unlike publicly traded stocks, have not been traded on an exchange. Rather, in most cases, issued bonds pass through broker-dealers before being sold to the ultimate investor. In the industry, a broker-dealer is understood to function as an "intermediary." Because bonds are not traded on centralized exchanges, bond trading has been regarded as a business based on client relationships and "who you know." For example, in an effort to find a certain bond issue for a client purchaser (Client 1), one broker-dealer (Broker-Dealer A) may call another broker-dealer (Broker-Dealer B), who may call another broker-dealer (Broker-Dealer C) who has the desired bonds. Along the way, each buying broker-dealer places an order with a "bid" to buy the bonds from another broker-dealer at a specified price, and each selling broker-dealer places an order with an "offer" to sell the bonds at a specified price. Once the price and quantity are negotiated, the transaction between broker-dealers is executed. In the example above, the bonds in question will be transferred in a series of transactions from Broker-Dealer C to Broker-Dealer B to Broker-Dealer A to Client 1. Along the path from Broker-Dealer A to Broker-Dealer C, each broker-dealer may set the selling (offer) price term for the bonds to be higher or may set the buying (bid) price to be lower. Thus, broker-dealers make their profit by reselling bonds for more than their purchase price.

Patent No. 7,231,363
Client Reference No. 65024-2

va-238097

When a broker-dealer buys bonds and holds them on the broker-dealer's own account, the broker-dealer is said to be acting as a "principal" in the trade. A principal is a counterparty in the sale who takes title to the bonds. Many broker-dealers buy bonds from issuers or other broker-dealers speculatively on the hope of selling them to another party at a higher price later. Thus, these broker-dealers maintain an "inventory" of bonds and are said to be a "market maker" for those bonds. Where the broker-dealer acts as a counterparty, but immediately resells the bonds to the next party in the series, the broker-dealer is said to act as a "riskless principal."

In some cases, a broker-dealer will act as an "agent" who communicates the orders that he or she received to others without acting as a counterparty to the transaction and without buying the bonds on the broker-dealer's own account. Rather, the broker-dealer simply arranges for the sale of bonds between one or more parties and thereby acts as a conduit. The terms "rebrokering" or "remarketing" can be used to refer to (but are not limited to) this process of arranging for the sale of bonds without holding them on the broker-dealer's own account.

### 3. The '363 Patent "Background of the Invention"

The Background section of the '363 Patent describes that the patent seeks to "facilitate enhanced and anonymous trading through the systematic use of broker-dealers." ('363 Patent at 1:31-34.) The '363 Patent further notes that many computerized trading systems "are designed to eliminate intermediaries, such as agents and brokers, who were traditionally involved in executing these transactions." (*Id.* at 1:43-46.)

The '363 Patent then addresses three types of known trading systems. These include "cross-matching systems," "dealer-systems," and "inter-dealer systems." The '363 Patent describes that the known "cross-matching" systems eliminate the use of intermediaries, that the known "dealer-systems" allow investor access only to specific participating broker-dealers, and that the known "inter-dealer systems" only allow brokers to trade with each other. The '363 Patent then concludes that "[c]learly, a need exists for a comprehensive and effective trading system which allows intermediaries to participate and provide the benefits of their participation." (*Id.* at 2:24-27.) As discussed in more detail below, this characterization of the limitations of the

5

prior art was incomplete because dealer systems and other electronic bond trading systems did in fact allow parties to trade financial instruments through multiple broker-dealers. (Rosen Decl. ¶¶ 20-23.) Patents and printed publications describing these systems are discussed in more detail below.

### 4.    The '363 Patent Specification

The specification of the '363 Patent discloses a method for trading a variety of financial instruments through one or more intermediaries. The specification suggests that an "intermediary" need not act as a principal in a transaction: that is, the broker-dealer need not be trading for his or her own account, but can be merely acting as an agent on behalf of another.

The '363 Patent states that "a broker-dealer may serve as an intermediary by passing along an order relating to a transaction or as a buyer or seller by opting instead to submit an appropriate matching or counteroffer order." ('363 Patent at 3:44-47 (emphasis added).) By describing that a broker-dealer acts as an "intermediary" by merely passing along an order and not by acting as a buyer or seller, the '363 Patent appears to define an intermediary as a party that is merely "passing along an order." The '363 Patent further describes that "[o]f the parties Y receiving the order from X, some may be serving as intermediaries who are allowed to rebroker their orders and others may be serving as end parties who can only accept the order by submitting a matching order or submit a counteroffer." (*Id.* at 4:30-35.) The description in the specification that intermediaries can act by rebrokering orders and need not accept orders further suggests that the applicants defined an "intermediary" as a party who merely passes along an order and need not act as a principal.

The '363 Patent describes several example transactions. According to one example, A submits an offer to sell bonds to broker-dealer X, who designates multiple parties Y[n] to communicate an order at the set price or at a markup. Eventually, another party B will submit an order which matches an order received from one of the intermediaries. The system will then execute the transaction by identifying and executing all orders between A and B. As a result, the

Patent No. 7,231,363
Client Reference No. 65024-2

va-238097

transaction is executed between A and B without A and B knowing one another.  ('363 Patent at 4:22-49.)

The '363 Patent describes how the claimed step of "Identifying the serial chain of transactions" is to be performed.  The specification describes that when an order is matched, "the order processing system identifies the chain of parties having matched orders by processing the orders file to follow each order in the transaction relating to the identified bond back up to the original investor submitting the first order."  (*Id.* at 10:9-13.)  No other embodiment or means for identifying the chain of parties is described.

The method is shown in Figure 5 of the '363 Patent, which is reproduced below.  The '363 Patent describes that customer 5A submits an offer to sell one or more bonds at a price of $101 each to brokers 5B, 5C, and 5D.  Broker-dealers 5C and 5D are permitted to rebroker the order. In the illustrated example, broker-dealers 5C and 5D mark up the order (by $0.03125/bond and $0.0625/bond, respectively) and issue new orders at the higher price to counterparties 5E, 5F, 5G, 5H, and 5I.  (*Id.* at 13:30-48.)



va-238097

5.    The '363 Patent's Claims

The '363 Patent contains 15 claims, of which only claim 1 is independent.

6.    The '363 Patent's Prosecution File History

The '363 Patent was filed on November 6, 2000, as U.S. Patent Application Serial No. 09/706,678 with Webster Hughes as sole inventor. A Request to Correct Inventorship under 37 C.F.R. § 1.48 was filed on May 25, 2006, adding Charles Fefferman as a co-inventor. The '363 Patent claims priority to three provisional applications filed on December 29, 1999, January 24, 2000, and May 3, 2000.

During prosecution, the applicants repeatedly emphasized that their approach differed from the prior art because the claimed method requires the presence of intermediaries who make intermediate orders and can rebroker transactions. Those arguments were made to overcome prior art relied upon by the Examiner that was alleged by applicants to have eliminated intermediaries.

In the Office Action mailed May 5, 2005, the Examiner rejected the claims over Broerman. In response to the rejection, applicants responded by arguing that:

> Among the reasons that embodiments of the invention, such as that recited in claim 18, differ from the prior art include that such prior art systems eliminate intermediaries of the type that make intermediate offers and rebrokering transactions between a first party and a second party, yet intermediate orders are the keystone of the invention. This was discussed in the instant application at pages 2-3 as follows: [excerpt from 1:35-2:6 of '363 Patent].

Amendment of July 5, 2005, p. 12, emphasis added. Applicants further stated:

> As discussed below, it is apparent that the examiner has not given the definition of the term "order" the appropriate meaning in making his rejection. When the term "order" is given its proper definition in this art area, i.e., including at least one offer or bid, the inadequacies of the Broerman reference vis-à-vis claim 18 of the instant application become clear . . . . It is crystal clear, however, that the Broerman reference does not disclose any "intermediate parties" to make "intermediate orders" relating to the first order or another of the intermediate orders as recited in the instant claims. Indeed, any orders of the Broerman reference between the buyer and the seller—no intermediate offers or bids take place between intermediate parties.

Amendment of July 5, 2005, pgs. 13-14, emphasis added.

8

Patent No. 7,231,363
Client Reference No. 65024-2

In the Office Action mailed November 4, 2005, the Examiner rejected the claims over

Alaia. In response to the rejection, applicants responded by arguing:

> As discussed during the interview, among the reasons that
> embodiments of the invention, such as that recited in claim 18,
> differ from the prior art include that <u>such prior art systems</u>
> <u>eliminate intermediaries</u> of the type that make intermediate offers
> and rebrokering transactions between a first party and a second
> party, <u>yet intermediate offers are the keystone of the invention</u>.

Amendment of January 24, 2006, pgs. 11-12, emphasis added. Applicants further argued:

> The Examiner agreed during the interview that the Alaia reference
> did not disclose the identification of a chain of transactions
> because that reference merely shows matching an orders [sic]
> between two parties—the supplier and the buyer. <u>No intermediate</u>
> <u>party is disclosed in the Alaia reference</u>. In view of the foregoing,
> it is clear that the Alaia reference fails to disclose each and every
> feature of the invention.

Amendment of January 24, 2006, p. 12, emphasis added. Applicants further sought to

distinguish the prior art on other grounds:

> Indeed, the use of "intermediary" in the '071 patent is in name
> only—and the existence of the intermediary in the '071 patent does
> not meet the language of claim 18 of the instant application.

Amendment of January 24, 2006, p. 13.

In response to references presented by the Examiner in an interview on January 9, 2006,

applicants argued:

> Notably, the systems of the '793 and '938 patents require the
> predetermined input of information in order to match parties with
> one another. There are no orders placed by parties in response to
> other orders. This is in sharp contrast to the language of claim 18
> of the instant application, which requires . . . <u>at least one of the</u>
> <u>intermediate orders being placed by the at least one intermediate</u>
> <u>party in response to the first order; . . . the second order being</u>
> <u>placed by the second ordering party in response to one or more of</u>
> <u>the intermediate orders</u>.

Amendment of January 24, 2006, p. 13, emphasis in original.

In the Office Action mailed April 13, 2006, the Examiner rejected the claims over

Rackson. In response to the rejection, applicants responded by arguing:

> As discussed during the interview, among the reasons that
> embodiments of the invention, such as that recited in claim 18,

Patent No. 7,231,363
Client Reference No. 65024-2

> differ from the prior art include that such prior art systems
> eliminate intermediaries of the type that make intermediate offers
> and rebrokering transactions between a first party and a second
> party.

Amendment of June 8, 2006, p. 11, emphasis added.

In the Office Action mailed August 30, 2006, the Examiner rejected the claims as

directed to non-statutory subject matter. In response to the rejection, applicants responded by

arguing:

> As discussed during the interview, Applicants have clarified the
> definition of "serial chain of transactions" as recited in claim 18
> [issued as claim 1]. In particular, it is now clear that the serial
> chain of transactions may be carried out using one or more
> intermediate parties, so long as the item is transferred serially from
> one to the other.

Amendment of October 2, 2006, p. 7, emphasis added.

In providing a Notice of Allowance, the Examiner characterized the prior art as follows:

> The prior art of record . . . fail to teach a method of trading
> financial instruments in which (i) a first party and one of a plurality
> of intermediate parties and a second party interact to communicate
> orders . . . such that one or more orders for the financial instrument
> from the one the plurality of intermediate parties is received in
> response to an order for the financial instrument . . . and (ii) a
> serial chain of transaction is identified using the first order . . . .

'363 Patent prosecution history, Notice of Allowance, February 15, 2007, emphasis in original.

## III.     THE CLAIMS OF THE '363 PATENT ARE NOT ENTITLED TO THE FILING DATE OF THE PARENT PROVISIONAL APPLICATIONS

The utility application that eventually issued as the '363 Patent claimed priority to three

provisional applications filed on December 29, 1999, January 24, 2000, and May 3, 2000.

Copies of the provisional applications are attached as Exhibits N-P. As detailed below, the '363

Patent is not entitled to the priority benefit of its provisional applications, because its claims are

not supported by those applications. Two of the references cited in this Request (Neyman and

Harpale) have effective dates after the filing date of the provisional applications, but prior to the

filing date of the application from which the '363 Patent issued. Neyman and Harpale are prior

art because the '363 Patent is not entitled to the filing date of its parent provisional applications.

va-238097

MPEP § 2617 provides that a reexamination request "may, where appropriate, point out that claims in the patent for which reexamination is requested are entitled only to the filing date of the patent and are not supported by an earlier foreign or United States patent application whose filing date is claimed."

This analysis requires determining whether the parent provisional applications comply with 35 U.S.C. § 112 (first paragraph) vis-à-vis the claims of the '363 Patent. Among other things, "the specification of the *provisional* must 'contain a written description of the invention and the manner and process of making and using it, in such full, clear, concise, and exact terms,' 35 U.S.C. § 112 ¶1, to enable an ordinarily skilled artisan to practice the invention *claimed* in the *non-provisional* application." *New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co.*, 298 F.3d 1290, 1294, 63 U.S.P.Q.2d 1843, 1846 (Fed. Cir. 2002).

Claim 1 of the '363 Patent recites the step of "identifying the serial chain of transactions using the first order, at least one received intermediate order, and the second order." From the claim language and specification of the '363 Patent, it is clear that this feature of claim 1 of the '363 Patent is directed to identifying a serial chain of transactions by processing the orders file to follow each order in the transaction relating to the identified bond back up to the original investor submitting the first order. ('363 Patent at 10:4-15.) The parent provisional applications do not describe using orders to identify a chain of transactions. Rather, this feature is only described in the utility patent application filed November 6, 2000. As discussed in more detail below, because the disclosures of the provisional applications do not support a recitation of the sole independent claim, none of the claims is entitled to any of the filing dates of the three provisional applications.

### A.   To Avoid Prior Art During Prosecution, the Applicant Amended the Claims to Require that a First Order, an Intermediate Order, *and* a Second Order Be Used to Identify the Chain of Transactions.

Original claim 18 as filed recited "identifying a chain of parties between the first and second ordering parties who have communicated orders relating to the orders." (Application, p. 103.) It is noted that this initial claim recited merely "identifying a chain of parties," not a

11

Patent No. 7,231,363
Client Reference No. 65024-2

"using" three different orders to identify a chain of transactions. In the Amendment filed January 6, 2005, the claim was amended to recite "identifying at least one chain of at least some of the intermediate parties." (Amendment of January 6, 2005, p. 5.)

The applicants' focus changed in the amendment filed July 5, 2005. In that amendment, the applicants amended the claim to recite "using the first order, at least one communicated intermediate order, and the second order to identify the chain of transactions to be executed." (Amendment of July 5, 2005, p. 5, emphasis added.) In the Amendment filed January 24, 2006, applicants further amended the claim to recite "identifying the chain of transactions to be executed among the first ordering party, at least one intermediate party, and the second ordering party using the first order, at least one received intermediate order, and the second order." (Amendment filed January 24, 2006, p. 5.) Additionally, applicants argued:

> In the Office Action, the Examiner took the position that the Alaia reference discloses "allowing each of a plurality of intermediate parties (see communication of intermediate orders listed in FIG. 2 [of Alaia]) and using the first order to identify a chain of transactions . . ." The Examiner agreed during the interview that the Alaia reference did not disclose the identification of a chain of transactions because that reference merely shows matching an order between two parties the supplier and the buyer. No intermediate party is disclosed in the Alaia reference.

(*Id.* at p. 12, emphasis added.) By this argument, applicants meant to explain that the "identification of a chain of transactions" is more than the simple matching of two orders. In the Amendment of June 13, 2006, applicants amended the limitation, for the last time, to recite "identifying the serial chain of transactions using the first order, at least one received intermediate order, and the second order."

**B.    The Provisional Applications Do Not Disclose the Identification of a Serial Chain of Transactions Using a First Order, Intermediate Order, and Second Order.**

The disclosures of the parent provisional applications do not support the recitation of "identifying the serial chain of transactions using the first order, at least one received intermediate order, and the second order" in claim 1. None of the provisional applications contains any discussion in the written description (i.e., the background section, the summary

12

section, and the detailed description section) of "using the first order, at least one received intermediate order, and the second order" for "identifying the serial chain of transactions." Rather, the provisional applications only make vague reference to a chain of transactions— without ever disclosing the step of identifying a chain in the manner now claimed.

The 60/173,581 provisional application filed December 29, 1999, does not disclose identifying a chain of transactions. The '581 provisional only describes that an individual trade can be identified. The '581 provisional describes that "[a]ccess to the XBOND Network substantially reduces the time and cost of identifying and executing bond trades" (Ex. N ('581 Application) at 21) and that "[u]sers of XBond identify and execute trades at reduced transaction costs". (Id. at 27.)[7] That does not describe identifying a serial chain of transactions. The '581 provisional application further describes that "XBOND notifies the indirect counterparties and all connecting brokers that they have executed TRADES according to terms in the ORDER." (Id. at 13.) There is no indication that the "ORDER" contains any information about the serial "chain" of transactions. Moreover, the notification is made according to the terms of only one unspecified "ORDER," not using a first order, an intermediate order, and the second order.

The 60/178,049 provisional application filed January 24, 2000, describes that the system can include "a database for storing trade orders and includes subroutine libraries that apply viewer authorization rules, broker-dealer mark-up rules, identify matching trade orders, and notify counter-parties of executed trades and/or pending trades." (Ex. O ('049 Application) at 5.) However, mere notification of parties of the execution of a trade also does not support using orders to identify a chain of transactions. There is no mention of identifying a "chain" of transactions in the '049 provisional application. Thus, the '049 provisional application only describes using a database to match a trade and notifying the two counterparties of executed

---

[7] The provisional applications filed by the patentee contain irregular page numbers that repeat or disappear in places. Requesters have stamped page numbers in the lower right-hand corner of the three provisional applications, and attached them as Exhibits N-P, for ease of reference.

va-238097

trades, not "using the first order, at least one received intermediate order, and the second order" to identify a serial chain of transactions.

The 60/201,599 provisional application filed May 3, 2000, describes that "[t]he XBond Order System processing center will identify matching orders, and notify counter-parties when trades occur." (Ex. P ('599 Application) at 15.) The '599 provisional application also describes that the system "facilitates efficient trading with counter-parties and instantly passes an offer through a chain of intermediaries." (*Id.* at 12.) Other references to a "chain of intermediaries" are made on pgs. 3 and 4. In the '599 provisional application, applicants disclosed that the system "instantly passes an offer through a chain of intermediaries." (*Id.*) These statements also do not support "identifying a serial chain of transactions" as defined in the specification of the '363 Patent. The '599 provisional only mentions the existence of a "chain of intermediaries" and fails to describe "using the first order, at least one received intermediate order, and the second order" to identify a serial chain of transactions.

Thus, the provisional applications do not describe "using" a first order, an intermediate order, and a second order to identify a serial chain of transactions. The provisional applications only describe passing an order through intermediaries, without identifying a serial chain using any orders. The provisional applications fail to even hint at the only embodiment disclosed in the '363 Patent—following each order in the transaction back up to the original investor submitting the first order. The provisional applications fail to convey to one of ordinary skill in the art that the applicant had possession of the invention of claim 1. (Rosen Decl. ¶¶ 28-32.)

Where a parent provisional application does not support the claims in a child application, the claims are not entitled to the parent application's filing date. For example, in *New Railhead Mfg.*, the Federal Circuit affirmed the district court's conclusion that the asserted claim limitation was not adequately supported by the provisional. *New Railhead Mfg.*, 298 F.3d at 1297, 63 U.S.P.Q.2d at 1850. In that case, the provisional application described a drill bit as having a "random elliptical orbital motion" and "high included angle offsets." *Id.* at 1292, 63 U.S.P.Q.2d at 1845. The utility application claimed the drill bit as "being angled with respect to the sonde

14

Patent No. 7,231,363
Client Reference No. 65024-2

housing the bit body." *Id.*, 63 U.S.P.Q.2d at 1846. The Federal Circuit found that "the provisional never states that the drill bit is angled with respect to the sonde housing." *Id* at 1297, 63 U.S.P.Q.2d at 1848. It thus held that the parent provisional application did not support the independent claims of the utility application. *Id.* The court then concluded that the independent claims were not entitled to the filing date of the parent application and found the claims invalid in view of commercial offers for sale. *Id.*

*New Railhead Mfg.* is nearly identical to the facts here. The parent provisional applications to the '363 Patent had only limited disclosures, i.e., they only described the existence of a chain of transactions and the existence of multiple orders—but did not identify the chain by using the orders. The applicants thereafter filed a utility patent application, as in *New Railhead Mfg.*, with a more detailed disclosure including a description of the identification of a chain of transactions. Thus, as in *New Railhead Mfg.*, the claims are not supported by the written description of the parent provisional applications. Accordingly, the claims are not entitled to the filing dates of any of the parent provisional applications and, as discussed in Section IV below, are anticipated by or obvious in view of intervening art.

It should be noted that Wall Corp., the patent owner, cannot preserve its claimed priority date by arguing that the claimed invention would have been "obvious" in view of the provisional applications. That would not satisfy the written description requirement or entitle the claims to the February 22, 1995 filing date. In *Lockwood v. American Airlines, Inc.*, 107 F.3d 1565, 1571-72, 41 U.S.P.Q.2d 1961, 1966 (Fed. Cir. 1997), the Federal Circuit stated:

> Entitlement to a filing date does not extend to subject matter which is not disclosed, but would be obvious over what is expressly disclosed. It extends only to that which is disclosed. While the meaning of terms, phrases, or diagrams in a disclosure is to be explained or interpreted from the vantage point of one skilled in the art, all the limitations must appear in the specification. The question is not whether a claimed invention is an obvious variant of that which is disclosed in the specification. Rather, a prior application itself must describe an invention, and do so in sufficient detail that one skilled in the art can clearly conclude that the inventor invented the claimed invention as of the filing date sought.

15

(emphasis added). In other words, what is absolutely required is that "one skilled in the art, reading the original disclosure, must 'immediately discern the limitation at issue' in the claims." *Purdue Pharma L.P. v. Faulding, Inc.*, 230 F.3d 1320, 1323, 56 U.S.P.Q.2d 1481, 1483 (Fed. Cir. 2000) (emphasis added, citation omitted).

One of ordinary skill in the art reading the provisional parent applications here would not "immediately discern" a disclosure of using a first order, an intermediate order, and a second order to identify a serial chain of transactions. Indeed, a skilled artisan would never find the required disclosure at all in the provisional applications because it is not there.

In conclusion, the provisional parent applications do not support a recitation of the sole independent claim. Accordingly, claims 1-15 are not supported by the parent provisional applications and, thus, are only entitled to the November 6, 2000 filing date of the utility patent application.

IV.    **DETAILED EXPLANATION UNDER 37 C.F.R. § 1.915(b)(3) OF THE PERTINENCY AND MANNER OF APPLYING THE CITED REFERENCES TO EVERY CLAIM FOR WHICH REEXAMINATION IS REQUESTED**

Each of the features of certain claims of the '363 Patent is anticipated by or obvious in view of various prior art references and combinations of references, as described below. Accordingly, these references present substantial new questions of patentability regarding those claims. Requesters attach Exhibits Q - Y, which are claim charts comparing the claims of the '363 Patent with the disclosures of the prior art references.

A.    **U.S. Patent No. 6,408,282 to Buist ("Buist") Anticipates Claims 1-8, 11-12, and 14-15 of the '363 Patent Under 35 U.S.C. § 102 (Exhibit Q).**

Buist describes a securities trading system that allows user-to-user trades by way of broker-dealers. Buist was filed on April 15, 1999, and thus qualifies as prior art under § 102(e) regardless of whether the claims of the '363 Patent are entitled to the December 29, 1999 filing date of the first provisional application. Buist was not considered during the prosecution of the '363 Patent. A reasonable examiner would consider its teachings important in determining

16

Patent No. 7,231,363
Client Reference No. 65024-2

whether claims 1-8, 11-12, and 14-15 are patentable, and thus it raises substantial new questions of patentability regarding those claims.

The background of Buist describes that the description therein is "fully applicable to trading of any securities," which can include "any note, stock, treasury stock, [or] bond." (*See* Ex. A (Buist) at 1:39-40; 1:16-18.) Buist discloses that the broker-dealer server receives over the computerized network an offer to sell from a first user computer. (*Id.* at 9:10-15; 9:42-65.) Buist describes a broker-dealer passing along a sell order from the investor to others on the system. Buist discloses that a seller transmits a sell order to his or her broker and, if the sale is approved by the seller's broker, the seller's broker sends the order to a server. A potential buyer can see and accept the sell offer by submitting a matching buy order. If the purchase is approved by the buyer's broker, the buyer's broker sends an approval to the server. Subsequently, the exchange of securities and money takes place between the buyer's broker and the seller's broker. Thus, the securities are serially exchanged between the seller, the seller's broker, the buyer's broker, and the buyer. (*Id.* at 10:42-11:62.) Buist discloses a method for receiving orders pertaining to a financial instrument from multiple parties and transferring the financial instrument between those parties through an intermediary.

Claim 1 of the '363 Patent recites "[a] method, comprising:

> receiving a first order from a first ordering party at a computerized system, the first order including at least one bid or offer relating to financial instrument to permit execution of a serial chain of transactions pertaining to the financial instrument in the computerized system, based on the first order;
>
> receiving one or more intermediate orders, including at least one offer or bid relating to said financial instrument, from at least one of a plurality of intermediate parties using the computerized system, at least one of the intermediate orders being placed by the at least one intermediate party in response to the first order;
>
> receiving a second order, including at least one offer or bid relating to said financial instrument, from a second ordering party using the computerized system, the second order being placed by the second ordering party in response to one or more of the intermediate orders;

17

Patent No. 7,231,363
Client Reference No. 65024-2

identifying the serial chain of transactions using the first order, at least one received intermediate order, and the second order;

executing the at least one transaction within the serial chain of transactions, where the serial chain of transactions comprises a transfer of said financial instrument between the first ordering party and a first intermediate party, and a transfer of said financial instrument between the second ordering party and a last intermediate party and where the first intermediate party and the last intermediate party are different parties or the same party."

Buist teaches all of the elements of claim 1, as well as the elements of dependent claims 2-8 and 14-15.

> 1. **Buist Teaches "a method, comprising: receiving a first order from a first ordering party at a computerized system, the first order including at least one bid or offer relating to financial instrument to permit execution of a serial chain of transactions pertaining to the financial instrument in the computerized system, based on the first order."**

The '363 Patent defines "orders" as "offers to sell securities and bids to purchase them." ('363 Patent at 3:39-40.) The '363 Patent defines the "computerized system" receiving the first order as any computer in a network of computers: "computerized systems . . . range from private networks for use by subscribers to open systems available over public networks such as the Internet." (*Id.* at 1:35-40.)

Buist discloses a computerized network containing four servers (the root server, the intermediate server, the broker-dealer server, and the replica server) that support buying and selling of securities. Buist discloses that the broker-dealer server receives over the computerized network an offer to sell from a first ordering party. Buist describes that "[t]o connect to the trading system of the preferred embodiment, a user at step 310 first activates the application which generates on the display screen of the user's workstation a connection status display (see FIG. 53) that establishes a connection to the server/database of the user's broker/dealer. . . . At step 322 the user selects a stock of interest by typing the stock symbol into an appropriate display (see FIG. 6, slot 642) . . . . Assuming that the user decides to sell some of his/her holdings in the displayed securities, at step 342 he/she fills in a trade ticket (see FIG. 11) for a sell order and selects the 'Verification' button on the trade ticket display . . . . As indicated, at

Patent No. 7,231,363
Client Reference No. 65024-2

step 346, the user then views the final verification screen (see FIG. 56) provided by the application and selects the 'Send' button. In response, the order is transmitted to the server and database of the user's broker/dealer . . . ." (*Id*. at 9:10-15; 9:42-65.)

Buist makes clear that the first order can instead be an offer to buy. "Assuming that the user decides to sell some of his/her holdings in the displayed securities, at step 342 he/she fills in a trade ticket (see FIG. 11) for a sell order . . . . Alternatively, at this point, the user may choose to purchase securities." (Ex. A (Buist) at 9:56-65.)

> 2.   **Buist Teaches "receiving one or more intermediate orders, including at least one offer or bid relating to said financial instrument, from at least one of a plurality of intermediate parties using the computerized system, at least one of the intermediate orders being placed by the at least one intermediate party in response to the first order."**

>> a.   **The Broadest Reasonable Meaning of the Term "Intermediate Order" Encompasses a Broker-Dealer "passing along" an Order Sent by a Client.**

The broadest reasonable meaning of the term "intermediate order" consistent with the specification encompasses "a broker-dealer . . . passing along an order relating to a transaction" and does not require that, to place an intermediate order, the intermediary act as a "principal" by taking title to the financial instrument or change the terms of the order from his or her client in any way. (Rosen Decl. ¶¶ 24-27.) In other words, the recitation encompasses passing along orders on behalf of others and does not require placing an order from the intermediary's own account or altering the terms of the order.

The specification describes that "a broker-dealer may serve as an intermediary by *passing along an order relating to a transaction*." ('363 Patent at 3:44-45 (emphasis added).) That interpretation is consistent with the '363 Patent's stated goal of computerizing the voice exchanges in traditional broker-dealer relationships. (*Id*. at 2:31-38.) In such a relationship, intermediaries "verbally relay the customer's order." (*Id*.) In addition, the specification defines "intermediaries" as "broker-dealers or *agents*." (*Id*. at 3:38-39 (emphasis added).) That indicates that an intermediary may act as an agent placing an order on behalf of a client, rather

19

than as a principal who takes title to the financial instrument before reselling it to his or her client.

The specification also states that intermediaries do not "accept" orders but merely "rebroker" them. "Of the parties Y receiving the order from X, some may be serving as intermediaries who are allowed to rebroker their orders and others may be serving as end parties who can only accept the order by submitting a matching order or submit a counteroffer." (*Id.* at 4:30-35.) That further suggests that intermediaries in the '363 Patent are not required to accept and place orders for their own accounts, but can simply pass along orders on behalf of others.

The example embodiments in the specification also describe that a broker-dealer may place an intermediate order by simply passing along his or her client's order. "In a first example, a first ordering party A submits an order for a transaction, such as an offer to sell bonds at a set price, to party X. X may be a broker-dealer. X designates one or more other parties $Y_1$, $Y_2$, . . . . $Y_n$, to whom to communicate an order relating to the bonds." (*Id.* at 4:25-30.) The subsequent order placed by broker-dealer X can be exactly the same as what A sent X. "For each party Y, the order may be at the set price [designated by A] . . . ." (*Id.*) Thus, the example further illustrates that X can simply pass along an order on behalf of A on the same terms as A originally submitted.

The description of the preferred embodiment also describes that an intermediate order is placed when a broker-dealer relays an order from his or her client to another party. "[B]roker-dealers use broker-dealer computers 18 running the program generating the graphical user interface 20 to receive orders from investors through the order processing system 12 and rebroker the orders to counterparties or other broker-dealers." (*Id.* at 7:62-9:2.) The '363 Patent defines "rebrokering" as "receiving an order related to the transaction to designate a plurality of other parties with whom to communicate orders relating to the transaction and to communicate orders with such designated other parties using the system." (*Id.* at 3:16-23.)

The doctrine of claim differentiation further supports the construction of an "intermediate order" as covering the mere forwarding of the first order without requiring an intermediary to act

20

as a principal or to change the terms of the order from his or her client in any way. As discussed above, claim 1 of the '363 Patent covers "receiving one or more intermediate orders, including at least one offer or bid relating to said financial instrument." Claim 1 is silent as to the terms of the intermediate orders. Dependent claim 9, however, recites "[t]he method of claim 1, wherein the first order received from the first ordering party has a first set of terms and the step of receiving intermediate orders comprises receiving intermediate orders having respective *second sets of terms different than the first set of terms.*"

Under the doctrine of claim differentiation, "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315, 75 U.S.P.Q.2d 1321, 1327 (Fed. Cir. 2005), *cert. denied*, 546 U.S. 1170 (2006). Indeed, the entire point of a dependent claim is to add a limitation to those recited in the independent claim. *See* 35 U.S.C. § 112 ¶ 4 ("[A] claim in dependent form shall contain a reference to a claim previously set forth and then specify a further limitation of the subject matter claimed."). If a dependent claim does not add a limitation, then it is superfluous. *See Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380, 77 U.S.P.Q.2d 1988, 1993 (Fed. Cir. 2006) (noting same). Thus, a legal presumption exists that claim 1 covers an "intermediate order" that has the same terms as the "first order."

Furthermore, the use of the terms "intermediary," "broker," and "dealer" as described above is consistent with their use in the securities industry. "Brokers" frequently act on an agency basis. (*See* Guide to Broker-Dealer Registration, Division of Market Regulation, U.S. Securities and Exchange Commission, December 2005 ("a broker . . . acts as agent").)[8] The Securities and Exchange Act of 1934 defines a "broker" as "any person engaged in the business of effecting transactions in securities *for the account of others.*" (Section 3(a)(4)(A) (emphasis

---

[8] *See* http://www.sec.gov/divisions/marketreg/bdguide.htm.

21

Patent No. 7,231,363
Client Reference No. 65024-2

added).) The Financial Industry Regulatory Authority (FINRA) provides an online glossary

providing similar definitions of "broker," "dealer," and "broker-dealer." [9]

> broker: An individual or firm who acts as an intermediary between a buyer and seller,
> usually charging a commission. (*See* dealer.)
> dealer: Any person or company in the business of buying and selling securities for his or
> her own account, through a broker or otherwise. (*See* broker.)
> broker-dealer: FINRA firms that act as securities dealers or brokers, or perform both
> functions. (*See* broker, dealer.)

(Emphasis added).

> **b.      Applying the Broadest Reasonable Meaning of the Term
> "intermediate order," Buist Teaches "receiving one or more
> intermediate orders, including at least one offer or bid relating
> to said financial instrument."**

Buist describes a broker-dealer passing along a sell order from the investor to others on

the system. Buist teaches a system in which an "offer to sell is received from a broker/dealer,

after transmission thereto by said first user computer" (Ex. A (Buist) at 38:44-47), and the

system "communicat[es] over the network said offer to sell . . . to other user computers." (*Id.* at

37:37-39.)

Buist discloses that the user submits a sell order, and "[i]n response, the order is

transmitted to the server and database of the user's broker/dealer, which checks, at step 350,

whether the user has sufficient shares in his account for the requested transaction . . . . If the

transaction is approved, at step 354, the server of the *broker/dealer sends the user's approved

sell order to the root server* 50, which attaches a system ID to the order, identifying the user's

account, his order (stock symbol, size, price, and whether buy or sell), and his broker/dealer . . . .

*The applications receive this sell offer and, at step 370, display the offer in the order book

displays of the subscribed users.*" (Ex. A (Buist) at 9:65-10:1, 10:7-11 (emphasis added).)

---

[9] *See* http://www.finra.org/Resources/Glossary/EntireGlossary/index.htm.

22

Patent No. 7,231,363
Client Reference No. 65024-2

The user can also require a broker-dealer to "route" orders to a specific market. The trade ticket for the sell order includes a "Route To" field that "is used to indicate special routing instructions (route order to a specific market)." (*Id.* at 14:37-40, Fig. 11.)

### c.    Buist Teaches that the Intermediate Order Is Received "from at least one of a plurality of intermediate parties using the computerized system."

As explained above, Buist teaches that a broker-dealer may place an intermediate order by passing along the order on behalf of a client. Buist further teaches that a plurality of broker-dealers use the broker-dealer servers, which are part of the computerized system, to place such intermediate orders. Buist provides that "[i]n the preferred embodiment, each of a multiplicity of users' workstations is simultaneously connected via the Internet to one of a *plurality of broker/dealer computers*." (Ex. A (Buist) at 6:26-29 (emphasis added).)

### d.    Buist Teaches "at least one of the intermediate orders being placed by the at least one intermediate party in response to the first order."

As explained above, Buist teaches that a broker-dealer places an "intermediate order" by passing along a sell order on behalf of a client. That intermediate order is placed "[i]n response" to the first order (i.e., the user's sell order). The specification explains: "In response, the [user's sell] order is transmitted to the server and database of the user's broker/dealer . . . . If the transaction is approved, at step 354, the server of the broker/dealer sends the user's approved sell order to the root server." (*Id.* at 9:65-10:9.)

### 3.    Buist Teaches "receiving a second order, including at least one offer or bid relating to said financial instrument, from a second ordering party using the computerized system, the second order being placed by the second ordering party in response to one or more of the intermediate orders."

As explained above, Buist teaches that a broker-dealer places an "intermediate order" by passing along a sell order on behalf of a client. Buist further teaches that such an intermediate order is then disseminated to other users on the system. "If the transaction is approved, at step 354, the server of the broker/dealer sends the user's approved sell order to the root server . . . . The applications receive this sell offer and, at step 370, display the offer in the order book

Patent No. 7,231,363
Client Reference No. 65024-2

displays of the subscribed users." (*Id.* at 9:69-10:1, 10:7-22.) A second ordering party can then respond to the intermediate order by executing a buy order from his or her workstation on the computerized system. (*Id.* at 10:26-30.)

In an alternative interpretation, Buist may be understood to teach that the second ordering party is responding to the "first user's sell offer" rather than the "intermediate order" placed by the first user's broker. However, that is only a difference in the nomenclature used by the Buist specification compared to the '363 Patent. As a matter of function, as described above, the second ordering party in Buist cannot respond directly to the first user's sell offer because the sell offer is not viewable by potential buyers on the system until after the broker-dealer has approved it and forwarded it as an intermediate order. Accordingly, even under this alternative interpretation, the second order in Buist is in response to the broker-dealer's intermediate order, not just to the first user's sell offer.

> 4.    **Buist Teaches "Identifying the serial chain of transactions using the first order, at least one received intermediate order, and the second order."**

Buist discloses the claimed step of identifying the serial chain of transactions. Buist assigns a unique identifier to the first ordering party's order that stays with the order through the serial chain of transactions. The first order (i.e., the sell order) and the intermediate order (i.e., the broker-dealer forwarding the sell order for display on the system) are both tagged with the same ID. "[T]he server of the broker/dealer sends the user's approved sell order to the root server 50, which attaches a system ID to the order, identifying the user's account, his order (stock symbol, size, price, and whether buy or sell), and his broker/dealer." (Ex. A (Buist) at 10:7-11.)

Then, the second user's buy order has the same ID attached to it. "The buy order, along with an ID assigned to the corresponding offer to sell, is transmitted at step 378, to the server and database of the buyer's broker/dealer using another, preferably Internet, connection that the buyer has to his broker/dealer system." (*Id.* at 10:30-34.)

Patent No. 7,231,363
Client Reference No. 65024-2

va-238097

Buist describes that "[t]he broker/dealer server/database sends the approved sell order (with a user account ID and the size, price, stock, and side (whether buy or sell) of the order) to the root server 50, which attaches a system ID to the order, said system ID containing sufficient information to enable the system to match the ID to the seller, the order, and the seller's broker/dealer." (*Id.* at 32:37-43.)

Accordingly, a serial chain of transactions is identified through the use of unique IDs applied to the first order, intermediate order, and second order.

> **5.** **Buist Teaches "executing the at least one transaction within the serial chain of transactions, where the serial chain of transactions comprises a transfer of said financial instrument between the first ordering party and a first intermediate party, and a transfer of said financial instrument between the second ordering party and a last intermediate party and where the first intermediate party and the last intermediate party are different parties or the same party."**
>
> **a.** **Buist Teaches "executing the at least one transaction within the serial chain of transactions."**

Buist describes a step in which the transaction is confirmed and executed. "The broker/dealer servers of both parties to the transaction notify the applications of the parties that the transaction is confirmed (by updating the open positions and related displays, and preferably also by email) . . . . The exchange of securities and money takes place subsequently in a conventional way between the broker/dealers of the buyer and the seller." (Ex. A (Buist) at 10:54-63.)

The clause "the exchange of securities and money takes place subsequently in a conventional way" discloses the electronic clearing and settling of the transaction. To determine what one of ordinary skill in the art would understand that clause to mean, it is appropriate to look to extrinsic evidence. For example, in *In re Baxter Travenol Labs*, 952 F.2d 388, 21 U.S.P.Q.2d 1281 (Fed. Cir. 1991), the patentee for a blood bag system argued in reexamination that a prior art reference did not expressly disclose that the blood bag was plasticized with DEHP, as required by the claims. 952 F.2d at 390, 21 U.S.P.Q.2d at 1284. The reference described the blood bag system as "very similar" to Baxter's existing commercial system, and

Patent No. 7,231,363
Client Reference No. 65024-2
va-238097

extrinsic evidence established that Baxter's commercial system used a bag plasticized with DEHP. *Id.* Relying on that extrinsic evidence, the examiner concluded that the reference anticipated the patent because "it is clear that one skilled in the art would have known that Becker was referring to a DEHP-plasticized primary bag." *Id.* The Federal Circuit affirmed, holding that "extrinsic evidence may be considered when it is used to explain, but not expand, the meaning of a reference." *Id.*

Here, one of ordinary skill in the art in April 1999 would have known the meaning of the clause "[t]he exchange of securities and money takes place subsequently in a conventional way between the broker/dealers of the buyer and the seller." A person having ordinary skill in the art in April 1999 would have been aware of the conventional use of computerized systems for clearing and settling transactions at that time. (Rosen Decl. ¶ 34.) That conventional use of computerized systems for clearing and settling transactions is referenced in the '363 Patent, which refers to "existing settlement and payment systems, such as the Thomson Financial system or the OASIS system using the SWIFT protocol." ('363 Patent at 13:24-29.)

          **b.**    **Buist Teaches that "the serial chain of transactions comprises a transfer of said financial instrument between the first ordering party and a first intermediate party, and a transfer of said financial instrument between the second ordering party and a last intermediate party."**

Buist teaches a serial chain of transactions in which the financial instrument is transferred from the seller to the seller's broker-dealer, then from the seller's broker-dealer to the buyer's broker-dealer, and finally from the buyer's broker-dealer to the buyer.

Buist discloses that "[t]he exchange of securities and money takes place subsequently in a conventional way between the broker/dealers of the buyer and the seller." (Ex. A (Buist) at 10:60-62.) One of ordinary skill in the art at the time of the invention would have known the conventional sequence of transfers that occurs when settling an agency trade in a stock transaction, for example: An investor would have kept his or her stock in the form of certificates with a custodian. Upon completion of a trade selling those securities, the custodian would have transferred the certificates to the seller's broker. The seller's broker would have then transferred

26

the certificates to the buyer's broker, who would have transferred them to the buyer's custodian. (Rosen Decl. ¶ 34.) Buist confirms that the seller's broker-dealer and the buyer's broker-dealer handle the transfer of the securities. "At step 390 the root server 50 notifies the broker/dealer systems of both parties of the details of the transaction so as to identify which funds and shares must be transferred to which accounts." (Ex. A (Buist) at 10:45-48.)

        c.      **Buist Teaches that "the first intermediate party and the last intermediate party are different parties or the same party."**

Buist teaches two intermediate parties. The first intermediate party is the seller's broker-dealer, as explained above. The last intermediate party is the buyer's broker-dealer. The buyer's broker-dealer, like the seller's broker-dealer, passes along the buyer's order after approving it. "The buy order, along with an ID assigned to the corresponding offer to sell, is transmitted at step 378, to the server and database of the buyer's broker/dealer . . . . The buyer's server checks, at step 382, whether the buyer has sufficient funds or credit in his account to purchase the stock offered by the seller . . . . Also, a broker/dealer may not authorize a transaction if buyer's profile and preference do not correspond to the characteristics of the security that he wants to purchase. If the transaction is approved, at step 386, the buyer's broker/dealer sends the approval of the order along with sufficient information to identify the buyer and the order to the root server 50." (Ex. A (Buist) at 10:30-45.) Thus, Buist allows that the buyer's broker-dealer and the seller's broker-dealer can be different parties or the same party.

        6.      **Buist Teaches Claim 2, Which Recites "The method of claim 1, comprising determining whether a match occurs between one of the intermediate orders and at least one of the first and second orders of the first and second ordering parties."**

The '363 Patent states that "a party B [i.e., the second ordering party] submits an order which is determined to match the order it received from one of the intermediaries" when, for example, party B "accepts an order by submitting a matching order."

Buist discloses exactly that process. Buist teaches that the buyer (i.e., the second ordering party) "sees" the sell offer passed along by the seller's broker-dealer (i.e., the intermediate order). (*Id.* at 10:26-30.) The buyer "accepts the offer (executing a buy order)."

27

Patent No. 7,231,363<br>Client Reference No. 65024-2

(*Id.*) That buy order is identified as matching the sell offer through the use of a unique identifier: "The buy order, along with an ID assigned to the corresponding offer to sell, is transmitted . . . ." (*Id.* at 10:30-31.)

In addition, Buist teaches using that same unique identifier to match the customer's original sell offer (i.e., the first order) with the sell order passed along by the seller's broker-dealer (i.e., the intermediate order). "The broker/dealer server/database sends the approved sell order . . . to the root server 50, which attaches a system ID to the order, said system ID containing sufficient information to enable the system to match the ID to the seller, the order, and the seller's broker/dealer." (*Id.* at 32:37-43.)

   7.    **Buist Teaches Claim 3, Which Recites "The method of claim 2, comprising matching one or more of the intermediate orders between the first order and the second order and executing the one or more matched orders to at least partially execute the serial chain of transactions."**

      a.    **Buist Teaches "matching one or more of the intermediate orders between the first order and the second order."**

As described above, Buist discloses "matching" the buyer's order (i.e., the second order) and the sell offer passed along by the seller's broker-dealer (i.e., the intermediate order) through use of a unique identifier. (Ex. A (Buist) at 10:26-31.) In addition, as described above, Buist discloses "matching" the investor's original sell offer (i.e., the first order) and the version of the offer passed along by the seller's broker-dealer (i.e., the intermediate order), through the use of the same unique identifier. (*Id.* at 32:37-43.)

      b.    **Buist Teaches "executing the one or more matched orders to at least partially execute the serial chain of transactions."**

Buist teaches a step in which the matched orders are confirmed and executed. "The broker/dealer servers of both parties to the transaction notify the applications of the parties that the transaction is confirmed (by updating the open positions and related displays, and preferably also by email) . . . . The exchange of securities and money takes place subsequently in a conventional way between the broker/dealers of the buyer and the seller." (*Id.* at 10:54-63.)

28

8.     Buist Teaches Claim 4, Which Recites "The method of claim 3, comprising receiving an indication from the first ordering party to select whether the first order is a live, executable order or a subject order."

The '363 Patent defines "a live, executable order" as an order that is "automatically execute[d]." ('363 Patent at 3:63-67.) By contrast, a "subject order" requires that "a condition is satisfied to which the order is subject before executing the transaction." (*Id.* at 4:4-8.)

Buist teaches that the first ordering party may select whether an order is to be placed with or without "conditions." The seller (i.e., the first ordering party) uses the graphical interface to "fill[] in a trade ticket (see FIG. 11) for a sell order." (*Id.* at 9:56-58.) That trade ticket has a field for "Conditions." (*Id.* at Fig. 11.) "The Conditions slot 1155 is used to indicate whether there is a condition on the order (e.g., all or none)." (*Id.* at 14:35-36.) In the example shown in Figure 11, the "Conditions" slot is set to "none." (*Id.* at Fig. 11.)

9.     Buist Teaches Claim 5, Which Recites "The method of claim 4 wherein the first order is a live, executable order, and the step of receiving one or more intermediate orders comprises receiving one or more live, executable intermediate orders."

As described above, Buist teaches that the seller (i.e., the first ordering party) may elect to place an order without "conditions," so that it is a live, executable order.

Buist teaches that, when the broker-dealer passes along his or her client's sell order, that intermediate order contains all the same information that the seller's original order contained. After the seller fills out the trade ticket online, the seller's "order is transmitted to the server and database of the user's broker/dealer." (Ex. A (Buist) at 9:65-6.) "If the transaction is approved, at step 354, the server of the broker/dealer sends the user's approved sell order to the root server 50, which attaches a system ID to the order . . . ." (*Id.* at 10:7-9.) Because the broker-dealer is simply forwarding the seller's order, no information is lost, and the terms are the same. Accordingly, if the seller's order was live and executable, the version of that order forwarded by the broker-dealer will be live and executable as well. (Rosen Decl. ¶ 35.)

Patent No. 7,231,363
Client Reference No. 65024-2

va-238097

10.   **Buist Teaches Claim 6, Which Recites "The method of claim 5, comprising automatically executing one or more live orders in the serial chain of transactions that are matched."**

Buist teaches that, absent any conditions on the order, the order is automatically executed when the buyer accepts the order by sending a matching buy order. Once the buyer's broker-dealer approves the buyer's order, the trade "must" be completed. "If the transaction is approved, at step 386, the buyer's broker/dealer sends the approval of the order . . . . At step 390 the root server 50 notifies the broker/dealer systems of both parties of the details of the transaction so as to identify which funds and shares *must* be transferred to which accounts . . . . The broker/dealer servers of both parties to the transaction notify the applications of the parties that the transaction is *confirmed* : . . . The exchange of securities and money takes place subsequently . . . ." (Ex. A (Buist) at 10:42-61 (emphasis added).)

11.   **Buist Teaches Claim 7, Which Recites "The method of claim 1, wherein: the first order received from the first ordering party is an order subject to satisfaction of a condition, and the method further comprises executing the order subject to condition only if the condition is satisfied."**

Buist teaches that the seller's order (i.e., the first order from the first ordering party) is subject to satisfaction of a condition: namely, that the order can be executed only if the seller has sufficient shares in his or her account to complete the transaction. The seller's "order is transmitted to the server and database of the user's broker/dealer, which checks, at step 350, whether the user has sufficient shares in his account for the requested transaction." (Ex. A (Buist) at 9:65-10:1.) The broker-dealer will pass on the order for viewing and execution by buyers only "[i]f the transaction is approved" as meeting that condition. (*Id.* at 10:7-9.)

Patent No. 7,231,363
Client Reference No. 65024-2

va-238097

12. **Buist Teaches Claim 8, Which Recites "The method of claim 1, comprising storing a set of rules for each of at least some of the parties using the system in a memory accessible to such parties, wherein the step of receiving intermediate orders comprises receiving intermediate orders generated between intermediate parties based upon the stored sets of rules."**

a. **Buist Teaches "storing a set of rules for each of at least some of the parties using the system in a memory accessible to such parties."**

Buist teaches that the seller's broker-dealer (i.e., the first intermediate party) and the buyer's broker-dealer (i.e., the last intermediate party) store sets of rules concerning when they will pass along their clients' orders.

The seller's broker-dealer, for example, stores a rule about whether the seller is required to own the shares that he or she plans to sell. The seller's "order is transmitted to the server and database of the user's broker/dealer, which checks, at step 350, whether the user has sufficient shares in his account for the requested transaction." (*Id.* at 9:65-10:1.) "The preferred embodiment does not provide for a short-sell option . . . , although this capability may be provided in the alternative embodiment." (*Id.* at 10:1-5.) In other words, the broker-dealer can set a rule that the user must have the shares, or that the user need not have the shares.

The buyer's broker stores similar rules. "The buy order . . . is transmitted at step 378, to the server and database of the buyer's broker/dealer." The "server checks, at step 382, whether the buyer has sufficient funds or credit in his account to purchase the stock offered by the seller. The buyer may purchase stock on margin if he has a margin account and sufficient credit with the broker/dealer. Also, a broker/dealer may not authorize a transaction if buyer's profile and preference do not correspond to the characteristics of the security that he wants to purchase." (Ex. A (Buist) at 10:30-41.)

In both cases, operations on the rules in Buist are performed in connection with a "database" and a "server." Buist further describes "that a typical computer system that may be employed here as a server or a workstation includes a central processing unit, a primary memory, e.g., RAM, one or more secondary memory storage devices, e.g., floppy or hard disk drives, CD-

Patent No. 7,231,363
Client Reference No. 65024-2

ROMs, DVDs, or tapes, and communication interfaces." (*Id.* at 7:30-35.) Thus, Buist discloses storing a set of rules in a memory.

> **b.    Buist Teaches that "the step of receiving intermediate orders comprises receiving intermediate orders generated between intermediate parties based upon the stored sets of rules."**

In Buist, the seller's broker-dealer will pass on the seller's order (i.e., generate an intermediate order) only if the seller has sufficient shares in his or her account, as required under the stored rules. The seller's broker-dealer "checks . . . whether the user has sufficient shares" and sends on the seller's order only "[*i*]*f* the transaction is approved." (*Id.* at 9:65-10:7, emphasis added.)

Similarly, the buyer's broker-dealer will pass on the buyer's order (i.e., generate an intermediate order) only if the order meets the criteria in the stored rules. The "buyer's server checks whether . . . the buyer has sufficient funds or credit" and "may not authorize a transaction if the buyer's profile and preference do not correspond to the characteristics of the security that he wants to purchase." (*Id.* at 10:34-41.) "*If* the transaction is approved, at step 386," the buyer's broker-dealer passes on the buyer's order. (*Id.* at 10:42-45, (emphasis added).)

> **13.    Buist Teaches Claim 11, Which Recites "The method of claim 1, wherein the step of identifying the serial chain of transactions comprises tracking a path of parties for which orders have been received tracing back to the first ordering party."**

As discussed above, Buist assigns a unique identifier to the first ordering party's order that tracks the order through the serial chain of transactions. The first order (i.e., the sell order), the intermediate order (i.e., the broker-dealer forwarding the sell order for display on the system), and the second order (i.e., the buy order) are all tagged with the same identifier. (Ex. A (Buist) at 10:7-11, 10:30-34.) That unique identifier tracks the parties associated with the order. The identifier can be traced back to the first ordering party because it is the identifier associated with the original sell offer (i.e., the first order).

Patent No. 7,231,363
Client Reference No. 65024-2

14. **Buist Teaches Claim 12, Which Recites "The method of claim 11, comprising storing a subset of the path of parties in association with each of the orders."**

As described in connection with claim 11, Buist teaches that the first order, intermediate order, and second order are tagged with identifiers that track the order through the serial chain of transactions. Those orders, with their matching identifiers, are stored in the "master database" of the "root server." (*Id.* at 10:11-13.)

15. **Buist Teaches Claim 14, Which Recites "The method of claim 1, wherein at least one further one of the intermediate orders participating in the serial chain of transactions is placed by at least one further intermediate party in response to one or more others of the intermediate orders."**

a. **Buist Teaches that "at least one further one of the intermediate orders participating in the serial chain of transactions is placed by at least one further intermediate party."**

Buist teaches two intermediate orders: one intermediate order placed by the seller's broker-dealer, which forwards the seller's order to the root server for viewing by potential counterparties, and a second intermediate order placed by the buyer's broker-dealer, which forwards the buyer's order for execution. The first intermediate order was addressed above. The second intermediate order (i.e., the "at least one further one of the intermediate orders") is described in detail in the Buist specification: "The buy order, along with an ID assigned to the corresponding offer to sell, is transmitted at step 378, to the server and database of the buyer's broker/dealer . . . . The buyer's server checks, at step 382, whether the buyer has sufficient funds or credit in his account to purchase the stock offered by the seller . . . . Also, a broker/dealer may not authorize a transaction if buyer's profile and preference do not correspond to the characteristics of the security that he wants to purchase. If the transaction is approved, at step 386, the buyer's broker/dealer sends the approval of the order along with sufficient information to identify the buyer and the order to the root server 50." (Ex. A (Buist) at 10:30-45.)

b. **Buist Teaches that the Further Intermediate Order Is Placed "in response to one or more others of the intermediate orders."**

Buist teaches that the buyer's broker-dealer places the second intermediate order "in response to" both the buyer's order and the first intermediate order sent by the seller's broker-

33

Patent No. 7,231,363
Client Reference No. 65024-2

dealer. After the seller's broker-dealer sends the first intermediate order to the root server, the buyer "sees" that "sell offer" and "accepts the offer (executing a buy order)." (*Id.* at 10:26-30.) "The buy order, along with an ID assigned to the corresponding offer to sell [from the seller's broker-dealer], is transmitted at step 378, to the server and database of the buyer's broker/dealer." (*Id.* at 10:30-34.) Upon receipt, the buyer's broker-dealer performs the approval "checks" and, if approved, sends a second intermediate order: that is, the buyer's broker-dealer "sends the approval of the order along with sufficient information to identify the buyer and the order" to the root server. (*Id.* at 10:42-45.)

   16.   **Buist Teaches Claim 15, Which Recites "The method of claim 1, wherein any further intermediate orders participating in the serial chain of transactions are placed by others of the intermediate parties in response to one or more others of the intermediate orders."**

         a.   **Buist Teaches that "any further intermediate orders participating in the serial chain of transactions are placed by others of the intermediate parties."**

As explained above, Buist teaches that the buyer's broker-dealer places a second intermediate order—a further intermediate order placed by a further intermediate party.

         b.   **Buist Teaches that the Further Intermediate Order Is Placed "in response to one or more others of the intermediate orders."**

As described above, Buist teaches that the buyer's broker-dealer places the second intermediate order "in response to" both the buyer's order and the first intermediate order sent by the seller's broker-dealer.

**B.   Buist in Combination with Harpale Renders Obvious Claims 9, 10, and 13 of the '363 Patent Under 35 U.S.C. § 103 (Exhibit R).**

   1.   **Claim 9 Recites "The method of claim 1, wherein the first order received from the first ordering party has a first set of terms, and the step of receiving intermediate orders comprises receiving intermediate orders having respective second sets of terms different than the first set of terms."**

         a.   **Buist Teaches that "the first order received from the first ordering party has a first set of terms."**

Buist teaches that "[a]ssuming that the user decides to sell some of his/her holdings in the displayed securities, at step 342 he/she fills in a trade ticket (see FIG. 11) for a sell order." (Ex.

34

Patent No. 7,231,363<br>Client Reference No. 65024-2

A (Buist) at 9:56-58.) Figure 11 shows fields for a set of terms: quantity, symbol, price type, duration, condition, route to, etc. The claimed "set of terms" is disclosed by the trade ticket with terms such as those illustrated in Figure 11.

**b.    Buist in Combination with Harpale Renders Obvious "the step of receiving intermediate orders comprises receiving intermediate orders having respective second sets of terms different than the first set of terms."**

While Buist does not teach "the step of receiving intermediate orders comprises receiving intermediate orders having respective second sets of terms different than the first set of terms," this claimed step is obvious over Buist in combination with U.S. Patent No. 7,222,089 to Harpale ("Harpale"). Harpale was filed on September 11, 2001, with a priority claim to a provisional application filed September 11, 2000. It therefore qualifies as prior art under 35 U.S.C. § 102(e), based on the November 6, 2000, filing date of the '363 Patent. Harpale was not considered during the prosecution of the '363 Patent.

The Harpale patent, entitled "Intermediary Driven Electronic Marketplace for Cross-Market Trading," discloses that intermediaries can take a markup on orders for trading commodities and services sent on behalf of clients. Harpale describes a computer system in which an intermediary receives an offer to sell from a seller, changes the price on that offer by adding a markup, and passes that offer along to the buyer: "Intermediaries can see bids posted by suppliers or other intermediaries .... Intermediaries mark-up [the] bid price ... to make up for moving the goods across markets. Intermediary-I1 231 and Intermediary-I2 232 add mark-up price, adjust bid quotation, and forward modified quotation 500 to Buyer-B1 211 for review." (Ex. B (Harpale) at 14; Figs. 4B and 5B.)

It would have been obvious to a person with ordinary skill in the art at the time of the invention to combine Harpale with Buist. Both Harpale and Buist involve electronic trading systems, and both involve intermediaries who are passing orders from the buyer to the seller and vice versa. Those skilled in the art of creating electronic trading platforms for financial instruments at the time of the invention would have been familiar with developments in handling

Patent No. 7,231,363
Client Reference No. 65024-2

orders in electronic trading platforms for commodities and services. (Rosen Decl. ¶ 39.) For example, during the late 1990s, developers of electronic trading platforms for financial instruments participated in conferences with developers of electronic trading platforms for commodities and services, thereby sharing information about the systems that they were developing. (*Id.*) Indeed, the '363 Patent recognizes that innovations in the area of bond trading can be applied to electronic trading of commodities and services, and vice versa, when it claims that the subject matter of the '363 Patent "may advantageously be used for trading and order matching of financial instruments . . . as well as many other electronic commerce systems which involve the buying, selling or auctioning of commodities or services." ('363 Patent at 3:30-35.)

Moreover, persons having ordinary skill in the art of creating electronic trading systems for broker-dealers at the time of the invention would have had a strong economic motivation to combine Buist with Harpale. (Rosen Decl. at ¶ 40.) As explained above, as compensation for services such as order processing, order routing, and order review and approval, broker-dealers typically either (1) charge a commission on orders that they pass along on an agency basis or (2) add a markup or markdown to the price of the order, taking a principal position before passing the order along, and pocketing the price difference. Markups or markdowns are often more profitable than commissions. (*Id.*) Accordingly, any person developing an electronic trading system in which brokers played a role, as in Buist, would have had a strong incentive to provide broker-dealers with the capability to generate income by taking a markup or markdown.

> **2.    Buist in Combination with Harpale Renders Obvious Claim 10, Which Recites "The method of claim 9, wherein the first set of terms include a price for one or more transactions in the serial chain of transactions, and the step of receiving intermediate orders includes receiving intermediate orders having respective second sets of terms in which a price term has been modified from the first set of terms."**

Buist discloses that the first order can include a price term. "Assuming that the user decides to sell some of his/her holdings in the displayed securities, at step 342 he/she fills in a trade ticket (see FIG. 11) for a sell order." (Ex. A (Buist) at 9:56-58.) Figure 11 of Buist shows fields for "limit price" and "stop price."

36

While Buist does not teach "wherein the first set of terms include a price for one or more transactions in the serial chain of transactions, and the step of receiving intermediate orders includes receiving intermediate orders having respective second sets of terms in which a price term has been modified from the first set of terms," Buist in combination with Harpale further teaches that the intermediate order can modify the price term in the first order, as explained above in connection with claim 9.

>     3.    **Buist in Combination with Harpale Renders Obvious Claim 13, Which Recites "The method of claim 1, wherein at least one of the first, second, and intermediate orders have parameters set by at least one of the first, second, and intermediate parties, and the intermediate orders in the serial chain of transactions cannot be prevented from execution by parameters set by the first and second ordering parties."**

>          a.    **Buist Teaches that "at least one of the first, second, and intermediate orders have parameters set by at least one of the first, second, and intermediate parties."**

The '363 Patent provides the following examples of "parameters" in an order: "price," "the counterparties specified," "whether the order is live or subject," or "whether the order is based on price or spread." ('363 Patent at 15:26-33.)

As described above, Buist teaches that the seller, as the first ordering party, can designate parameters of his or her sell order, including "price." (Ex. A (Buist) at 9:56-58; Fig. 11.)

>          b.    **Buist in Combination with Harpale Renders Obvious that "the intermediate orders in the serial chain of transactions cannot be prevented from execution by parameters set by the first and second ordering parties."**

While Buist does not teach that "the intermediate orders in the serial chain of transactions cannot be prevented from execution by parameters set by the first and second ordering parties," this claimed feature is taught by Buist in combination with Harpale. As described above, Harpale teaches an intermediate order that changes the price term of a seller's order before sending that order onward for potential buyers to accept and execute. In that scenario, the seller's original price (i.e., the parameter set by the first ordering party) does not prevent execution of a trade between the seller's broker-dealer and the buyer at the higher, marked-up price set by the seller's broker-dealer.

37

Patent No. 7,231,363<br>Client Reference No. 65024-2

C.    **Buist in Combination with Minton Renders Obvious Claims 9, 10, and 13 of the '363 Patent Under 35 U.S.C. § 103 (Exhibit S).**

1.    **Claim 9 Recites "The method of claim 1, wherein the first order received from the first ordering party has a first set of terms, and the step of receiving intermediate orders comprises receiving intermediate orders having respective second sets of terms different than the first set of terms."**

a.    **Buist Teaches that "the first order received from the first ordering party has a first set of terms."**

As described above, Buist teaches that the seller, as the first ordering party, can designate terms of his or her sell order, including quantity, symbol, price type, duration, condition, route to, etc. (Ex. A (Buist) at 9:56-58, Fig. 11.)

b.    **Buist in Combination with Minton Renders Obvious "the step of receiving intermediate orders comprises receiving intermediate orders having respective second sets of terms different than the first set of terms."**

While Buist does not teach "the step of receiving intermediate orders comprises receiving intermediate orders having respective second sets of terms different than the first set of terms," this claimed step is obvious over Buist in combination with U.S. Pat. No. 6,014,643 to Minton ("Minton"). Minton was filed on August 26, 1996, with a priority claim to a provisional application filed June 28, 1996. It therefore qualifies as prior art under 35 U.S.C. § 102(e), regardless whether the priority date for the '363 Patent is the filing date of the utility patent application on November 6, 2000, or the filing date of the earliest provisional application on December 29, 1999. Minton was not considered during the prosecution of the '363 Patent.

Minton discloses an "Interactive Securities Trading System" in which users on the system can act as "market makers." According to Minton, a user can create a setup by which he or she automatically buys securities for one price and resells for another price. (Ex. C (Minton) at 13:46-14:6; Fig. 9.)

It would have been obvious to combine Minton with Buist to provide broker-dealers the ability to buy from clients at one price and resell to others on the system at another price. (Rosen Decl. ¶ 41.) Both Minton and Buist describe electronic trading platforms for financial instruments. Minton even describes a system quite similar to Buist's. In Minton, as in Buist,

38

Patent No. 7,231,363
Client Reference No. 65024-2

User A sends his limit order to his broker, who can either approve or disapprove it. (Ex. C (Minton) at 12:54-64; Fig. 8.) If it is approved, the broker sends the order on to other investors, including User B. (*Id.* at 13:7-10.) User B can accept User A's offer by entering a matching order. (*Id.* at 13:21-25.) User B's order is sent on to his broker, who can either approve or disapprove it. (*Id.* at 13:24-27.) Moreover, as described above, there would have been strong economic motivation to combine Minton with Buist in order to enable broker-dealers to charge markups on orders executed for their clients.

> **2.** **Buist in Combination with Minton Renders Obvious Claim 10, Which Recites "The method of claim 9, wherein the first set of terms include a price for one or more transactions in the serial chain of transactions, and the step of receiving intermediate orders includes receiving intermediate orders having respective second sets of terms in which a price term has been modified from the first set of terms."**

As described above, Buist teaches that the seller, as the first ordering party, can designate the terms of his or her sell order, including "price." (Ex. A (Buist) at 9:56-58; Fig. 11.)

While Buist does not teach "wherein the first set of terms include a price for one or more transactions in the serial chain of transactions, and the step of receiving intermediate orders includes receiving intermediate orders having respective second sets of terms in which a price term has been modified from the first set of terms," Buist, in combination with Minton, further teaches that the intermediate order can modify the price term in the first order, as explained above in connection with claim 9.

> **3.** **Buist in Combination with Minton Renders Obvious Claim 13, Which Recites "The method of claim 1, wherein at least one of the first, second, and intermediate orders have parameters set by at least one of the first, second, and intermediate parties, and the intermediate orders in the serial chain of transactions cannot be prevented from execution by parameters set by the first and second ordering parties."**

> > **a.** **Buist Teaches that "at least one of the first, second, and intermediate orders have parameters set by at least one of the first, second, and intermediate parties."**

As described above, Buist teaches that the seller, as the first ordering party, can designate parameters of his or her sell order, including "price." (*Id.* at 9:56-58; Fig. 11.)

39

      **b.**    **Buist in Combination with Minton Renders Obvious that "the intermediate orders in the serial chain of transactions cannot be prevented from execution by parameters set by the first and second ordering parties."**

While Buist does not teach that "the intermediate orders in the serial chain of transactions cannot be prevented from execution by parameters set by the first and second ordering parties," this claimed feature is taught by Buist in combination with Minton. As described above, Minton teaches an intermediate order that changes the price term of a seller's order before sending that order onward for potential buyers to accept and execute. In that scenario, the seller's original price (i.e., the parameter set by the first ordering party) does not prevent execution of a trade between the seller's broker-dealer and the buyer at the higher, marked-up price set by the seller's broker-dealer.

   **D.**    **Buist in Combination with Cohen Renders Obvious Claims 9, 10, and 13 of the '363 Patent Under 35 U.S.C. § 103 (Exhibit T).**

      **1.**    **Claim 9 Recites "The method of claim 1, wherein the first order received from the first ordering party has a first set of terms, and the step of receiving intermediate orders comprises receiving intermediate orders having respective second sets of terms different than the first set of terms."**

         **a.**    **Buist Teaches that "the first order received from the first ordering party has a first set of terms."**

As described above, Buist teaches that the seller, as the first ordering party, can designate terms of his or her sell order, including quantity, symbol, price type, duration, condition, route to, etc. (Ex. A (Buist) at 9:56-58; Fig. 11.)

         **b.**    **Buist in Combination with Cohen Renders Obvious "the step of receiving intermediate orders comprises receiving intermediate orders having respective second sets of terms different than the first set of terms."**

While Buist does not teach "the step of receiving intermediate orders comprises receiving intermediate orders having respective second sets of terms different than the first set of terms," this claimed step is obvious over Buist in combination with Marilyn Cohen, "Bond Trading Goes On-Line", *Forbes*, at 100 (Jan. 25, 1999) (Ex. D, "Cohen"). Cohen was published on January 25, 1999. It therefore qualifies as prior art under 35 U.S.C. § 102(b), based on the November 6,

Patent No. 7,231,363
Client Reference No. 65024-2

2000 filing date of the '363 Patent. Moreover, even if the '363 Patent were entitled to its claimed priority date of December 29, 1999 based on its earliest provisional application, Gutner would still qualify as prior art under 35 U.S.C. § 102(a). Cohen was not considered during the prosecution of the '363 Patent.

The Cohen article discloses an electronic bond trading system that allows a broker-dealer, E-Trade, to modify the price term before passing along a sell offer to buyers. A potential buyer can "peruse lists of offerings" and "place a limit order to buy." The offerings include a "markup, the profit tacked on by E-Trade." A person having ordinary skill in the art at the time of the invention would have understood that a "markup" refers to the fact that E-Trade changes the price of the offering from the seller before passing it along to users on the system. (Rosen Decl. ¶ 42.)

It would have been obvious to a person with ordinary skill in the art at the time of the invention to combine Cohen with Buist. Both references deal with electronic trading systems for financial instruments. (Id. at ¶ 43.) As described above, a person developing order management systems for broker-dealers would have had a strong economic motivation to combine Buist with a reference that allowed the broker-dealer to change the price of the financial instrument before passing it along.

Moreover, a person having ordinary skill in the art at the time of the invention would have had sufficient knowledge to implement the markup described in the Cohen article. (Rosen Decl. ¶ 44.) As of January 1999, when the Cohen article was published, numerous electronic trading systems existed in which broker-dealers took markups on trades. (Id.) Given the prevalence of markups in electronic bond trading systems at that time, a person having ordinary skill in the art at the time of the invention could easily have implemented such an addition to the Buist system without undue experimentation.

41

   2. **Buist in Combination with Cohen Renders Obvious Claim 10, Which Recites "The method of claim 9, wherein the first set of terms include a price for one or more transactions in the serial chain of transactions, and the step of receiving intermediate orders includes receiving intermediate orders having respective second sets of terms in which a price term has been modified from the first set of terms."**

As described above, Buist teaches that the seller, as the first ordering party, can designate the terms of his or her sell order, including "price." (Ex. A (Buist) at 9:56-58, Fig. 11.)

While Buist does not teach "wherein the first set of terms include a price for one or more transactions in the serial chain of transactions, and the step of receiving intermediate orders includes receiving intermediate orders having respective second sets of terms in which a price term has been modified from the first set of terms," Buist, in combination with Cohen, further teaches that the intermediate order can modify the price term in the first order, as explained above in connection with claim 9.

   3. **Buist in Combination with Cohen Renders Obvious Claim 13, Which Recites "The method of claim 1, wherein at least one of the first, second, and intermediate orders have parameters set by at least one of the first, second, and intermediate parties, and the intermediate orders in the serial chain of transactions cannot be prevented from execution by parameters set by the first and second ordering parties."**

    a. **Buist Teaches that "at least one of the first, second, and intermediate orders have parameters set by at least one of the first, second, and intermediate parties."**

As described above, Buist teaches that the seller, as the first ordering party, can designate the parameters of his or her her sell order, including "price." (*Id.* at 9:56-58, Fig. 11.)

    b. **Buist in Combination with Cohen Renders Obvious that "the intermediate orders in the serial chain of transactions cannot be prevented from execution by parameters set by the first and second ordering parties."**

While Buist does not teach "the intermediate orders in the serial chain of transactions cannot be prevented from execution by parameters set by the first and second ordering parties," this claimed feature is taught by Buist in combination with Cohen. As described above, Cohen teaches an intermediate order that changes the price term of a seller's order before sending that order onward for potential buyers to accept and execute. In that scenario, the seller's original price (i.e., the parameter set by the first ordering party) does not prevent execution of a trade

42

between the seller's broker-dealer and the buyer at the higher, marked-up price set by the seller's broker-dealer.

**E.** **Buist in Combination with Gutner Renders Obvious Claims 9, 10, and 13 of the '363 Patent Under 35 U.S.C. § 103 (Exhibit U).**

1. **Claim 9 Recites "The method of claim 1, wherein the first order received from the first ordering party has a first set of terms, and the step of receiving intermediate orders comprises receiving intermediate orders having respective second sets of terms different than the first set of terms."**

   a. **Buist Teaches that "the first order received from the first ordering party has a first set of terms."**

As described above, Buist teaches that the seller, as the first ordering party, can designate the terms of his or her sell order, including price type, duration, condition, route to, etc. (Ex. A (Buist) at 9:56-58; Fig. 11.)

   b. **Buist in Combination with Gutner Renders Obvious "the step of receiving intermediate orders comprises receiving intermediate orders having respective second sets of terms different than the first set of terms."**

While Buist does not teach "the step of receiving intermediate orders comprises receiving intermediate orders having respective second sets of terms different than the first set of terms," this claimed step is obvious over Buist in combination with Toddi Gutner, "How to Seal a Great Bond Deal", *BusinessWeek*, at 110 (May 24, 1999) (Ex. E, "Gutner"). Gutner was published on May 24, 1999. It therefore qualifies as prior art under 35 U.S.C. § 102(b), based on the November 6, 2000 filing date of the '363 Patent. Moreover, even if the '363 Patent were entitled to its claimed priority date of December 29, 1999 based on its earliest provisional application, Gutner would still qualify as prior art under 35 U.S.C. § 102(a). Gutner was not considered during the prosecution of the '363 Patent.

The Gutner article discloses an electronic bond trading system that allows a broker-dealer, E-Trade, to modify the price term before passing along a sell offer to buyers. A potential buyer can see inventory "from the trading desks at several bond dealers" and "lists of corporate, agency, U.S. Treasury, municipal, and zero-coupon bonds, plus certificates of deposit." The

43

offerings may include "a markup of a half-percent to three-quarters of a percent." A person having ordinary skill in the art at the time of the invention would have understood that a "markup" refers to the fact that E-Trade changes the price of the offering from the seller before passing it along to users on the system. (Rosen Decl. ¶ 45.)

It would have been obvious to a person with ordinary skill in the art at the time of the invention to combine Gutner with Buist. Both references deal with electronic trading systems for financial instruments. (*Id.* at ¶ 46.) As described above, a person developing order management systems for broker-dealers would have had a strong economic motivation to combine Buist with a reference that allowed the broker-dealer to change the price of the financial instrument before passing it along.

Moreover, a person having ordinary skill in the art at the time of the invention would have had sufficient knowledge to implement the markup described in the Gutner article. (Rosen Decl. ¶ 47.) As of May 1999, when the Gutner article was published, numerous electronic trading systems existed in which broker-dealers took markups on trades. (*Id.*) Given the prevalence of markups in electronic bond trading systems at that time, a person having ordinary skill in the art at the time of the invention could easily have implemented such an addition to the Buist system without undue experimentation.

> 2. **Buist in Combination with Gutner Renders Obvious Claim 10, Which Recites "The method of claim 9, wherein the first set of terms include a price for one or more transactions in the serial chain of transactions, and the step of receiving intermediate orders includes receiving intermediate orders having respective second sets of terms in which a price term has been modified from the first set of terms."**

As described above, Buist teaches that the seller, as the first ordering party, can designate the terms of his or her sell order, including "price." (Ex. A (Buist) at 9:56-58; Fig. 11.)

While Buist does not teach "wherein the first set of terms include a price for one or more transactions in the serial chain of transactions, and the step of receiving intermediate orders includes receiving intermediate orders having respective second sets of terms in which a price term has been modified from the first set of terms," Buist, in combination with Gutner, further

44

Patent No. 7,231,363
Client Reference No. 65024-2

teaches that the intermediate order can modify the price term in the first order, as explained above in connection with claim 9.

3. **Buist in Combination with Gutner Renders Obvious Claim 13, Which Recites "The method of claim 1, wherein at least one of the first, second, and intermediate orders have parameters set by at least one of the first, second, and intermediate parties, and the intermediate orders in the serial chain of transactions cannot be prevented from execution by parameters set by the first and second ordering parties."**

a. **Buist Teaches that "at least one of the first, second, and intermediate orders have parameters set by at least one of the first, second, and intermediate parties."**

As described above, Buist teaches that the seller, as the first ordering party, can designate the parameters of his or her sell order, including "price." (*Id.* at 9:56-58; Fig. 11.)

b. **Buist in Combination with Gutner Renders Obvious that "the intermediate orders in the serial chain of transactions cannot be prevented from execution by parameters set by the first and second ordering parties."**

While Buist does not teach that "the intermediate orders in the serial chain of transactions cannot be prevented from execution by parameters set by the first and second ordering parties," this claimed feature is taught by Buist in combination with Gutner. As described above, Gutner teaches an intermediate order that changes the price term of a seller's order before sending that order onward for potential buyers to accept and execute. In that scenario, the seller's original price (i.e., the parameter set by the first ordering party) does not prevent execution of a trade between the seller's broker-dealer and the buyer at the higher, marked-up price set by the seller's broker-dealer.

F.    **Buist in Combination with the Bond Market Association Survey Renders Obvious Claims 9, 10, and 13 of the '363 Patent Under 35 U.S.C. § 103 (Exhibit V).**

    1.    **Claim 9 Recites "The method of claim 1, wherein the first order received from the first ordering party has a first set of terms, and the step of receiving intermediate orders comprises receiving intermediate orders having respective second sets of terms different than the first set of terms."**

        a.    **Buist Teaches that "the first order received from the first ordering party has a first set of terms."**

As described above, Buist teaches that the seller, as the first ordering party, can designate the terms of his or her sell order, including quantity, symbol, price type, duration, condition, route to, etc. (*Id.* at 9:56-58; Fig. 11.)

        b.    **Buist in Combination with the Bond Market Association Survey Renders Obvious "the step of receiving intermediate orders comprises receiving intermediate orders having respective second sets of terms different than the first set of terms."**

While Buist does not teach "the step of receiving intermediate orders comprises receiving intermediate orders having respective second sets of terms different than the first set of terms," this claimed step is obvious over Buist in combination with Bond Market Association, *The 1998 Review of Electronic Transaction Systems in the U.S. Fixed Income Securities Markets* (Nov. 1998) (Exhibit F, "Bond Market Association Survey"). The Bond Market Association Survey was published in November 1998. It therefore qualifies as prior art under 35 U.S.C. § 102(b), regardless whether the priority date for the '363 Patent is the filing date of the utility patent application on November 6, 2000 or the filing date of the earliest provisional application on December 29, 1999. The Bond Market Association Survey was not considered during the prosecution of the '363 Patent.

The Bond Market Association Survey discloses an electronic bond trading system in which a broker-dealer, Trading Edge, Inc., buys from one party and immediately resells to another at a markup. "Trading Edge, Inc. will be acting as a riskless principal in all transactions and plans to disclose markups and markdowns for each transaction." (Ex. F (Bond Market Association Survey) at 14.) A person having ordinary skill in the art at the time of the invention

46

would have understood that a "markup" or "markdown" referred to the fact that Trading Edge changed the price of bids and offers before passing them along to users on the system. (Rosen Decl. ¶ 48.)

It would have been obvious to a person with ordinary skill in the art at the time of the invention to combine the markup described in the Bond Market Association Survey with Buist. Both references deal with electronic trading systems for financial instruments, (*Id.* at ¶ 49.) As described above, a person developing order management systems for broker-dealers would have had a strong economic motivation to combine Buist with a reference that allowed the broker-dealer to change the price of the financial instrument before passing it along.

Moreover, as explained above in regard to the Gutner and Cohen articles, a person having ordinary skill in the art at the time of the invention would have had sufficient knowledge to implement the markup described in the Bond Market Association Survey. (*Id.* at ¶ 50.)

>    2.    **Buist in Combination with the Bond Market Association Survey Renders Obvious Claim 10, Which Recites "The method of claim 9, wherein the first set of terms include a price for one or more transactions in the serial chain of transactions, and the step of receiving intermediate orders includes receiving intermediate orders having respective second sets of terms in which a price term has been modified from the first set of terms."**

As described above, Buist teaches that the seller, as the first ordering party, can designate the terms of his or her sell order, including "price." (Ex. A (Buist) at 9:56-58; Fig. 11.)

While Buist does not teach "wherein the first set of terms include a price for one or more transactions in the serial chain of transactions, and the step of receiving intermediate orders includes receiving intermediate orders having respective second sets of terms in which a price term has been modified from the first set of terms," Buist, in combination with the Bond Market Association Survey, further teaches that the intermediate order can modify the price term in the first order, as explained above in connection with claim 9.

Patent No. 7,231,363
Client Reference No. 65024-2

va-238097

3.    **Buist in Combination with the Bond Market Association Survey Renders Obvious Claim 13, Which Recites "The method of claim 1, wherein at least one of the first, second, and intermediate orders have parameters set by at least one of the first, second, and intermediate parties; and the intermediate orders in the serial chain of transactions cannot be prevented from execution by parameters set by the first and second ordering parties."**

        a.    **Buist Teaches that "at least one of the first, second, and intermediate orders have parameters set by at least one of the first, second, and intermediate parties."**

As described above, Buist teaches that the seller, as the first ordering party, can designate the parameters of his or her sell order, including "price." (Ex. A (Buist) at 9:56-58; Fig. 11.)

        b.    **Buist in Combination with the Bond Market Association Survey Renders Obvious that "the intermediate orders in the serial chain of transactions cannot be prevented from execution by parameters set by the first and second ordering parties."**

While Buist does not teach that "the intermediate orders in the serial chain of transactions cannot be prevented from execution by parameters set by the first and second ordering parties," this claimed feature is taught by Buist in combination with the Bond Market Association Survey. As described above, the Bond Market Association Survey teaches an intermediate order that changes the price term of a seller's order before sending that order onward for potential buyers to accept and execute. In that scenario, the seller's original price (i.e., the parameter set by the first ordering party) does not prevent execution of a trade between the seller's broker-dealer and the buyer at the higher, marked-up price set by the seller's broker-dealer.

    G.    **The Post-*KSR* Examination Guidelines for Determining Obviousness Support a Determination that Claims 9, 10, and 13 Are Obvious as Discussed in Sections IV.B-F, *Supra*.**

As discussed above in Sections IV.B-F, *supra*, Claims 9, 10, and 13 are satisfied where the intermediary takes a markup. As discussed in those respective sections, Harpale, Minton, Cohen, Gutner, and the Bond Market Association Survey all disclose computerized systems in which intermediaries or broker-dealers send orders onward to other parties after taking a markup on those orders. The fact that five separate references describe markups provides strong indication that the taking of a markup by an intermediary using a computerized system qualifies

Patent No. 7,231,363
Client Reference No. 65024-2

as a known technique that would be readily applicable to a known system: that is, the
computerized trading system described in Buist. Moreover, the fact that five separate references
describe markups further indicates that the results of applying a markup to the system in Buist
would be predictable. (*See also* Rosen Decl. ¶ 65.) Thus, rejection of these claims under the
combination of Buist and any one of Harpale, Minton, Cohen, Gutner, or the Bond Market
Association Survey is supported by Rationale (D) of the Examination Guidelines for
Determining Obviousness Under 35 U.S.C. § 103 ("[a]pplying a known technique to a known
device (method, or product) ready for improvement to yield predictable results").

> **H.    Even if Terms in the '363 Patent Were Given a Narrower Interpretation than
> the Broadest Reasonable Meaning Consistent with the Specification, Claims
> 1-15 Would Still Be Rendered Obvious Under 35 U.S.C. § 103 as Discussed in
> Sections IV.A-G, *Supra*.**

As discussed above, the broadest reasonable interpretation of "intermediate order"
encompasses "a broker-dealer . . . passing along an order relating to a transaction," that is, a
broker-dealer acting as an agent or another type of intermediary who does not take title to the
security or otherwise act as a "principal" in the transaction. Nothing in the specification or claim
language requires or suggests that the intermediary act as a principal in the transaction.
Nonetheless, the patent owner may propose a claim construction whereby the step in claim 1 of
"at least one of the intermediate orders being placed by the at least one intermediate party"
requires that the intermediary trade on behalf of his or her own account by taking a principal
position in the transaction.

Even under such a narrow interpretation of the term "intermediate order," the claimed
feature of "receiving one or more intermediate orders" is obvious in light of the prior art. As
explained above, Buist teaches an electronic system in which the broker-dealer can act as an
agent for the client by passing along the client's order. It would have been obvious to one of
ordinary skill in the art at the time of the invention to modify that system so that a broker-dealer
could take a principal position in the trade. (Rosen Decl. ¶ 51.) As discussed below, Harpale,
Minton, Cohen, Gutner, the Bond Market Association Survey, the 1998 NASD Working Paper,

49

and the 1986 NASD Notice *each* teach electronic systems in which broker-dealers take a principal position in orders that they send on behalf of clients. Buist, in combination with *any one* of Harpale, Minton, Cohen, Gutner, or the Bond Market Association Survey, teaches receiving intermediate orders placed on a principal basis. In addition, Buist, in combination with both the 1998 NASD Working Paper and the 1986 NASD Notice, teaches receiving intermediate orders placed on a principal basis.

1. **Even if an "Intermediate Order" Were Construed to Require the Intermediary to Place an Order on His or Her Own Account, Claims 1-15 Would Still Be Obvious over Buist in Combination with Harpale.**

As explained above in section IV.B, Harpale teaches electronic trading systems in which broker-dealers send client orders onward after taking a markup on those trades. As explained in section IV.B, it would be obvious to combine Harpale with Buist because any person developing an electronic trading system that requires the involvement of broker-dealers will have a strong economic motivation to allow those broker-dealers to generate income by taking markups. (Rosen Decl. ¶ 40.)

By disclosing systems allowing broker-dealers to take markups, Harpale inherently discloses broker-dealers placing the marked-up orders on a principal basis on behalf of their own accounts. Where a broker-dealer generates its income through a markup or markdown, the broker-dealer must take a principal position (i.e., take title) in the financial instrument being traded. Such a principal position by the broker is required by securities rules, which allow a broker-dealer to charge a markup only when trading on his or her own account. (*Id.* at ¶ 52.) As a result of those rules, the industry practice is to refer to "markups" only where a principal position is taken. (*Id.*) Accordingly, a person having ordinary skill in the art at the time of the invention would have understood Harpale as disclosing not only the ability to charge markups but also the ability to take a principal position on trades. (*Id.*)

Patent No. 7,231,363
Client Reference No. 65024-2

  2. **Even if an "Intermediate Order" Were Construed to Require the Intermediary to Place an Order on His or Her Own Account, Claims 1-15 Would Still Be Obvious over Buist in Combination with Minton.**

As explained above in section IV.C, Minton teaches electronic trading systems in which broker-dealers send client orders onward after taking a markup on those trades. That inherently discloses broker-dealers placing the orders on a principal basis on behalf of their own accounts, because the industry practice is to refer to "markups" only where a principal position is taken. (Rosen Decl. ¶ 52.)

  3. **Even if an "Intermediate Order" Were Construed to Require the Intermediary to Place an Order on His or Her Own Account, Claims 1-15 Would Still Be Obvious over Buist in Combination with Cohen.**

As explained above in section IV.D, Cohen teaches electronic trading systems in which broker-dealers send client orders onward after taking a markup on those trades. That inherently discloses broker-dealers placing the orders on a principal basis on behalf of their own accounts, because the industry practice is to refer to "markups" only where a principal position is taken. (Rosen Decl. ¶ 52.)

  4. **Even if an "Intermediate Order" Were Construed to Require the Intermediary to Place an Order on His or Her Own Account, Claims 1-15 Would Still Be Obvious over Buist in Combination with Gutner.**

As explained above in section IV.E, Gutner teaches electronic trading systems in which broker-dealers send client orders onward after taking a markup on those trades. That inherently discloses broker-dealers placing the orders on a principal basis on behalf of their own accounts, because the industry practice is to refer to "markups" only where a principal position is taken. (*Id.*)

  5. **Even if an "Intermediate Order" Were Construed to Require the Intermediary to Place an Order on His or Her Own Account, Claims 1-15 Would Still Be Obvious over Buist in Combination with the Bond Market Association Survey.**

The Bond Market Association Survey teaches electronic trading systems in which broker-dealers can make principal trades. The article describes the New York Stock Exchange's Automated Bond System as allowing both "agency orders" and "principal trades." (Ex. F (Bond

Patent No. 7,231,363
Client Reference No. 65024-2

Market Association Survey) at 12.) It also discloses that "Trading Edge, Inc. will be acting as a riskless principal in all transactions" facilitated on the BondLink system, and that "Winstar provides a two-sided market and acts as principal in all transactions" facilitated on the Winstar system. (*Id.* at 8, 14.)

> 6. **Even if an "Intermediate Order" Were Construed to Require the Intermediary to Place an Order on His or Her Own Account, Claims 1-15 Would Still Be Obvious over Buist in Combination with the 1998 NASD Working Paper and with the 1986 NASD Notice.**

The element of a broker-dealer taking a principal position when sending on a client's order is also obvious over Buist in combination with two publications published by the National Association of Securities Dealers ("NASD") concerning electronic order routing systems: Smith, Selway, and McCormick, *The Nasdaq Stock Market: Historical Background and Current Operation*, NASD Working Paper 98-01 (Aug. 24, 1998) (Ex. G, "1998 NASD Working Paper"), and National Association of Securities Dealers, Notice to Members 86-67, at 6 (Oct. 2, 1986) (Ex. H, "1986 NASD Notice"). Because the 1998 NASD Working Paper and the 1986 NASD Notice were both published more than one year prior to the filing date of the earliest provisional application for the '363 Patent, both publications qualify as prior art under 35 U.S.C. § 102(b), regardless whether the priority date for the '363 Patent is November 6, 2000 or December 29, 1999. Neither the 1998 NASD Working Paper nor the 1986 NASD Notice was considered during the prosecution of the '363 Patent.

The 1998 NASD Working Paper describes the Small Order Entry System ("SOES") as an electronic system that enables investors to send small orders to their broker-dealers, who then route those orders to various markets for execution. (Ex. G (1998 NASD Working Paper) at 27-28, 33.) The 1986 NASD Notice discloses that broker-dealers routing orders through SOES on behalf of investors may take a "riskless principal" position on those orders—that is, broker-dealers may purchase the security from their clients and immediately resell it to another party. (Ex. H (1986 NASD Notice) at 6.) Those two publications in combination with Buist disclose broker-dealers sending intermediate orders on a riskless principal basis.

52

Patent No. 7,231,363<br>Client Reference No. 65024-2

The 1998 NASD Working Paper also describes SelectNet, an electronic "order delivery system that can be used to route an order to a single market-maker." (Ex. G (1998 NASD Working Paper) at 35.) The paper notes that broker-dealers sending orders to SelectNet may send those orders on either a principal or an agency basis. (*Id.*)

It would have been obvious to combine Buist with the 1998 NASD Working Paper and the 1986 NASD Notice. (Rosen Decl. ¶¶ 54-58.) SOES and SelectNet were well known to those of ordinary skill in the art at the time of the invention and oft-used applications in the field of electronic trading platforms for financial instruments. (*Id.*) Furthermore, there would have been a strong motivation to combine Buist with the 1998 NASD Working Paper and the 1986 NASD Notice for the reasons described above—principal trading allows the brokers to generate income by taking a markup on trades. (*Id.*)

Moreover, based on Buist, the 1998 NASD Working Paper, and the 1986 NASD Notice, a person having ordinary skill in the art at the time of the invention would have been able to implement principal trading without undue experimentation. The computerized system disclosed in Buist would need very little modification to allow principal trading. (Rosen Decl. ¶ 58.) The system undertakes essentially the same steps regardless of whether, legally, title will pass through the hands of the broker-dealer before being resold to his or her client. (*Id.*) Although additional features could be useful for broker-dealers trading on a principal basis, the only strictly necessary change would be in the clearing and settlement stage of the trade, when the securities and the money are exchanged. (*Id.*) Buist teaches that, in the preferred embodiment, such functions would occur off the system in the conventional manner. (Ex. A (Buist) at 10:54-63.) Accordingly, the addition of a principal trading feature would require very little modification to the computerized system disclosed in Buist. (Rosen Decl. ¶ 58.)

Patent No. 7,231,363
Client Reference No. 65024-2

7.  Even if "Identifying the Serial Chain of Transactions" Were
    Construed to Require that a Path of Parties Be Tracked by
    Appending Each Step in the Path to an Order Data Entry,
    Claims 1-15 Would Still Be Obvious over Buist in Combination With
    the FIX Protocol.

As explained above, Buist alone anticipates the element of "identifying the serial chain of

transactions" in the broadest reasonable meaning of that term in light of the specification.

However, the claims of the '363 Patent would still be invalid even if an alternative,

narrower interpretation of that term were adopted requiring the path of parties to be "tracked" in

the manner disclosed in the preferred embodiment of the '363 Patent: by "appending each step in

the pathway taken by an order to the order data entry." ('363 Patent at 11:34-36.) Such a

narrower interpretation is not the broadest reasonable construction of the term "track" and

appears to be inconsistent with the specification which states that such a method is merely one

way in which "[t]his tracking *may* be performed." (*Id.* (emphasis added).)

Under that narrower construction, the claimed tracking method would have been obvious

based on Buist in combination with the FIX trading protocol. A new version of the Financial

Information eXchange ("FIX") protocol was published with errata on June 30, 1999. (*See*

Financial Information eXchange Protocol, Version 4.1 (Mar. 31, 1998, with errata from Jun. 30,

1999) (Ex. I, "FIX Protocol"). The FIX protocol and its errata therefore qualify as prior art

under 35 U.S.C. § 102(b), based on the November 6, 2000 filing date of the '363 Patent.

Moreover, even if the '363 Patent were entitled to its claimed priority date of December 29, 1999

based on its earliest provisional application, the FIX protocol and its errata would still qualify as

prior art under 35 U.S.C. § 102(a). The FIX protocol was not considered during the prosecution

of the '363 Patent.

FIX is a "message standard developed to facilitate the electronic exchange of information

related to securities transactions" and "is intended for use between trading partners wishing to

automate communications." (Ex. I (FIX Protocol) at 3.) FIX specifically contemplates the

participation of intermediaries: that is, "allow[ing] third parties to participate in the delivery of

messages between trading partners." (*Id.*) FIX teaches tracking the path of an order by

Patent No. 7,231,363
Client Reference No. 65024-2

appending each step in the pathway as a field in the order message. The order contains several fields: "SenderCompID" is an identifier for the party sending the order, "TargetCompID" is an identifier for the intermediary, and "DeliverToCompID" is an identifier for the ultimate counterparty to the order. (*Id.* at 11, 71-74.) The paper describes a scenario in which "A sends to B via Q," where "A=sellside," "B=buyside," and "Q=third-party [intermediary]." (*Id.* at 11.) There, the SenderCompID is A, the TargetCompID is Q, and the DeliverToCompID is B. (*Id.*) It would be obvious to combine the FIX protocol with Buist, since the purpose of the FIX protocol is to facilitate messaging in electronic trading platforms for securities, such as Buist. (Rosen Decl. ¶ 61.)

There would also have been a strong motivation to combine Buist with the FIX protocol to track a path of parties. When a security has passed through multiple parties in a series of transactions, it will often be useful to identify the party who initiated the transaction by submitting the first order. For example, such identification allows a trade confirmation message to be sent to all parties, including the first ordering party. One of ordinary skill in the art at the time of the invention would have recognized the desirability of following a recorded chain of orders to identify the source of the original order. (Rosen Decl. ¶ 62.)

        **8.    Even if "Identifying the Serial Chain of Transactions" Were Construed to Require that a Path of Parties Be Tracked by Appending Each Step in the Path to an Order Data Entry, Claims 1-15 Would Still Be Obvious over Buist in Combination with Neyman.**

Additionally, even under the alternative narrow definition of "track" discussed above, the method of tracking each step in the pathway and the order in which those steps were taken is obvious in light of Buist in combination with U.S. Patent Number 7,333,952 to Neyman (Ex. J, "Neyman"). Because Neyman was filed on June 23, 2000, it qualifies as prior art under 35 U.S.C. § 102(e), based on the November 6, 2000 filing date of the '363 Patent. Neyman was not considered during the prosecution of the '363 Patent.

The trading system described in Neyman can be used to trade a wide variety of financial instruments. (*Id.* at 5:43-52.) Neyman describes a system in which Counterparty A passes an

55

Patent No. 7,231,363<br/>Client Reference No. 65024-2

offer to Broker Node B, who passes it to Broker Node C, who passes it to Counterparty D, who accepts the offer. Neyman teaches that each broker node stores information about the broker node from which it received the order. Using that information, a trading message is then traced back through the series of broker nodes to its source. Neyman describes that "[t]he message will thus follow the path of the original information back to its source." (*Id.* at 9:49-51.) It would have been obvious to combine Neyman with Buist, as both systems involve brokers passing along orders on behalf of clients in an electronic trading platform for financial instruments. (Rosen Decl. ¶ 64.) Furthermore, as explained above, one of ordinary skill in the art at the time of the invention would have been motivated to combine the systems to trace a path of parties.

I.      **The U.S. General Accounting Office Report Renders Obvious Claims 1-3, 6, 8, 11, 12, 14, and 15 of the '363 Patent under 35 U.S.C. § 103(a) (Exhibit W).**

The U.S. General Accounting Office Report entitled "U.S. Government Securities: An Examination of Views Expressed About Access to Brokers' Services" (December 1987) (Ex. K, "GAO Report") presents the results of a GAO study on the nature of the trading system in the secondary market for government securities as it existed in 1986. The GAO Report notes that the government has an interest in promoting the liquidity, safety, and efficiency of the secondary market for government securities and describes the methods of operation of the then-existing brokerage firms, including how orders are taken from customers and processed. (*Id.* at 2.)

The GAO Report was published in December 1987, more than ten years prior to the filing date of any of the '363 Patent and its three parent provisional applications. Thus, the GAO Report is prior art under 35 U.S.C. § 102(b). The GAO Report was not considered during prosecution of the '363 Patent. Additional substantial new questions of patentability are raised for claims 1-3, 5, 6, 8, 11, 12, 14, and 15 in view of the GAO Report. This conclusion is particularly salient in light of *KSR*, as reflected in the PTO's obviousness guidelines, and in light of recent Federal Circuit case law.

### 1.    The PTO Post-*KSR* Guidelines

The '363 Patent issued prior to the decision of the Supreme Court in *KSR International Co. v. Teleflex, Inc.*, 127 S. Ct. 1727, 1739, 82 U.S.P.Q.2d 1385, 1395 (2007).  In *KSR*, the Supreme Court emphasized "the need for caution in granting a patent based on the combination of elements found in the prior art," 127 S. Ct. at 1739, 82 U.S.P.Q.2d at 1395, and discussed circumstances in which a patent might be determined to be obvious without an explicit application of the teaching, suggestion, motivation test.  The Court explained:

> When a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one. If a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability.  For the same reason, if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill.

*Id.* at 1740, 82 U.S.P.Q.2d at 1396 (emphasis added).  The operative question in this "functional approach" is thus "whether the improvement is more than the predictable use of prior art elements according to their established functions." *Id.* at 1739, 1740, 82 U.S.P.Q.2d at 1395, 1396.

The Supreme Court's opinion in *United States v. Adams*, 383 U.S. 39, 40, 148 U.S.P.Q. 479, 480 (1966), is illustrative of the "functional approach" to be taken in cases where the claimed invention is a prior art structure altered by substituting one element in the structure for another known element. *KSR*, 127 S. Ct. at 1734, 82 U.S.P.Q.2d at 1391. "The Court [in *Adams*] recognized that when a patent claims a structure already known in the prior art that is altered by the mere substitution of one element for another known in the field, the combination must do more than yield a predictable result." *Id.* at 1740, 82 U.S.P.Q.2d at 1395.

Following the Supreme Court's *KSR* decision, the United States Patent and Trademark Office published guidelines to be followed by examiners in determining whether a patent application should be rejected for obviousness under 35 U.S.C. § 103 (the "Guidelines"). *See* Notice, 72 Fed. Reg. 57,526-57,535 (Oct. 10, 2007).  In order to aid patent examiners in issuing

obviousness rejections that are appropriately supported by facts and reasoning, the Guidelines set forth a number of rationales to support such rejections. Included among such rationales are the following:

> 1) Combining prior art elements according to known methods to yield predictable results; and
>
> 2) Applying a known technique to a known device (method, or product) ready for improvement to yield predictable results.

Notice, 72 Fed. Reg. at 57,529. In considering these rationales, the Guidelines emphasize that "Office personnel may also take into account 'the inferences and creative steps that a person of ordinary skill in the art would employ.'" 72 Fed. Reg. at 57,528 (quoting *KSR Int'l*, 127 S. Ct. at 1741, 82 U.S.P.Q.2d at 1396).

### 2. Federal Circuit Guidance in *In re Comiskey* and *Leapfrog*

In *Leapfrog Enterprises, Inc. v. Fisher Price, Inc.*, 485 F.3d 1157, 82 U.S.P.Q.2d 1687 (Fed. Cir. 2007), the Federal Circuit held the asserted claim invalid as obvious in light of certain prior art references in combination with the knowledge of one of ordinary skill in the art. The court noted that "[a]ccommodating a prior art mechanical device that accomplishes that goal to modern electronics would have been reasonably obvious to one of ordinary skill in designing children's learning devices. Applying modern electronics to older mechanical devices has been commonplace in recent years." 485 F.3d at 1161, 82 U.S.P.Q.2d at 1691. The court concluded that "[t]he combination is thus the adaptation of an old idea or invention . . . using newer technology that is commonly available and understood in the art." *Id.* at 1162, 82 U.S.P.Q.2d at 1691.

Similarly, in *In re Comiskey*, 499 F.3d 1365, 84 U.S.P.Q.2d 1670 (Fed. Cir. 2007), the Federal Circuit found that certain claims "at most merely add a modern general purpose computer to an otherwise unpatentable mental process" and that other claims "merely add modern communication devices." 499 F.3d at 1380, 84 U.S.P.Q.2d at 1680. The court then cautioned that "[t]he routine addition of modern electronics to an otherwise unpatentable invention typically creates a prima facie case of obviousness." *Id.* (citing *Leapfrog* and *KSR*).

Patent No. 7,231,363
Client Reference No. 65024-2

va-238097

3.       **The GAO Report Renders Obvious Claim 1.**

a.       **The GAO Report Teaches "a method, comprising: receiving a first order from a first ordering party at a computerized system, the first order including at least one bid or offer relating to financial instrument to permit execution of a serial chain of transactions pertaining to the financial instrument in the computerized system, based on the first order."**

The GAO Report discloses that, in traditional voice trading, a customer calls in a first order including a bid or offer to the customer's broker. "Customers have direct phone lines to the various desks at each of the broker firms . . . . When customers wish to buy or sell a security, they call their broker . . .The customer can . . . tell the broker to post a new bid or offer on the screen." (Ex. K (GAO Report) at 30.)

While the GAO Report does not disclose that the first order is received over a computerized system, it would have been obvious to modify the method from receiving orders over the telephone to receiving orders via a computer. Modifying existing phone-based securities trading environments to utilize computers is merely "applying a known technique to a known device (method, or product) ready for improvement to yield predictable results," and thus, would have been obvious under *KSR* and the PTO's new guidelines for obviousness. The Guidelines explain:

> The rationale to support a conclusion that the claim would have been obvious is that a particular known technique was recognized as part of the ordinary capabilities of one skilled in the art. One of ordinary skill in the art would have been capable of applying this known technique to a known device (method, or product) that was ready for improvement and the results would have been predictable to one of ordinary skill in the art.

Notice, 72 Fed. Reg. at 57,531. The general notion of computerizing the trading of financial instruments would have been obvious to a person having ordinary skill in the art at the time of the invention. Indeed, by 1998, numerous firms were offering or planning to offer electronic trading systems for fixed-income securities. (*See* Rosen Decl. ¶ 65.) The results of computerizing such a system would have been predictable. (*Id.*) Accordingly, it would have been obvious to one of ordinary skill in the art of securities trading systems in 1998 to allow orders to be received by a computerized system rather than by telephone.

59

Furthermore, allowing orders to be received by computer rather than by telephone is merely the routine addition of modern electronics to an otherwise unpatentable telephone-based system. Under the line of reasoning employed by the Federal Circuit in *Leapfrog* and *Comiskey*, such routine additions of modern communications devices to otherwise unpatentable inventions result in a *prima facie* case of obviousness. Thus, the GAO Report in combination with the knowledge of one of ordinary skill in the art teaches this claimed feature.

In addition to modifying the traditional voice trading model to receive orders via computer, it would have been obvious to one of ordinary skill in the art at the time of the invention to permit execution of the serial chain of transactions, comprising the claimed transfer of securities, in the computerized system. It would have been obvious to send the trade confirmation messages electronically when messages for receiving orders were already electronic. (*Id.* ¶ 68.) Furthermore, it would have been obvious to conduct the transfer of securities, i.e., clearance and settlement, through a computerized system as well. Such computerized clearance and settlement systems were widespread and conventional at the time. (*Id.* ¶ 34.) One of the chief advantages of computerizing the processing of orders is the ability to send those orders for clearance and settlement via a computer network. (*Id.* ¶ 68.) That increases accuracy by avoiding transcription errors between the order processing stage and the clearance and settlement stage. (*Id.*) It also reduces paperwork and conserves human resources by automating the process of sending orders for clearance and settlement. (*Id.*)

           b.      **The GAO Report Teaches "receiving one or more intermediate orders, including at least one offer or bid relating to said financial instrument."**

The GAO Report discloses that, in traditional voice trading, the broker enters an order on behalf of his or her customer, after receiving the customer's order. "Brokers call out their bids and offers as received from customers . . . . Either the brokers or staff at the center of the desk enter this information so it is displayed on an internal computer screen or overhead projector. Simultaneously, similar information is transmitted via computer for instant display on each customer's video display screen." (Ex. K (GAO Report) at 31.)

60

      c.      **The GAO Report Teaches Receiving an Intermediate Order "from at least one of a plurality of intermediate parties using the computerized system."**

The GAO Report refers to the bids and offers being placed by a plurality of "brokers" rather than a single broker. (*Id.*) Moreover, the GAO Report describes those brokers using the computerized system. After "[b]rokers call out their bids and offers," "the brokers or staff at the center of the desk enter this information so it is displayed on an internal computer screen," and that information is "transmitted via computer for instant display on each customer's video display screen." (*Id.*)

      d.      **The GAO Report Teaches "at least one of the intermediate orders being placed by the at least one intermediate party in response to the first order."**

The GAO Report discloses that, in traditional voice trading, the brokers "call out their bids and offers *as received from customers*." (Ex. K (GAO Report) at 31 (emphasis added).)

      e.      **The GAO Report Renders Obvious "receiving a second order, including at least one offer or bid relating to said financial instrument, from a second ordering party using the computerized system, the second order being placed by the second ordering party in response to one or more of the intermediate orders."**

The GAO Report teaches that, in traditional voice trading, after the broker calls out the customer's order, the order is "transmitted via computer" to other customers, who can respond by "hit[ting]" a bid or "tak[ing]" an offer. (*Id.* at 31.) Hitting a bid or taking an offer means to place an order accepting a bid or offer. (Rosen Decl. ¶ 67.) For the reasons discussed above in Sections IV.I.1- IV.I.3.a, it would have been obvious to implement these teachings of the GAO Report in a "computerized system." Furthermore, the disclosure in the GAO Report of transmitting an order "via computer" is a strong suggestion that other aspects of the system would also benefit from being computerized.

      f.      **The GAO Report Teaches "identifying the serial chain of transactions using the first order, at least one received intermediate order, and the second order."**

The GAO Report teaches that, in traditional voice trading, the broker tracks its own involvement in a transaction. "Brokers call out their bids and offers as received from customers

61

. . . . Either the brokers or staff at the center of the desk enter this information so it is displayed on an *internal computer screen*." (Ex. K (GAO Report) at 31.) The GAO Report further teaches identifying the buyer and the seller of the securities using codes applied to their orders: "Code numbers or initials are used on the brokers' internal systems to *identify* the customers who are buying and selling securities." (*Id.*)

        g.    **The GAO Report Teaches "executing the at least one transaction within the serial chain of transactions."**

The GAO Report teaches that, in traditional voice trading, a clearing bank executes the trade and clears the transaction after the trade is confirmed. "When a trade is completed, . . . [t]he broker firm communicates instructions to its clearing bank which will perform the transfer of securities and cash." (*Id.* at 32.)

        h.    **The GAO Report Teaches "where the serial chain of transactions comprises a transfer of said financial instrument between the first ordering party and a first intermediate party, and a transfer of said financial instrument between the second ordering party and a last intermediate party, and where the first intermediate party and the last intermediate party are different parties or the same party."**

The GAO Report further teaches that, during the clearance and settlement of the trade, the broker in a traditional voice trade purchases the security from the seller and resells it to the buyer. Accordingly, there is a transfer of the financial instrument from the buyer to the intermediary and from the intermediary to the seller. "When a trade is completed, . . . [t]he broker firm sends separate written confirmations to the buyer and the seller. The respective confirmations show the broker firm as the seller and purchaser of securities, thus maintaining customer anonymity." (*Id.* at 32.)

        4.    **The GAO Report Teaches Claim 2, Which Recites "The method of claim 1, comprising determining whether a match occurs between one of the intermediate orders and at least one of the first and second orders of the first and second ordering parties."**

The GAO Report discloses that, in traditional voice trading, the broker makes a determination of whether the order "is an acceptance of a posted price." (*Id.* at 31.) The posted prices are intermediate orders: that is, bids and offers posted by other brokers after receiving an

62

order from their customers. (*Id.*) To determine whether a customer's order is an acceptance of a posted price, the broker determines whether that customer's order (i.e., the second order) matches the price posted by another broker on behalf of another customer (i.e., the intermediate order).

     5.    **The GAO Report Teaches Claim 3, Which Recites "The method of claim 2, comprising matching one or more of the intermediate orders between the first order and the second order and executing the one or more matched orders to at least partially execute the serial chain of transactions."**

As described above, the GAO Report discloses that, in traditional voice trading, the broker matches a second order and the intermediate order. The GAO Report further discloses executing the matched orders. After a posted price is accepted (i.e., when a bid is hit or an offer taken), the "trade is completed." (*Id.* at 32.) "The broker firm communicates instructions to its clearing bank which will perform the transfer of securities and cash." (*Id.*)

     6.    **The GAO Report Teaches Claim 6, Which Recites "The method of claim 5, comprising automatically executing one or more live orders in the serial chain of transactions that are matched."**

As described above, the GAO Report discloses that, in traditional voice trading, the broker matches a second order and the intermediate order. When a match occurs, the "trade is completed." (*Id.* at 32.) "The broker firm communicates instructions to its clearing bank which will perform the transfer of securities and cash." (*Id.*)

     7.    **The GAO Report Renders Obvious Claim 8, Which Recites "The method of claim 1, comprising storing a set of rules for each of at least some of the parties using the system in a memory accessible to such parties, wherein the step of receiving intermediate orders comprises receiving intermediate orders generated between intermediate parties based upon the stored sets of rules."**

The GAO Report teaches that, in traditional voice trading, brokers "call out their bids and offers as received from customers" only when certain rules are satisfied: "when the new bid is higher (or offer lower) than one already shown or if it is an acceptance of a posted price." (*Id.* at 31.)

Patent No. 7,231,363
Client Reference No. 65024-2

va-238097

If storing is construed to require electronic storage, for the reasons discussed above in Sections IV.I.1- IV.I.3.a, it would have been obvious to implement these teachings of the GAO Report in a "computerized system." One of ordinary skill in the art would have known that, in a "computerized system," the rules would be "stored." (Rosen Decl. ¶ 68.)

> 8. **The GAO Report Teaches Claim 11, Which Recites "The method of claim 1, wherein the step of identifying the serial chain of transactions comprises tracking a path of parties for which orders have been received tracing back to the first ordering party."**

The GAO Report teaches that, in traditional voice trading, the broker tracks a path consisting of the first ordering party, the intermediate party, and the second ordering party. The buyer and the seller of the security are identified using codes applied to the order: "Code numbers or initials are used on the brokers' internal systems to *identify* the customers who are buying and selling securities." (Ex. K (GAO Report) at 31.) In addition, the brokers' internal system notes the broker's own participation as an intermediary in the order. "Brokers call out their bids and offers as received from customers . . . . Either the brokers or staff at the center of the desk enter this information so it is displayed on an *internal computer screen.*" (*Id.*)

> 9. **The GAO Report Teaches Claim 12, Which Recites "The method of claim 11, comprising storing a subset of the path of parties in association with each of the orders."**

As explained above, the GAO Report teaches that, in traditional voice trading, the broker tracks a path consisting of the first ordering party, the intermediate party, and the second ordering party. As noted above, that information is stored in the "brokers' internal systems." (*Id.*)

If storing is construed to require electronic storage, for the reasons discussed above in Sections IV.I.1- IV.I.3.a, it would have been obvious to implement these teachings of the GAO Report in a "computerized system." One of ordinary skill in the art would have known that, in a "computerized system," the rules would be "stored." (Rosen Decl. ¶ 68.)

Patent No. 7,231,363
Client Reference No. 65024-2

       10.     **The GAO Report Teaches Claim 14, Which Recites "The method of claim 1, wherein at least one further one of the intermediate orders participating in the serial chain of transactions is placed by at least one further intermediate party in response to one or more others of the intermediate orders."**

As described above, the GAO Report teaches that a seller calls his or her broker with an initial offer and the seller's broker places a first intermediate order by posting that sell offer to the screen. The GAO Report further discloses a second intermediate order placed by a second intermediary, the buyer's broker. To accept a posted price, the buyer calls his or her broker. "When customers wish to buy or sell a security, they call their broker" and "can either hit a bid or take an offer already shown on the screen." (Ex. K (GAO Report) at 30.) The buyer's broker then places a second intermediate order by "call[ing] out" the "acceptance of a posted price." (*Id.*) That second intermediate order is placed in response to the price posted by the seller's broker (i.e., the first intermediate order).

       11.     **The GAO Report Teaches Claim 15, Which Recites "The method of claim 1, wherein any further intermediate orders participating in the serial chain of transactions are placed by others of the intermediate parties in response to one or more others of the intermediate orders."**

As described above, the GAO Report teaches that the second intermediate order (i.e., the acceptance of the posted price by the buyer's broker) is placed in response to the first intermediate order (i.e., the posting of the price by the seller's broker).

    J.     **The U.S. General Accounting Office Report In Combination with Weiss Renders Obvious Claims 4, 5, 7, 9, 10, and 13 of the '363 Patent under 35 U.S.C. § 103(a) (Exhibit X).**

       1.     **The GAO Report In Combination with Weiss Renders Obvious Claim 4, Which Recites "The method of claim 3, comprising receiving an indication from the first ordering party to select whether the first order is a live, executable order or a subject order."**

In 1993, Weiss published a textbook known as *After the Trade Is Made: Processing Securities Transactions* (1993) ("Weiss"). Because Weiss was published in 1993, it qualifies as prior art under 35 U.S.C. § 102(b), regardless whether the priority date for the '363 Patent is the filing date of the utility patent application on November 6, 2000 or the filing date of the earliest

Patent No. 7,231,363
Client Reference No. 65024-2

provisional application on December 29, 1999. Weiss was not considered during the prosecution of the '363 Patent.

It would be obvious to combine Weiss with the GAO Report because both publications describe the traditional operation of trading securities. Weiss teaches that, in traditional voice trading, customers may place orders of different types. (Ex. L (Weiss).) These orders can be "market orders," which are live and executable. "A *market order* is an order to execute at whatever the market price is when the broker enters the crowd." (*Id.* at 59.) The orders can also be subject to various conditions that must be fulfilled before execution. For example, an order can be "all or none," which means that "given the time constraints, such as a day, *all* of the order must be filled or the client does not have to accept the execution." (*Id.* at 60.)

> 2.  **The GAO Report in Combination with Weiss Renders Obvious Claim 5, Which Recites "The method of claim 4 wherein the first order is a live, executable order, and the step of receiving one or more intermediate orders comprises receiving one or more live, executable intermediate orders."**

As described above, Weiss teaches that the first order from the customer can be live and executable. Weiss further teaches that, in traditional voice trading, the intermediate orders placed by broker-dealers can be "firm" or "subject." (Ex. L (Weiss) at 277.) "*Firm quotes* are prices at which dealers must trade . . . . A *subject quote* is a bid or offer that is subject to verification with an interested party." (*Id.*) "Firm" orders are live and executable. (Rosen Decl. ¶ 66.)

> 3.  **The GAO Report in Combination with Weiss Renders Obvious Claim 7, Which Recites "The method of claim 1, wherein: the first order received from the first ordering party is an order subject to satisfaction of a condition, and the method further comprises executing the order subject to condition only if the condition is satisfied."**

As described above, Weiss teaches that, in traditional voice trading, orders can be subject to various conditions that must be fulfilled before execution. For example, an order can be "all or none," which means that "given the time constraints, such as a day, *all* of the order must be filled or the client does not have to accept the execution." (Ex. L (Weiss) at 60.)

Patent No. 7,231,363
Client Reference No. 65024-2

va-238097

4.    **The GAO Report in Combination with Weiss Renders Obvious Claim 9, Which Recites "The method of claim 1, wherein the first order received from the first ordering party has a first set of terms, and the step of receiving intermediate orders comprises receiving intermediate orders having respective second sets of terms different than the first set of terms."**

Weiss discloses that, in traditional voice trading, broker-dealers "mark up" and "mark down" the prices of orders they receive from others before passing those orders on to others. (*Id.* at 278.) "When a customer wants to sell a security in the OTC [i.e., over-the-counter] market, the dealer charges a 'mark-down.' The dealer . . . buys the security from the customer at one price, and sells it to a market maker at a higher price. The difference between the price the broker pays to the customer and what he/she gets from the market maker is the *mark-down*." (*Id.*) Accordingly, the sell order (i.e., the first order) has one price, but the dealer's order (i.e., the intermediate order) has a different, lower price.

5.    **The GAO Report in Combination with Weiss Renders Obvious Claim 10, Which Recites "The method of claim 9, wherein the first set of terms include a price for one or more transactions in the serial chain of transactions, and the step of receiving intermediate orders includes receiving intermediate orders having respective second sets of terms in which a price term has been modified from the first set of terms."**

As described above, Weiss discloses that, in traditional voice trading, broker-dealers receive first orders at one price and place intermediate orders in which the original prices are marked up or marked down. (Ex. L (Weiss) at 278.)

6.    **The GAO Report in Combination with Weiss Renders Obvious Claim 13, Which Recites "The method of claim 1, wherein at least one of the first, second, and intermediate orders have parameters set by at least one of the first, second, and intermediate parties, and the intermediate orders in the serial chain of transactions cannot be prevented from execution by parameters set by the first and second ordering parties."**

The '363 Patent states that "price" is an example of a "parameter" in an order. ('363 Patent at 15:26-33.) As described above, Weiss discloses that, in traditional voice trading, broker-dealers receive orders from customers with a set price, and that those broker-dealers place intermediate orders in which the price parameters are marked up or marked down. (Ex. L (Weiss) at 278.)

Patent No. 7,231,363
Client Reference No. 65024-2

K.    **BondExchange, Spear, Leeds & Kellogg Fixed Income On Line Trading Manual Renders Obvious Claims 1-15 of the '363 Patent Under 35 U.S.C. § 103(a) (Exhibit Y).**

Requesters BondDesk Group LLC and BondDesk Trading LLC operate an electronic fixed-income trading platform based on a system originally developed by BondExchange LLC ("BondExchange"). (Declaration of Charles Almond ("Almond Decl."), ¶ 1.) By the fall of 1998, BondExchange had provided several major brokerage houses with portals to offer bonds for sale on the electronic system. (*Id.* ¶ 5.) Spear, Leeds & Kellogg ("SLK") was one of BondExchange's earliest customers. (*Id.* ¶ 4.) Through a portal provided by BondExchange and branded with the SLK logo, SLK could offer bonds for sale to its clients, who were traders at other brokerage houses. Those traders could mark up SLK's bond offers and, usually with the help of a sales representative, resell those bonds to retail or institutional investors. (*Id.* ¶ 6.) In addition to having its own branded portal, SLK also had its own branded On Line Trading Manual to distribute to its clients at other brokerage houses who would be using the BondExchange system to purchase SLK bond offerings. (*Id.* ¶ 7.)

As explained in further detail below, BondExchange published the Spear, Leeds & Kellogg Fixed Income On Line Trading Manual (Ex. M, "BondExchange Manual") before December 29, 1998, more than one year prior to the filing date of the earliest of the provisional applications for the '363 Patent. Accordingly, the BondExchange Manual is prior art under 35 U.S.C. § 102(b). The BondExchange Manual was not considered during prosecution of the '363 Patent, and raises additional substantial new questions of patentability for claims 1-15.

1.    **BondExchange Published the BondExchange Manual Before December 29, 1999.**

"The determination of whether a reference is a 'printed publication' under 35 U.S.C. § 102(b) involves a case-by-case inquiry . . . ." *In re Klopfenstein*, 380 F.3d 1345, 1350, 72 U.S.P.Q.2d 1117, 1120 (Fed. Cir. 2004). The "keys" are "dissemination and public accessibility" to those "interested in the art." *Id.* at 1348, 72 U.S.P.Q.2d at 1119. The Federal Circuit has identified the following as the factors relevant to that determination: "the length of time the display was exhibited, the expertise of the target audience, the existence (or lack

68

Patent No. 7,231,363
Client Reference No. 65024-2

thereof) of reasonable expectations that the material displayed would not be copied, and the simplicity or ease with which the material displayed could have been copied." *Id.* at 1350, 72 U.S.P.Q.2d at 1120. The BondExchange Manual satisfies each of those factors.

Here, the BondExchange Manual was widely disseminated to persons interested in electronic trading systems for bonds before December 29, 1999. The BondExchange Manual was posted on the SLK branded portal, www.slkbond.com, when the system launched in April 1998. (Almond Decl. ¶¶ 6-7.) That manual remained on the website for user reference for over a year. (*Id.*)

While posted on the SLK portal, the BondExchange Manual was available to numerous persons interested in the art of electronic trading systems for brokers. On the website, the manual was available to all users at other brokerage houses who bought bonds or viewed bond offerings through the SLK portal. (Almond Decl. ¶ 7.) It is estimated that, as of December 28, 1998, over one year before the filing date of the earliest of the provisional applications for the '363 Patent, persons at approximately ten to twenty other brokerage houses had access to the manual. (*Id.*) The BondExchange Manual was designed to be widely disseminated among sales representatives, liaison traders, brokers, and technical personnel at those other brokerage houses to allow those users to understand how the BondExchange system operated. (*Id.*)

The BondExchange Manual was also made available to those with an interest in the art. As of December 28, 1998, the BondExchange Manual for SLK had been shown to approximately fifteen to twenty current and prospective BondExchange clients to demonstrate the system's capabilities. (*Id.* ¶ 8. ) In addition, by that time, similar versions of the BondExchange Manual had been posted on the branded portals of each of BondExchange's other clients, including E*Trade and Charles Schwab, for their customers to view. (*Id* ¶ 9.) Moreover, the screen images in the BondExchange Manual were captured from the demo website on the SLK branded portal, which was publicly available to all users of the Internet. (*Id.*)

The BondExchange Manual was made available without any confidentiality notice and without any restrictions on copying. (*Id.* ¶ 10.) Any person with access to the manual could

69

va-238097

have printed out copies of the manual to share with others. (*Id.*) Indeed, the expectation was that the manual would generate excitement about the BondExchange system among members of the public. (*Id.*) In keeping with that expectation, on November 25, 1998, BondExchange's Chief Executive Officer, Charles Almond, sent a copy of the manual to institutional investor Marilyn Cohen to provide her with information for her upcoming article in *Forbes* magazine regarding the BondExchange system. (*Id.* ¶ 11.) Cohen's article was published in the January 1999 issue of *Forbes*, and is cited above as another example of prior art that was not cited to the Office during prosecution of the '363 Patent and that raises a substantial new question of patentability. (Ex. D (Cohen).)

Those facts are more than sufficient to satisfy the factors laid out in *Klopfenstein*. Indeed, in *Klopfenstein*, the Federal Circuit found publication on facts far less compelling than these. There, a printout of a slide presentation was included on a posterboard that was displayed for a total of four days at two conferences. 380 F.3d at 1347, 72 U.S.P.Q.2d at 1118. No copies were distributed, and the presentation was never catalogued or indexed in any way. *Id.* The Federal Circuit affirmed the rejection of an application over that art, holding that the slide presentation was a "printed publication." *Id.* at 1352, 72 U.S.P.Q.2d at 1121. The court concluded that the presentation had been "shown for an extended period of time to members of the public," that those persons "were not precluded from taking notes or even photographs of the reference," and that "copying of the information it contained would have been a relatively simple undertaking." *Id.* The same logic applies here.

Indeed, courts have consistently held that user manuals and similar technical information distributed to customers or potential customers are sufficient to constitute publication. *See Sheller-Globe Corp. v. Milsco Mfg. Co.*, 206 U.S.P.Q. 42, 50-52 (E.D. Wis. 1979), *aff'd*, 636 F.2d 177 (7th Cir. 1980) ("Trouble Shooting Guide" distributed to customers and salesmen constitutes a publication); *Torin Corp. v. Philips Indus., Inc.*, 625 F. Supp. 1077, 1089, 228 U.S.P.Q. 465, 472 (S.D. Ohio 1985) (a sales memorandum and accompanying photographs circulated to the patentee's independent sales representatives constituted a printed publication);

Patent No. 7,231,363
Client Reference No. 65024-2

va-238097

*Canron, Inc. v. Plasser Am. Corp.*, 474 F. Supp. 1010, 1013, 203 U.S.P.Q. 440, 444 (E.D. Va. 1978), *aff'd*, 609 F.2d 1075 (4th Cir. 1979) ("Detailed data sheets accompanying offers for sale of the invention that are privately distributed . . . are sufficient to constitute publication."); *Vetco Offshore Indus., Inc. v. Rucker Co.*, 448 F. Supp. 1203, 1207-10, 200 U.S.P.Q. 525, 528-31 (N.D. Cal. 1978) (blueprints and drawings circulated to persons in the industry constituted publication); *In re Certain Caulking Guns*, 223 U.S.P.Q. 388, 397 (U.S. Int'l Trade Comm'n 1984) (technical information sheet distributed with product constituted publication).

        **2.**        **The BondExchange Manual Renders Obvious Claim 1.**

        **a.**        **The BondExchange Manual Teaches "a method, comprising: receiving a first order from a first ordering party at a computerized system, the first order including at least one bid or offer relating to financial instrument to permit execution of a serial chain of transactions pertaining to the financial instrument in the computerized system, based on the first order."**

The BondExchange Manual discloses that "offerings" are posted on the computerized system for viewing by other users. (Ex. M (BondExchange Manual) at 5.) Users can then view the listed offers. (*Id.* at 11.) The offerings can be offers to sell, which list a green "buy" price for the user to click on. (*Id.*) They can also be bids to buy, which list a red "sell" price for the user to click on. (*Id.*) To be posted for viewing on the computerized system, those first orders inherently must have been received by the computerized system prior to their posting.

        **b.**        **The BondExchange Manual Teaches "receiving one or more intermediate orders, including at least one offer or bid relating to said financial instrument."**

The BondExchange Manual discloses that intermediaries can view offerings and place orders to resell the securities to other parties. The order confirmation screen on page 15 shows an intermediate order.



Once you have verified your ticket is correct the final step is to click on 'Place Order'.

The intermediary placing the order is "Pat Boyle." The "Trade Type" is listed as "Principal." The ticket has a row labeled "DEALER." A person having ordinary skill in the art in April 1998 would have understood that row to show the terms on which Boyle will obtain the bond from the seller. (Rosen Decl. ¶ 69.) Below that, the ticket has a row labeled "CUSTOMER." A person with ordinary skill in the art in April 1998 would have understood that row to show the terms on which Boyle's customer would obtain the bond from Boyle. (Id.) In the example, Boyle placed an order to resell the bond to the customer for $7,402.86 and to purchase the bond from the seller for $7,366.03. That price difference, known as a "markup," is noted in the column labeled "Markup."

The BondExchange Manual further discloses that an intermediary can place multiple intermediate orders at once on a series of bonds. The intermediary can select a series of bond offerings by marking checkboxes. (Ex. M (BondExchange Manual) at 29, 33.) The intermediary

can then place intermediate orders on those offerings. (*Id.* at 30, 34.) Through a radio button,

the intermediary can choose whether the intermediate orders are on an "Agency" or "Principal"

basis. (*Id.*) The intermediary can also "appl[y] . . . mark-ups" to the offers and calculate how

those markups will affect the price that he or she is offering his or her customer. (*Id.*)

> **c.   The BondExchange Manual Teaches "from at least one of a plurality of intermediate parties using the computerized system."**

The BondExchange Manual discloses that a plurality of intermediaries can be placing

intermediate orders on the computerized system. The Order Inquiry screen shows Pat Boyle's

intermediate order, as described above. (*Id.* at 17.)



It also shows a second intermediate order by a different intermediary, John Boudinot. (*Id.*)

Unlike Boyle's order, which is pending, Boudinot's order has been filled, as indicated in the

Status column. (*Id.*) The "Filled Dealer" row for Boudinot's order indicates that Boudinot

obtained the bond from SLK for 107.063. (Rosen Decl. ¶ 70.) The "Filled Cust" row for

Patent No. 7,231,363
Client Reference No. 65024-2

va-238097

Boudinot's order indicates that Boudinot's customer obtained the bond from Boudinot at the same price. (*Id.*)

        d.    **The BondExchange Manual Teaches "at least one of the intermediate orders being placed by the at least one intermediate party in response to the first order."**

The BondExchange Manual discloses that the intermediary places his or her order in response to a bid or offer listed. The intermediary submits an order by clicking on the "Buy price" for an existing offer or the "Sell price" for an existing bid. (Ex. M (BondExchange Manual) at 11.) That takes the intermediary to the "ticket," which allows input of the intermediate order. (*Id.* at 11, 14.)

        e.    **The BondExchange Manual Renders Obvious "receiving a second order, including at least one offer or bid relating to said financial instrument, from a second ordering party using the computerized system, the second order being placed by the second ordering party in response to one or more of the intermediate orders."**

The BondExchange Manual discloses that a second order is placed in response to the intermediate order: that is, that a customer ultimately agrees to purchase the bond that the intermediary resells to him or her. On the Order Inquiry screen, the "Filled Cust" row indicates a "completed" order, listing the terms on which the customer has purchased the bond from the intermediary. (Ex. M (BondExchange Manual) at 17.)

Although the BondExchange Manual does not expressly disclose whether the second order is placed using the computerized system, that step would have been obvious to a person with ordinary skill in the art at the time the BondExchange Manual was published. (Rosen Decl. ¶ 71.) There are numerous advantages to allowing the second order to be received by computer. For example, receiving a matching buy order on a computerized system increases the speed at which the order can be confirmed and executed. (*Id.*) Market changes can occur within seconds in the bond markets, and a delay of even a few minutes in processing a matching buy order can result in a subject order no longer being available or a trade no longer being attractive. (*Id.*) In addition, computerizing the receipt of orders improves accuracy by reducing transcription errors

that can occur when orders arrive by telephone or fax. (*Id.*) It also reduces paperwork and conserves human resources, thus freeing up brokers to perform other tasks. (*Id.*) As discussed above in Sections IV.I.1– IV.I.3.a, it would have been obvious to receive an order from a customer through a "computerized system" rather than by telephone or fax. That is particularly so where, as here, virtually every other aspect of the ordering process has been computerized. (*Id.*)

        **f.**    **The BondExchange Manual Teaches "Identifying the serial chain of transactions using the first order, at least one received intermediate order, and the second order."**

The BondExchange Manual teaches that when an order is "completed," a serial chain is identified using the first order, intermediate order, and second order. The Order Inquiry screen shows an order with a "Filled" status, which means "your order has been completed." (Ex. M (BondExchange Manual) at 17.) In the example, John Boudinot's order has been filled. At that point, the "Filled Dealer" row shows the first transaction in the chain: John Boudinot obtained 167 T Bonds at a price of 107.063 from Spear, Leeds & Kellogg. The "Filled Cust" row shows the second transaction in the chain: Boudinot's customer obtained the bonds from Boudinot at the same price.

        **g.**    **The BondExchange Manual Renders Obvious "executing the at least one transaction within the serial chain of transactions."**

The BondExchange Manual discloses that offerings on the website can be "live executable" offers. (Ex. M (BondExchange Manual) at 32.) It also discloses that transactions are marked "confirmed" and "completed." (*Id.*)

Although the BondExchange Manual does not disclose the actual execution of those orders, it would be obvious, upon completion of those live executable orders, to execute those orders. (Rosen Decl. ¶ 72.) After all, that is the purpose of having executable orders. (*Id.*)

Patent No. 7,231,363
Client Reference No. 65024-2

va-238097

> **h.    The BondExchange Manual Teaches "where the serial chain of
> transactions comprises a transfer of said financial instrument
> between the first ordering party and a first intermediate party,
> and a transfer of said financial instrument between the second
> ordering party and a last intermediate party, and where the
> first intermediate party and the last intermediate party are
> different parties or the same party."**

As described above, the BondExchange Manual shows a serial chain of transactions on
the Order Inquiry screen.  (Ex. M (BondExchange Manual) at 17.)  In the example, John
Boudinot's order has been filled.  At that point, the "Filled Dealer" row shows the transfer from
the first ordering party (SLK) to the intermediate party (Boudinot).  The "Filled Cust" row shows
the transfer from the intermediate party (Boudinot) to the second ordering party (the customer).

Although the BondExchange Manual does not disclose the actual transfer of the bonds in
the clearance and settlement process, it would be obvious, upon completion of orders, to carry
out a transfer of the bonds as described on the Order Inquiry screen.  (Rosen Decl. ¶ 72.)  After
all, that is the purpose of the orders.  (*Id.*)

> **3.    The BondExchange Manual Teaches Claim 2, Which Recites "The
> method of claim 1, comprising determining whether a match occurs
> between one of the intermediate orders and at least one of the first
> and second orders of the first and second ordering parties."**

The BondExchange Manual discloses that the intermediary views the first ordering
party's offer, clicks on it, and then submits a matching order.  (Ex. M (BondExchange Manual)
at 13-14.)  The fields for Issue, Coupon, Maturity, Transaction (i.e., Buy or Sell), and CUSIP are
automatically matched to the first order because those fields are populated with the information
from the first order when the trade ticket for the intermediate order is generated.  (*Id.* at 14.)

> **4.    The BondExchange Manual Renders Obvious Claim 3, Which Recites
> "The method of claim 2, comprising matching one or more of the
> intermediate orders between the first order and the second order and
> executing the one or more matched orders to at least partially execute
> the serial chain of transactions."**

As described above, the BondExchange Manual discloses that the intermediate order
matches the first order.

Although the BondExchange Manual does not expressly disclose the execution of the
first order and the matching intermediate order, that step would have been obvious to a person

with ordinary skill in the art at the time of the invention. (Rosen Decl. ¶ 72.) The

BondExchange Manual discloses that the "offerings" (*i.e.*, the first orders) can be "live

executable" orders. (Ex. M (BondExchange Manual) at 5.) Where an order is executable, it

would be obvious to execute it. (Rosen Decl. ¶ 72.)

> 5.   **The BondExchange Manual Teaches Claim 4, Which Recites "The
> method of claim 3, comprising receiving an indication from the first
> ordering party to select whether the first order is a live, executable
> order or a subject order."**

The BondExchange Manual discloses that the "offerings" (*i.e.*, the first orders) can be

"live executable" orders. (Ex. M (BondExchange Manual) at 5.) It also discloses placing an

order with the "Execution Type" listed as "Subject." (*Id.* at 15.)

> 6.   **The BondExchange Manual Renders Obvious Claim 5, Which Recites
> "The method of claim 4 wherein the first order is a live, executable
> order, and the step of receiving one or more intermediate orders
> comprises receiving one or more live, executable intermediate
> orders."**

As described above, the BondExchange Manual discloses that the "offerings" (*i.e.*, the

first orders) can be "live executable" orders. (Ex. M (BondExchange Manual) at 5.)

The BondExchange Manual does not expressly disclose that the intermediate order

necessarily can be live and executable as well. However, that step would have been obvious to a

person with ordinary skill in the art at the time of the manual's publication. (Rosen Decl. ¶ 73.)

The BondExchange Manual itself suggests such a step. The order confirmation screen shows an

intermediate order with "Execution Type" listed as "SUBJECT." (Ex. M (BondExchange

Manual) at 15.) There are generally two execution types: (1) live and executable or (2) subject.

(Rosen Decl. ¶ 73.) The presence of an "Execution Type" category suggests the possibility of

having *both* live orders and subject orders. (*Id.*) Moreover, the BondExchange Manual discloses

that first orders can be live and executable. It would have been obvious that an intermediate

order could be live and executable as well. (*Id.*)

77

7. **The BondExchange Manual Renders Obvious Claim 6, Which Recites "The method of claim 5, comprising automatically executing one or more live orders in the serial chain of transactions that are matched."**

As described above, the BondExchange Manual discloses live, executable first orders and matching intermediate orders. Although the BondExchange Manual does not expressly disclose executing those matched orders, that step would have been obvious to a person with ordinary skill in the art at the time of the manual's publication. (Rosen Decl. ¶ 72.) The purpose of having a live, executable order is to automatically execute it. (*Id.*)

8. **The BondExchange Manual Renders Obvious Claim 7, Which Recites "The method of claim 1, wherein: the first order received from the first ordering party is an order subject to satisfaction of a condition, and the method further comprises executing the order subject to condition only if the condition is satisfied."**

The BondExchange Manual discloses an order confirmation screen showing an intermediate order with "Execution Type" listed as "SUBJECT." (BondExchange Manual at 15.) Although the BondExchange Manual does not expressly disclose that first orders can be subject, that step would have been obvious to a person with ordinary skill in the art at the time of the manual's publication. If an intermediate order can be subject, a first order can also be subject. (Rosen Decl. ¶ 73.) Moreover, the step of executing a subject order only if the condition is satisfied would have been obvious too. The purpose of designating an order as a subject order is to ensure that it will be executed only if conditions are satisfied. (*Id.*)

9. **The BondExchange Manual Teaches Claim 8, Which Recites "The method of claim 1, comprising storing a set of rules for each of at least some of the parties using the system in a memory accessible to such parties, wherein the step of receiving intermediate orders comprises receiving intermediate orders generated between intermediate parties based upon the stored sets of rules."**

The BondExchange Manual discloses the use of predefined, stored queries to locate offerings on which intermediate orders will be generated. (Ex. M (BondExchange Manual) at 9.)

78

    10.    **The BondExchange Manual Teaches Claim 9, Which Recites "The method of claim 1, wherein the first order received from the first ordering party has a first set of terms, and the stop of receiving intermediate orders comprises receiving intermediate orders having respective second sets of terms different than the first set of terms."**

As described above, the BondExchange Manual discloses that intermediaries mark up the price of bonds in their intermediate orders. The order confirmation screen shows an intermediate order. (*Id.* at 15.) As explained above, the row labeled "DEALER" shows the price at which the bond is sold to the intermediary. (Rosen Decl. ¶ 69.) Below that, the row labeled "CUSTOMER" shows a higher price charged to the intermediary's customer. (*Id.*) That row also shows a "Markup" reflecting the price change. (*Id.*)

In addition, as described above, the BondExchange Manual shows how an intermediary can mark up the price on a group of orders at the same time, and then submit those marked up orders as intermediate orders. (Ex. M (BondExchange Manual) at 30, 34.)

    11.    **The BondExchange Manual Teaches Claim 10, Which Recites "The method of claim 9, wherein the first set of terms include a price for one or more transactions in the serial chain of transactions, and the step of receiving intermediate orders includes receiving intermediate orders having respective second sets of terms in which a price term has been modified from the first set of terms."**

As described above, the BondExchange Manual discloses that intermediaries mark up the price on offers on the system before reselling those bonds to their customers. (*Id.* at.15, 30 34.)

    12.    **The BondExchange Manual Teaches Claim 11, Which Recites "The method of claim 1, wherein the step of identifying the serial chain of transactions comprises tracking a path of parties for which orders have been received tracing back to the first ordering party."**

The BondExchange Manual teaches tracking a path of parties consisting of the first ordering party, the intermediate party, and the second ordering party. The Order Inquiry screen shows an order with a "Filled" status, which means "your order has been completed." (Ex. M (BondExchange Manual) at 17.) That screen displays the tracking of a path of parties, from the dealer who posted the bond offering (i.e., the first ordering party) to the broker who obtained it for his or her client (*i.e.*, the intermediate party) to the customer who buys the bond (i.e., the second ordering party). In the example shown in the BondExchange Manual, the intermediary

79

Patent No. 7,231,363
Client Reference No. 65024-2

John Boudinot's order has been filled. (*Id.*) At that point, the "Filled Dealer" row shows the first transaction in the chain: John Boudinot obtained 167 T Bonds at a price of 107.063 from Spear, Leeds & Kellogg. The "Filled Cust" row shows the second transaction in the chain: Boudinot's customer obtained the bonds from Boudinot at the same price. (*Id.*)

> **13. The BondExchange Manual Teaches Claim 12, Which Recites "The method of claim 11, comprising storing a subset of the path of parties in association with each of the orders."**

The BondExchange Manual teaches electronically storing a subset of the path of parties in association with each order. The sell order (*i.e.*, the first order) lists the dealer offering that bond for sale (i.e., the first ordering party). (*Id.* at 12.) The intermediary and the first ordering party are stored in association with the intermediate order. In the example in the manual, John Boudinot is listed as the intermediary, and Spear, Leeds & Kellogg is listed as the dealer offering the bond for sale. (*Id.* at 17.) Finally, the customer (i.e., the second ordering party) and the intermediary are listed in association with the customer's order. In the example in the manual, the customer is listed by account number 1-000112279, and the intermediary is listed as John Boudinot. (*Id.*)

> **14. The BondExchange Manual Teaches Claim 13, Which Recites "The method of claim 1, wherein at least one of the first, second, and intermediate orders have parameters set by at least one of the first, second, and intermediate parties, and the intermediate orders in the serial chain of transactions cannot be prevented from execution by parameters set by the first and second ordering parties."**

The '363 Patent states that "price" is an example of a "parameter" in an order. ('363 Patent at 15:26-33.) As described above, the BondExchange Manual discloses that offers to sell are posted at a set price and that intermediaries place intermediate orders in which the price parameters are marked up or marked down. (BondExchange Manual at 16, 30, 34.)

va-238097

15. **The BondExchange Manual Renders Obvious Claim 14, Which Recites "The method of claim 1, wherein at least one further one of the intermediate orders participating in the serial chain of transactions is placed by at least one further intermediate party in response to one or more others of the intermediate orders."**

The BondExchange Manual does not specifically state that additional intermediaries place further intermediate orders after the first intermediate order is placed. That step, however, would have been obvious to a person with ordinary skill in the art in April 1998.

Adding a second intermediary would have required nothing more than a repetition of the steps already shown in the BondExchange Manual. (Rosen Decl. ¶ 74.) For example, after a trader on a brokerage house's trading desk placed an intermediate order that marked up the trade (Ex M (BondExchange Manual) at 16; 30; 34), that order could be re-posted so that it was viewable by sales representatives at that brokerage house. (*Id.* at 11-12.) In response, a sales representative could submit his or her own intermediate order adding a commission and purchasing the bond on an agency basis on behalf of his or her client. (*Id.* at 14.)

A person with ordinary skill in the art in April 1998 would have had a strong economic motivation to provide the opportunity for a second intermediary to add a second layer of markups or commissions to a bond transaction. (Rosen Decl. ¶ 74.) The BondExchange Manual already teaches permitting one layer of markups. Once the advantages of permitting one layer of markups were recognized, the advantages of permitting two layers would have been obvious. (*Id.*)

16. **The BondExchange Manual Renders Obvious Claim 15, Which Recites "The method of claim 1, wherein any further intermediate orders participating in the serial chain of transactions are placed by others of the intermediate parties in response to one or more others of the intermediate orders."**

As described above in connection with claim 14, it would have been obvious to a person with ordinary skill in the art in April 1998 to allow repetition of the steps shown in the BondExchange Manual, such that a second intermediate order could be placed in response to the first intermediate order.

81

Patent No. 7,231,363
Client Reference No. 65024-2

**V.     CERTIFICATION AND STATEMENTS PURSUANT TO 37 C.F.R. § 1.915**

Pursuant to 37 C.F.R. § 1.915(a), Requesters authorize the United States Patent and Trademark Office to charge the fee set in 37 C.F.R. § 1.20(c)(2) for requesting *inter partes* reexamination to Deposit Account No. 03-1952.

Pursuant to 37 C.F.R. § 1.915(b)(1), Requesters respectfully request reexamination of claims 1-15 of U.S. Patent No. 7,231,363.

Pursuant to 37 C.F.R. § 1.915(b)(2), Requesters provide a citation of the patents and printed publications presented to provide a substantial new question of patentability on pages 1-2 of this Request. The identified patents and publications are also listed on the attached PTO/SB/08 forms.

Pursuant to 37 C.F.R. § 1.915(b)(3), Requesters provide statements pointing out each substantial new question of patentability below for each identified claim for which they have requested reexamination and a detailed explanation of the pertinence and manner of applying the cited patents and publications to each identified claim:

Pursuant to 37 C.F.R. § 1.915(b)(4), Requesters provide copies of the pertinent patents and publications relied upon in Exhibits A-M.

Pursuant to 37 C.F.R. § 1.915(b)(5), Requesters provide a copy of the entire '363 Patent, including the front face, drawings, and specification/claims (in double column format) in Exhibit AA.

Pursuant to 37 C.F.R. § 1.915(b)(6), Requesters attach a Certificate of Service certifying that Requesters have served a copy of the Request in its entirety on the patent owner.

Purusant to 37 C.F.R. § 1.915(b)(7), Requesters hereby certify that the estoppel provisions of 37 C.F.R. § 1.907 do not prohibit this Request for *inter partes* reexamination.

Pursuant to 37 C.F.R. § 1.915(b)(8), Requesters hereby certify that the real parties in interest are BondDesk Group LLC and BondDesk Trading LLC ("Requesters").

## VI.  CONCLUSION

For the reasons herein, Requesters respectfully submit that the cited references raise substantial new questions of patentability as to all of the claims of the '363 Patent and *inter partes* reexamination should be commenced.  Furthermore, Requesters submit that claims 1-15 of the '363 Patent are unpatentable over the prior art cited in this Request as described in detail above, and should be canceled by the Office.

In the event that the transmittal letter is separated from this document and the Patent and Trademark Office determines that relief is required for proper consideration of this Request, Requesters, BondDesk Group LLC and BondDesk Trading LLC, petition for any required relief necessary to initiate the reexamination requested herein and authorize the Commissioner to charge the cost of such petitions and/or other fees due in connection with filing of this document to Deposit Account 03-1952 referencing 650240000002.

Respectfully submitted,

James M. Denaro
Reg. No. 54,063
MORRISON & FOERSTER LLP
1650 Tysons Blvd, Suite 400
McLean, VA 22102
(703) 760-7331
ATTORNEYS FOR REQUESTERS

Dated:  June 3, 2008

83

Patent No. 7,231,363
Client Reference No. 65024-2

va-238097

## <u>CERTIFICATE OF SERVICE</u>

I, Karen E. Keller, Esquire, hereby certify that on June 20, 2008, a true and correct copy

of the foregoing document was electronically filed with the Clerk of the Court using CM/ECF,

which will send notification that such filing is available for viewing and downloading to the

following counsel of record:

> Mary B. Graham, Esquire
> Morris Nichols Arsht & Tunnell LLP
> 1201 North Market Street
> PO Box 1347
> Wilmington, DE 19899-1347

I further certify that on June 20, 2008,  I caused a copy of the foregoing document to be

served by hand delivery on the above-listed counsel of record and the following non-registered

participants in the manner indicated:

### <u>BY ELECTRONIC MAIL</u>

> Michael A. Jacobs, Esquire
> [mjacobs@mofo.com]
> Rita F. Lin, Esquire
> [rlin@mofo.com]
> Morrison & Foerster LLP
> 425 Market Street
> San Francisco, CA 94105-2482

> YOUNG CONAWAY STARGATT & TAYLOR, LLP

> /S/ KAREN E. KELLER
> _____
> Karen E. Keller (No. 4489)
> The Brandywine Building
> 1000 West Street, 17th Floor
> Wilmington, DE 19801
> (302) 571-6600
> *kkeller@ycst.com*