# MORRIS, NICHOLS, ARSHT & TUNNELL LLP

1201 NORTH MARKET STREET
P.O. BOX 1347
WILMINGTON, DELAWARE 19899-1347

———

(302) 658-9200
(302) 658-3989 FAX

MARY B. GRAHAM
(302) 351-9199
mgraham@mnat.com

August 27, 2008

**BY E-FILING**

The Honorable Gregory M. Sleet
United States District Court
Federal Building
844 North King Street
Wilmington, DE 19801

      Re:    *Wall Corporation v. BondDesk Group, L.L.C., et al.*
               C.A. No. 07-844 (GMS)

Dear Chief Judge Sleet:

        This is to supplement the record in connection with BondDesk's pending Motion For A Stay Of The Proceeding Pending *Inter Partes* Reexamination of the patent in suit (D.I. 11), which has been fully briefed. The request to the Patent Office for reexamination, made on June 3, 2008, was granted by the Patent Office on August 22, 2008 (Ex. A, attached). At the same time, the Patent Office issued a non-final office action rejecting all 15 claims (Ex. B, attached).

        Respectfully,

        */s/ Mary B. Graham*

        Mary B. Graham (#2256)

MBG/dam
cc:    Karen E. Keller, Esq. (by e-mail)
       Michael W. Shore, Esq. (by e-mail)
       Michael A. Jacobs, Esq. (by e-mail)
2463028

EXHIBIT A

UNITED STATES PATENT AND TRADEMARK OFFICE

COMMISSIONER FOR PATENTS
UNITED STATES PATENT AND TRADEMARK OFFICE
P.O. BOX 1450
ALEXANDRIA, VA 22313-1450
www.uspto.gov

| CONTROL NO. | FILING DATE | PATENT IN REEXAMINATION | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 95/001,049 | 06/03/08 | 7,231,363 | |

KAPLAN GILMAN GIBSON & DERNIER L.L.P.
900 ROUTE 9 NORTH
WOODBRIDGE, NJ 07095

| EXAMINER |
|---|
| GRAHAM, M. |

| ART UNIT | PAPER |
|---|---|
| 3993 | |

DATE MAILED:

08/22/08

# *INTER PARTES* REEXAMINATION COMMUNICATION

BELOW/ATTACHED YOU WILL FIND A COMMUNICATION FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE OFFICIAL(S) IN CHARGE OF THE PRESENT REEXAMINATION PROCEEDING.

**All correspondence** relating to this *inter partes* reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of this communication.

PTOL-2071 (Rev.07-04)



UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

MORRISON & FOERSTER LLP
1650 TYSONS BOULEVARD
SUITE 400
MCLEAN, VA 22102

# Transmittal of Communication to Third Party Requester
## *Inter Partes* Reexamination

REEXAMINATION CONTROL NUMBER *95/001,049*.

PATENT NUMBER *7,231,363*.

TECHNOLOGY CENTER *3999*.

ART UNIT *3993*.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above-identified reexamination proceeding. 37 CFR 1.903.

Prior to the filing of a Notice of Appeal, each time the patent owner responds to this communication, the third party requester of the *inter partes* reexamination may once file written comments within a period of 30 days from the date of service of the patent owner's response. This 30-day time period is statutory (35 U.S.C. 314(b)(2)), and, as such, it <u>cannot</u> be extended. See also 37 CFR 1.947.

If an *ex parte* reexamination has been merged with the *inter partes* reexamination, no responsive submission by any *ex parte* third party requester is permitted.

**All correspondence** relating to this inter partes reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of the communication enclosed with this transmittal.

PTOL-2070 (Rev.07-04)

| ***ORDER GRANTING/DENYING REQUEST FOR* INTER PARTES REEXAMINATION** | Control No. | Patent Under Reexamination |
|---|---|---|
| | 95/001,049 | 7231363 |
| | Examiner | Art Unit |
| | MATTHEW C. GRAHAM | 3993 |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address. --*

The request for *inter partes* reexamination has been considered. Identification of the claims, the references relied on, and the rationale supporting the determination are attached.

Attachment(s):  ☐ PTO-892    ☒ PTO/SB/08    ☐Other: _____

1. ☒ The request for *inter partes* reexamination is GRANTED.

    ☒ An Office action is attached with this order.

    ☐ An Office action will follow in due course.

2. ☐ The request for *inter partes* reexamination is DENIED.

This decision is not appealable. 35 U.S.C. 312(c). Requester may seek review of a denial by petition to the Director of the USPTO within ONE MONTH from the mailing date hereof. 37 CFR 1.927. EXTENSIONS OF TIME ONLY UNDER 37 CFR 1.183. In due course, a refund under 37 CFR 1.26(c) will be made to requester.

**All correspondence** relating to this *inter partes* reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of this Order.

## ORDER

1.    A substantial new question of patentability affecting claim1-15 of United

States Patent Number 7,231,363 to Hughes et al. (Hughes) is raised by the present

request for *inter partes* reexamination.

Extensions of time under 37 CFR 1.136(a) will not be permitted in *inter partes*
reexamination proceedings because the provisions of 37 CFR 1.136 apply only to "an
applicant" and not to the patent owner in a reexamination proceeding. Additionally, 35
U.S.C. 314(c) requires that *inter partes* reexamination proceedings "will be conducted
with special dispatch" (37 CFR 1.937). Patent owner extensions of time in *inter partes*
reexamination proceedings are provided for in 37 CFR 1.956. Extensions of time are
not available for third party requester comments, because a comment period of 30 days
from service of patent owner's response is set by statute. 35 U.S.C. 314(b)(3).

Claim 1 of Hughes recites a method, comprising: receiving a first order from a

first ordering party at a computerized system, the first order including at least one bid or

offer relating to financial instrument to permit execution of a serial chain of transactions

pertaining to the financial instrument in the computerized system, based on the first

order; receiving one or more intermediate orders, including at least one offer or bid

relating to said financial instrument, from at least one of a plurality of intermediate

parties using the computerized system, at least one of the intermediate orders being

placed by the at least one intermediate party in response to the first order; receiving a

second order, including at least one offer or bid relating to said financial instrument,

from a second ordering party using the computerized system, the second order being

placed by the second ordering party in response to one or more of the intermediate

orders; identifying the serial chain of transactions using the first order, at least one

received intermediate order, and the second order; executing the at least one

Application/Control Number: 95/001,049                                Page 3
Art Unit: 3993

transaction within the serial chain of transactions, where the serial chain of transactions

comprises a transfer of said financial instrument between the first ordering party and a

first intermediate party, and a transfer of said financial instrument between the second

ordering party and a last intermediate party and where the first intermediate party and

the last intermediate party are different parties or the same party.

Key to the claim is the recitation of a computerized system, a first order, an

intermediate order and a second order and identifying a serial chain of transactions.

Hughes claims priority to provisional applications 60/201,599, filed 05/03/200,

60/178,049, filed 01/24/2000, and 60/173,581, filed 12/29/1999. However, none of

these provisional applications disclose the serial chain of transactions or identifying the

serial chain of transactions as claim in the application that matured into the patent of

Hughes. Therefor, the earliest effective priority date of Hughes is considered to be that

of the filing date of application 09/706,678 on November 06, 2000.

The request indicates that US Patent 6,408,282 to Buist, filed on 4/15/1999,

raises a substantial new question of patentability of claims 1-15.

Buist discloses a computerized network containing four servers (the root server,

the intermediate server, the broker-dealer server, and the replica server) that support

buying and selling of securities. Buist discloses that the broker-dealer server receives

an offer to sell from a first ordering party. Buist describes connecting "to the trading

system of the preferred embodiment, a user at step 310 first activates the application

which generates on the display screen of the user's workstation a connection status

display (see FIG. 53) that establishes a connection to the server/database of the user's

Application/Control Number: 95/001,049                                    Page 4
Art Unit: 3993

broker/dealer. At step 322 the user selects a stock of interest by typing the stock symbol

into an appropriate display (see FIG. 6, slot 642). Assuming that the user decides to sell

some of his/her holdings in the displayed securities, at step 342 he/she fills in a trade

ticket (see FIG. 11) for a sell order and selects the 'Verification' button on the trade

ticket display. As indicated, at step 346, the user then views the final verification screen

(see FIG. 56) provided by the application and selects the 'Send' button. In response, the

order is transmitted to the server and database of the user's broker/dealer".

        Buist makes clear that the first order can instead be an offer to buy. "Assuming

that the user decides to sell some of his/her holdings in the displayed securities, at step

342 he/she fills in a trade ticket (see FIG. 11) for a sell order .... Alternatively, at this

point, the user may choose to purchase securities."

        Buist therefore teaches that a broker-dealer may place an intermediate order by

passing along the order on behalf of a client. Buist further teaches that a plurality of

broker-dealers use the broker-dealer servers, which are part of the computerized

system, to place intermediate orders. Buist provides that in "the preferred embodiment,

each of a multiplicity of users' workstations is simultaneously connected via the Internet

to one of a plurality of broker/dealer computers."

        The intermediate order is placed in response to the first order (i.e., the user's sell

order). Buist notes that "In response, the order is transmitted to the server and database

of the user's broker/dealer .... If the transaction is approved, at step 354, the server of

the broker/dealer sends the user's approved sell order to the root server."  Buist further

teaches that such an intermediate order is then disseminated to other users on the

system. "If the transaction is approved, at step 354, the server of the broker/dealer

sends the user's approved sell order to the root server .... The applications receive this

sell offer and, at step 370, display the offer in the order book displays of the subscribed

users." A second ordering party can then respond to the intermediate order by

executing a buy order.

Buist discloses the step of identifying the serial chain of transactions. Buist

assigns a unique identifier to the first ordering party's order that stays with the order

through the serial chain of transactions. The first order (i.e., the sell order) and the

intermediate order (i.e., the broker-dealer forwarding the sell order for display on the

system) are both tagged with the same ID. The "server of the broker/dealer sends the

user's approved sell order to the root server 50, which attaches a system ID to the

order, identifying the user's account, his order (stock symbol, size, price, and whether

buy or sell), and his broker/dealer." (See Col. 10, lines 7-11.)

Then, the second user's buy order has the same ID attached to it. "The buy

order, along with an ID assigned to the corresponding offer to sell, is transmitted at step

378, to the server and database of the buyer's broker/dealer using another, preferably

Internet, connection that the buyer has to his broker/dealer system." (See Col 10, lines

30-34.)

Buist describes that the "broker/dealer server/database sends the approved sell

order (with a user account ID and the size, price, stock, and side (whether buy or sell) of

the order) to the root server 50, which attaches a system ID to the order, said system ID

Application/Control Number: 95/001,049                                      Page 6
Art Unit: 3993

containing sufficient information to enable the system to match the ID to the seller, the

order, and the seller's broker/dealer." (See Col. 32, lines 37-43.)

Accordingly, a serial chain of transactions is identified through the use of unique

IDs applied to the first order, intermediate order, and second order.

Buist describes a step in which the transaction is confirmed and executed. "The

broker/dealer servers of both parties to the transaction notify the applications of the

parties that the transaction is confirmed (by updating the open positions and related

displays, and preferably also by email) . The exchange of securities and money takes

place subsequently in a conventional way between the broker/dealers of the buyer and

the seller." (See Col. 10, lines 54-63.) Buist teaches a serial chain of transactions in

which the financial instrument is transferred from the seller to the seller's broker-dealer,

then from the seller's broker- dealer to the buyer's broker-dealer, and finally from the

buyer's broker-dealer to the buyer.

Buist discloses that the "exchange of securities and money takes place

subsequently in a conventional way between the broker/dealers of the buyer and the

seller." (See Col. 10, lines 60-62.) Buist confirms that the seller's broker-dealer and the

buyer's broker-dealer handle the transfer of the securities. "At step 390 the root server

50 notifies the broker/dealer systems of both parties of the details of the transaction so

as to identify which funds and shares must be transferred to which accounts." (See Col.

10, lines 45-48.)

Buist teaches two intermediate parties. The first intermediate party is the seller's

broker-dealer, as explained above. The last intermediate party is the buyer's broker-

dealer. The buyer's broker-dealer, like the seller's broker-dealer, passes along the

buyer's order after approving it. "The buy order, along with an ID assigned to the

corresponding offer to sell, is transmitted at step 378, to the server and database of the

buyer's broker/dealer. The buyer's server checks, at step 382, whether the buyer has

sufficient funds or credit in his account to purchase the stock offered by the seller".

Also, a broker/dealer may not authorize a transaction if buyer's profile and

preference do not correspond to the characteristics of the security that he wants to

purchase. If the transaction is approved, at step 386, the buyer's broker/dealer sends

the approval of the order along with sufficient information to identify the buyer and the

order to the root server 50." Thus, Buist allows that the buyer's broker- dealer and the

seller's broker-dealer can be different parties or the same party.

Thus, Buist teaches a computerized system, a first order, an intermediate order

and a second order and identifying a serial chain of transactions.  It is therefore agreed

that Buist raises a substantial new question of patentability of claims 1-15 of Hughes

because the features in Buist were not previously considered in the examination of

Hughes. There is a substantial likelihood that a reasonable Examiner would consider

these teachings to be important in deciding whether or not at least claims 1-15 are

patentable.  Accordingly, Buist raises a substantial new question of patentability of at

claims 1-15, which question has not been decided in a previous examination of the

Hughes patent.



The requestor further contends that the following publications ~~alos~~ raise a *also*

substantial new question of patentability of claims 1-15:

US Patent 7,222,089 to Harpale, filed 9/11/2001, with a priority to provisional

application of 9/11/200—making the effective date 9/11/2000.

US Patent 7,333,952 to Neyman et al. (Neyman), filed 6/23/2000.

US Patent 6,014,643 to Minton, published 1/11/2000

Marilyn COHEN, "Bond Trading Goes On-Line", Forbes (Jan. 25, 1999)

Toddi GUTNER, "How to Seal a Great Bond Deal", Business Week (May 24,

1999)

BOND MARKET ASSOCIATION, The 1998 Review of Electronic Transaction

Systems in the U.S. Fixed Income Securities Markets (Nov. 1998)

NATIONAL ASSOCIATION OF SECURITIES DEALERS (NASD), Notice to

Members 86-67 (Oct. 2, 1986)

SMITH, SELWAY, and MCCORMICK, The Nasdaq Stock Market: Historical

Background and Current Operation, NASD Working Paper 98-01 (Aug. 24, 1998)

Financial Information eXchange Protocol, Version 4.1 (Mar. 31, 1998, with errata

from Jun. 30, 1999), (FIX Protocols).

Harpale, Cohen, Gutner, Minton and the Bond Market Association each disclose

bond trading methods having intermediate orders via mark-ups.   It is therefore agreed

that Harpale, Cohen, Gutner, Minton and the Bond Market Association each raise a

substantial new question of patentability of claims 1-15 of Hughes because the features

in Harpale, Cohen, Gutner, Minton and the Bond Market Association were not

previously considered in the examination of Hughes. There is a substantial likelihood

that a reasonable Examiner would consider these teachings to be important in deciding

whether or not at least claims 1-15 are patentable. Accordingly, Harpale, Cohen, Gutner, Minton and the Bond Market Association each raise a substantial new question of patentability of at claims 1-15, which question has not been decided in a previous examination of the Hughes patent.

The 1998 NASD Working Paper describes the Small Order Entry System ("SOES") as an electronic system that enables investors to send small orders to their broker-dealers, who then route those orders to various markets for execution. The 1986 NASD Notice discloses that broker-dealers routing orders through SOES on behalf of investors may take a "riskless principal" position on those orders--that is, broker-dealers may purchase the security from their clients and immediately resell it to another party. (Ex. H (1986 NASD Notice) at 6.) Therefore, these two broker-dealers sending intermediate orders on a riskless principal basis.   It is therefore agreed that the two NASD publications each raise a substantial new question of patentability of claims 1-15 of Hughes because the features in the two NASD publications were not previously considered in the examination of Hughes. There is a substantial likelihood that a reasonable Examiner would consider these teachings to be important in deciding whether or not at least claims 1-15 are patentable. Accordingly, the two NASD publications each raise a substantial new question of patentability of at claims 1-15, which question has not been decided in a previous examination of the Hughes patent.

The FIX Protocol is a "message standard developed to facilitate the electronic exchange of information related to securities transactions" and "is intended for use between trading partners wishing to automate communications." FIX specifically

contemplates the participation of intermediaries: that is, allowing "third parties to

participate in the delivery of messages between trading partners." FIX teaches tracking

the path of an order by appending each step in the pathway as a field in the order

message. The order contains several fields: "SenderCompID" is an identifier for the

party sending the order, "TargetCompID" is an identifier for the intermediary, and

"DeliverToCompID" is an identifier for the ultimate counterparty to the order. (See page

11, lines 71-74.) The paper describes a scenario in which "A sends to B via Q," where

"A=sellside," "B=buyside," and "Q=third-party [intermediary]."   It is therefore agreed

that the FIX Protocol raises a substantial new question of patentability of claims 1-15 of

Hughes because the features in the FIX Protocol were not previously considered in the

examination of Hughes. There is a substantial likelihood that a reasonable Examiner

would consider these teachings to be important in deciding whether or not at least

claims 1-15 are patentable.  Accordingly, the FIX Protocol raises a substantial new

question of patentability of at claims 1-15, which question has not been decided in a

previous examination of the Hughes patent.

Neyman describes a system in which Counterparty A passes an offer to Broker

Node B, who passes it to Broker Node C, who passes it to Counterparty D, who accepts

the offer. Neyman teaches that each broker node stores information about the broker

node from which it received the order. Using that information, a trading message is then

traced back through the series of broker nodes to its source. Neyman describes that the

"message will thus follow the path of the original information back to its source." (See

Col 9, lines 49-51). Neyman thus discloses identifying a serial chain of transactions.  It

is therefore agreed that Neyman raises a substantial new question of patentability of

claims 1-15 of Hughes because the features in Neyman were not previously considered

in the examination of Hughes. There is a substantial likelihood that a reasonable

Examiner would consider these teachings to be important in deciding whether or not at

least claims 1-15 are patentable. Accordingly, Neyman raises a substantial new

question of patentability of at claims 1-15, which question has not been decided in a

previous examination of the Hughes patent.

The requestor further contends that U.S. GENERAL ACCOUNTING OFFICE,

U.S. Government Securities: An Examination of Views Expressed About Access to

Brokers' Services, GAO/GGD-88-8 (Dec. 1987) (GAO Report) raises a substantial new

question of patentability of claims 1-15.

The GAO Report refers to the bids and offers being placed by a plurality of

"brokers" rather than a single broker. Moreover, the GAO Report describes those

brokers using the computerized system. After brokers "call out their bids and offers,"

"the brokers or staff at the center of the desk enter this information so it is displayed on

an internal computer screen," and that information is "transmitted via computer for

instant display on each customer's video display screen."

The GAO Report discloses that, in traditional voice trading, the brokers "call out

their bids and offers as received from customers." After the broker calls out the

customer's order, the order is "transmitted via computer" to other customers, who can

respond by hitting a bid or taking an offer. Hitting a bid or taking an offer means to place

an order accepting a bid or offer. The GAO Report further teaches that, during the

Application/Control Number: 95/001,049                                    Page 12
Art Unit: 3993

clearance and settlement of the trade, the broker in a traditional voice trade purchases

the security from the seller and resells it to the buyer. Accordingly, there is a transfer of

the financial instrument from the buyer to the intermediary and from the intermediary to

the seller. When a trade is completed, "the broker firm sends separate written

confirmations to the buyer and the seller. The respective confirmations show the broker

firm as the seller and purchaser of securities, thus maintaining customer anonymity."

The written confirmation is considered to be an identification of a serial chain of

transactions.  It is therefore agreed that the GAO Report raises a substantial new

question of patentability of claims 1-15 of Hughes because the features in the GAO

Report were not previously considered in the examination of Hughes. There is a

substantial likelihood that a reasonable Examiner would consider these teachings to be

important in deciding whether or not at least claims 1-15 are patentable.  Accordingly,

the GAO Report raises a substantial new question of patentability of at claims 1-15,

which question has not been decided in a previous examination of the Hughes patent.

The requestor also contends that WEISS After the Trade Is Made: Processing

Securities Transactions (1993) in combination with the GAO Report raises a substantial

new question of patentability of at claims 4, 5, 7, 9, 10, and 13.

Claim 4 adds "comprising receiving an indication from the first ordering party to

select whether the first order is a live, executable order or a subject order." Weiss

teaches that, in traditional voice trading, customers may place orders of different types.

These orders can be "market orders," which are live and executable. "A market order is

an order to execute at whatever the market price is when the broker enters the crowd."

(See page 59.) The orders can also be subject to various conditions that must be fulfilled before execution. For example, an order can be "all or none," which means that "given the time constraints, such as a day, all of the order must be filled or the client does not have to accept the execution." (See page 60).

Claim 5 adds that "the first order is a live, executable order, and the step of receiving one or more intermediate orders comprises receiving one or more live, executable intermediate orders." As described above, Weiss teaches that the first order from the customer can be live and executable. Weiss further teaches that, in traditional voice trading, the intermediate orders placed by broker-dealers can be "firm" or "subject." (See page 277.) "Firm quotes are prices at which dealers must trade .... A subject quote is a bid or offer that is subject to verification with an interested party."

Claim 7 recites that the "first order received from the first ordering party is an order subject to satisfaction of a condition, and the method further comprises executing the order subject to condition only if the condition is satisfied." Weiss teaches that, in traditional voice trading, orders can be subject to various conditions that must be fulfilled before execution. For example, an order can be "all or none," which means that "given the time constraints, such as a day, all of the order must be filled or the client does not have to accept the execution." (See page 60.)

Claims 9 add that "the first order received from the first ordering party has a first set of terms, and the step of receiving intermediate orders comprises receiving intermediate orders having respective second sets of terms different than the first set of terms" and "the first set of terms include a price for one or more transactions in the

Application/Control Number: 95/001,049                    Page 14
Art Unit: 3993

serial chain of transactions, and the step of receiving intermediate orders includes

receiving intermediate orders having respective second sets of terms in which a price

term has been modified from the first set of terms." Similarly, claim 13 recites that "at

least one of the first, second, and intermediate orders have parameters set by at least

one of the first, second, and intermediate parties, and the intermediate orders in the

serial chain of transactions cannot be prevented from execution by parameters set by

the first and second ordering parties." Weiss also discloses that broker-dealers "mark

up" and "mark down" the prices of orders they receive from others before passing those

orders on to others. (See page 278.) "When a customer wants to sell a security in the

OTC [i.e., over-the-counter] market, the dealer charges a 'mark-down.' The dealer..

buys the security from the customer at one price, and sells it to a market maker at a

higher price. The difference between the price the broker pays to the customer and

what he/she gets from the market maker is the mark-down." Accordingly, the sell order

(i.e., the first order) has one price, but the dealer's order (i.e., the intermediate order)

has a different, lower price.

It is therefore agreed that the Weiss raises a substantial new question of

patentability of claims 4, 5, 7, 9, 10, and 13 of Hughes because the features in Weiss

were not previously considered in the examination of Hughes. There is a substantial

likelihood that a reasonable Examiner would consider these teachings to be important in

deciding whether or not at least claims 4, 5, 7, 9, 10, and 13 are patentable.

Accordingly, Weiss raises a substantial new question of patentability of at claims 4, 5, 7,

9, 10, and 13, which question has not been decided in a previous examination of the

Hughes patent.

Finally, the requestor further contends that BONDEXCHANGE, Spear, Leeds &

Kellogg--Fixed Income On Line Trading Manual (Apr 1998) raises a substantial new

question of patentability of claims 1-15.

The BondExchange Manual discloses that "offerings" are posted on the

computerized system for viewing by other users. Users can then view the listed offers.

(See page 11.) The offerings can be offers to sell, which list a green "buy" price for the

user to click on. They can also be bids to buy, which list a red "sell" price for the user to

click on. The BondExchange Manual further discloses that an intermediary can place

multiple intermediate orders at once on a series of bonds. The intermediary can select a

series of bond offerings by marking checkboxes. Through a radio button, the

intermediary can choose whether the intermediate orders are on an "Agency" or

"Principal" basis. The intermediary can also apply mark-ups to the offers and calculate

how those markups will affect the price that he or she is offering his or her customer.

The BondExchange Manual teaches that when an order is "completed," a serial chain is

identified using the first order, intermediate order, and a second order. The Order

Inquiry screen shows an order with a "Filled" status. At that point, the "Filled Dealer" row

shows the first transaction in the chain. BondExchange also discloses that transactions

are marked "confirmed" and "completed".

Thus, BondExchange shows intermediate orders and identification of a serial

chain of transactions. It is therefore agreed that the BondExchange raises a substantial

Application/Control Number: 95/001,049                                Page 16
Art Unit: 3993

new question of patentability of claims 1-15 of Hughes because the features in

BondExchange were not previously considered in the examination of Hughes. There is

a substantial likelihood that a reasonable Examiner would consider these teachings to

be important in deciding whether or not at least claims 1-15 are patentable.

Accordingly, BondExchange raises a substantial new question of patentability of at

claims 1-15, which question has not been decided in a previous examination of the

Hughes patent.

Accordingly, all claims 1-15 of the Hughes patent will be reexamined in this

proceeding.

2.    Please mail any communications to:


Attn: Mail Stop "Inter Partes Reexam"
Central Reexamination Unit
Commissioner for Patents
P. O. Box 1450
Alexandria VA   22313-1450

Please FAX any communications to:

(571) 273-9900
Central Reexamination Unit

Please hand-deliver any communications to:

Customer Service Window
Attn:  Central Reexamination Unit
Randolph Building, Lobby Level
401 Dulany Street
Alexandria, VA  22314


Any inquiry concerning this communication or earlier communications from the
Reexamination Legal Advisor or Examiner, or as to the status of this proceeding, should
be directed to the Central Reexamination Unit at telephone number (571) 272-7705.

Application/Control Number: 95/001,049                    Page 17
Art Unit: 3993

Signed:

Matthew C. Graham
CRU Examiner
3993
(571) 272-7116

Conferees:

EXHIBIT B

UNITED STATES PATENT AND TRADEMARK OFFICE

COMMISSIONER FOR PATENTS
UNITED STATES PATENT AND TRADEMARK OFFICE
P.O. BOX 1450
ALEXANDRIA, VA 22313-1450
www.uspto.gov

| CONTROL NO. | FILING DATE | PATENT IN REEXAMINATION | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 95/001,049 | 06/03/08 | 7,231,363 | |

KAPLAN GILMAN GIBSON & DERNIER L.L.P.
900 ROUTE 9 NORTH
WOODBRIDGE, NJ 07095

| EXAMINER |
|---|
| GRAHAM, M. |

| ART UNIT | PAPER |
|---|---|
| 3993 | |

DATE MAILED:

08/22/08

# *INTER PARTES* REEXAMINATION COMMUNICATION

BELOW/ATTACHED YOU WILL FIND A COMMUNICATION FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE OFFICIAL(S) IN CHARGE OF THE PRESENT REEXAMINATION PROCEEDING.

**All correspondence** relating to this *inter partes* reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of this communication.

PTOL-2071 (Rev.07-04)

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

MORRISON & FOERSTER LLP
1650 TYSONS BOULEVARD
SUITE 400
MCLEAN, VA 22102

# Transmittal of Communication to Third Party Requester
## *Inter Partes* Reexamination

REEXAMINATION CONTROL NUMBER *95/001,049*.

PATENT NUMBER *7,231,363*.

TECHNOLOGY CENTER *3999*.

ART UNIT *3993*.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above-identified reexamination proceeding. 37 CFR 1.903.

Prior to the filing of a Notice of Appeal, each time the patent owner responds to this communication, the third party requester of the *inter partes* reexamination may once file written comments within a period of 30 days from the date of service of the patent owner's response. This 30-day time period is statutory (35 U.S.C. 314(b)(2)), and, as such, it <u>cannot</u> be extended. See also 37 CFR 1.947.

If an *ex parte* reexamination has been merged with the *inter partes* reexamination, no responsive submission by any *ex parte* third party requester is permitted.

**All correspondence** relating to this inter partes reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of the communication enclosed with this transmittal.

PTOL-2070 (Rev.07-04)

| *OFFICE ACTION IN* **INTER PARTES** *REEXAMINATION* | Control No. 95/001,049 | Patent Under Reexamination 7231363 | |
|---|---|---|---|
| | Examiner MATTHEW C. GRAHAM | Art Unit 3993 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address. --*

Responsive to the communication(s) filed by:
Patent Owner on _____
Third Party(ies) on _____

**RESPONSE TIMES ARE SET TO EXPIRE AS FOLLOWS:**

*For Patent Owner's Response*:
    2 MONTH(S) from the mailing date of this action. 37 CFR 1.945. EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.956.
*For Third Party Requester's Comments on the Patent Owner Response:*
    30 DAYS from the date of service of any patent owner's response. 37 CFR 1.947. NO EXTENSIONS OF TIME ARE PERMITTED. 35 U.S.C. 314(b)(2).

**All correspondence** relating to this inter partes reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of this Office action.

This action is not an Action Closing Prosecution under 37 CFR 1.949, nor is it a Right of Appeal Notice under 37 CFR 1.953.

**PART I.  THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:**

1. ☐ Notice of References Cited by Examiner, PTO-892
2. ☐ Information Disclosure Citation, PTO/SB/08
3. ☐ _____

**PART II.  SUMMARY OF ACTION:**

1a. ☒ Claims 1-15 are subject to reexamination.
1b. ☐ Claims _____ are not subject to reexamination.
2. ☐ Claims _____ have been canceled.
3. ☐ Claims _____ are confirmed. [Unamended patent claims]
4. ☐ Claims _____ are patentable. [Amended or new claims]
5. ☒ Claims 1-15 are rejected.
6. ☐ Claims _____ are objected to.
7. ☐ The drawings filed on _____  ☐ are acceptable.  ☐ are not acceptable.
8. ☐ The drawing correction request filed on _____ is:  ☐ approved.  ☐ disapproved.
9. ☐ Acknowledgment is made of the claim for priority under 35 U.S.C. 119 (a)-(d). The certified copy has:
    ☐ been received.  ☐ not been received.  ☐ been filed in Application/Control No 95001049.
10. ☐ Other _____

Application/Control Number: 95/001,049                                    Page 2
Art Unit: 3993

## NON-FINAL REJECTION

**Proposed Rejections Adopted**

1.      The following is a quotation of the appropriate paragraphs of 35

U.S.C. 102 that form the basis for the rejections under this section made in this Office

action:

> A person shall be entitled to a patent unless –
>
> (e) the invention was described in (1) an application for patent, published under section 122(b), by another filed in the United States before the invention by the applicant for patent or (2) a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent, except that an international application filed under the treaty defined in section 351(a) shall have the effects for purposes of this subsection of an application filed in the United States only if the international application designated the United States and was published under Article 21(2) of such treaty in the English language.

2.      (Ground #1) Claims 1-8, 11-2 and 14-15 rejected under 35 U.S.C. 102(e)

as being anticipated by Buist.

A discussion as to how Buist relates to claims 1-8, 11-2 and 14-15 is provided on

pages 16-34 of the Request and in the claim chart, Exhibit Q, and is herein incorporated

by reference.

Buist discloses a computerized network containing four servers (the root server,

the intermediate server, the broker-dealer server, and the replica server) that support

buying and selling of securities. Buist discloses that the broker-dealer server receives

an offer to sell from a first ordering party. Buist describes connecting "to the trading

system of the preferred embodiment, a user at step 310 first activates the application

which generates on the display screen of the user's workstation a connection status

display (see FIG. 53) that establishes a connection to the server/database of the user's

Application/Control Number: 95/001,049                    Page 3
Art Unit: 3993

broker/dealer. At step 322 the user selects a stock of interest by typing the stock symbol

into an appropriate display (see FIG. 6, slot 642). Assuming that the user decides to sell

some of his/her holdings in the displayed securities, at step 342 he/she fills in a trade

ticket (see FIG. 11) for a sell order and selects the 'Verification' button on the trade

ticket display. As indicated, at step 346, the user then views the final verification screen

(see FIG. 56) provided by the application and selects the 'Send' button. In response, the

order is transmitted to the server and database of the user's broker/dealer".

Buist makes clear that the first order can instead be an offer to buy. "Assuming

that the user decides to sell some of his/her holdings in the displayed securities, at step

342 he/she fills in a trade ticket (see FIG. 11) for a sell order .... Alternatively, at this

point, the user may choose to purchase securities."

Buist therefore teaches that a broker-dealer may place an intermediate order by

passing along the order on behalf of a client. Buist further teaches that a plurality of

broker-dealers use the broker-dealer servers, which are part of the computerized

system, to place intermediate orders. Buist provides that in "the preferred embodiment,

each of a multiplicity of users' workstations is simultaneously connected via the Internet

to one of a plurality of broker/dealer computers."

The intermediate order is placed in response to the first order (i.e., the user's sell

order). Buist notes that "In response, the order is transmitted to the server and database

of the user's broker/dealer .... If the transaction is approved, at step 354, the server of

the broker/dealer sends the user's approved sell order to the root server."  Buist further

teaches that such an intermediate order is then disseminated to other users on the

system. "If the transaction is approved, at step 354, the server of the broker/dealer

sends the user's approved sell order to the root server .... The applications receive this

sell offer and, at step 370, display the offer in the order book displays of the subscribed

users." A second ordering party can then respond to the intermediate order by

executing a buy order.

Buist discloses the step of identifying the serial chain of transactions. Buist

assigns a unique identifier to the first ordering party's order that stays with the order

through the serial chain of transactions. The first order (i.e., the sell order) and the

intermediate order (i.e., the broker-dealer forwarding the sell order for display on the

system) are both tagged with the same ID. The "server of the broker/dealer sends the

user's approved sell order to the root server 50, which attaches a system ID to the

order, identifying the user's account, his order (stock symbol, size, price, and whether

buy or sell), and his broker/dealer." (See Col. 10, lines 7-11.)

Then, the second user's buy order has the same ID attached to it. "The buy

order, along with an ID assigned to the corresponding offer to sell, is transmitted at step

378, to the server and database of the buyer's broker/dealer using another, preferably

Internet, connection that the buyer has to his broker/dealer system." (See Col 10, lines

30-34.)

Buist describes that the "broker/dealer server/database sends the approved sell

order (with a user account ID and the size, price, stock, and side (whether buy or sell) of

the order) to the root server 50, which attaches a system ID to the order, said system ID

containing sufficient information to enable the system to match the ID to the seller, the

order, and the seller's broker/dealer." (See Col. 32, lines 37-43.)

Accordingly, a serial chain of transactions is identified through the use of unique

IDs applied to the first order, intermediate order, and second order.

Buist describes a step in which the transaction is confirmed and executed. "The

broker/dealer servers of both parties to the transaction notify the applications of the

parties that the transaction is confirmed (by updating the open positions and related

displays, and preferably also by email) . The exchange of securities and money takes

place subsequently in a conventional way between the broker/dealers of the buyer and

the seller." (See Col. 10, lines 54-63.) Buist teaches a serial chain of transactions in

which the financial instrument is transferred from the seller to the seller's broker-dealer,

then from the seller's broker- dealer to the buyer's broker-dealer, and finally from the

buyer's broker-dealer to the buyer.

Buist discloses that the "exchange of securities and money takes place

subsequently in a conventional way between the broker/dealers of the buyer and the

seller." (See Col. 10, lines 60-62.) Buist confirms that the seller's broker-dealer and the

buyer's broker-dealer handle the transfer of the securities. "At step 390 the root server

50 notifies the broker/dealer systems of both parties of the details of the transaction so

as to identify which funds and shares must be transferred to which accounts." (See Col.

10, lines 45-48.)

Buist teaches two intermediate parties. The first intermediate party is the seller's

broker-dealer, as explained above. The last intermediate party is the buyer's broker-

Application/Control Number: 95/001,049                                    Page 6
Art Unit: 3993

dealer. The buyer's broker-dealer, like the seller's broker-dealer, passes along the

buyer's order after approving it. "The buy order, along with an ID assigned to the

corresponding offer to sell, is transmitted at step 378, to the server and database of the

buyer's broker/dealer. The buyer's server checks, at step 382, whether the buyer has

sufficient funds or credit in his account to purchase the stock offered by the seller".

Also, a broker/dealer may not authorize a transaction if buyer's profile and

preference do not correspond to the characteristics of the security that he wants to

purchase. If the transaction is approved, at step 386, the buyer's broker/dealer sends

the approval of the order along with sufficient information to identify the buyer and the

order to the root server 50." Thus, Buist allows that the buyer's broker- dealer and the

seller's broker-dealer can be different parties or the same party.

3.    The following is a quotation of 35 U.S.C. 103(a) which forms the basis for

all obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set
> forth in section 102 of this title, if the differences between the subject matter sought to be patented and
> the prior art are such that the subject matter as a whole would have been obvious at the time the
> invention was made to a person having ordinary skill in the art to which said subject matter pertains.
> Patentability shall not be negatived by the manner in which the invention was made.

4.    (Ground #2) Claims 9, 10 and 13 are rejected under 35 U.S.C. 103(a) as

being unpatentable over Buist in view of Harpale.

A discussion as to how Buist in view of Harpale relates to claims 9, 10 and 13 is

provided on pages 34-37 of the Request and in the claim chart, Exhibit R, and is herein

incorporated by reference.

Application/Control Number: 95/001,049                                    Page 7
Art Unit: 3993

Regarding claims 9-10, the claimed invention differs from Buist only in that the intermediate orders have a second set of terms (price) different from the first set of terms.

Harpale discloses the commonplace bond trading method having intermediate wherein the second et of terms (price ) is different from the first set of terms due to a mark-up.

It would have been obvious to one of ordinary skill in the art to have allowed for a mark-up in the method of Buist in view of the teaching of Harpale as a commonplace procedure in the trading of bonds.

Regarding claim 13, the claimed invention differs from Buist only in that the intermediate orders in the serial chain of transactions cannot be prevented from execution by parameters set by the first and second ordering parties.

Harpale teaches an intermediate order that changes the price term of a seller's order before sending that order onward for potential buyers to accept and execute. In that scenario, the seller's original price (i.e., the parameter set by the first ordering party) does not prevent execution of a trade between the seller' s broker-dealer and the buyer at the higher, marked-up price set by the seller's broker-dealer.

It would have been obvious to one of ordinary skill in the art that the intermediate orders in the serial chain of transactions would be prevented from execution by parameters set by the first and second ordering parties in the method of Buist in view of the teaching of Harpale as a commonplace procedure in the trading of bonds so as to allow for mark-ups of the bond price.

5.      (Ground #3) Claims 9, 10 and 13 are rejected under 35 U.S.C. 103(a) as being unpatentable over Minton.

A discussion as to how Buist in view of Minton relates to claims 9, 10 and 13 is provided on pages 38-40 of the Request and in the claim chart, Exhibit S, and is herein incorporated by reference.

Regarding claims 9-10, the claimed invention differs from Buist only in that the intermediate orders have a second set of terms (price) different from the first set of terms.

Minton discloses an "Interactive Securities Trading System" in which users on the system can act as "market makers." According to Minton, a user can create a setup by which he or she automatically buys securities for one price (term) and resells for another price. (See Col. 13, line 46- Col. 14, line 6 and Fig. 9.)

It would have been obvious to one of ordinary skill in the art to have allowed for a mark-up in the method of Buist in view of the teaching of Minton as a commonplace procedure in the trading of bonds.

Regarding claim 13, the claimed invention differs from Buist only in that the intermediate orders in the serial chain of transactions cannot be prevented from execution by parameters set by the first and second ordering parties.

As noted above, Minton teaches an intermediate order that changes the price term of a seller's order before sending that order onward for potential buyers to accept and execute. In that scenario, the seller's original price (i.e., the parameter set by the

first ordering party) does not prevent execution of a trade between the seller's broker-dealer and the buyer at the higher, marked-up price set by the seller's broker-dealer.

It would have been obvious to one of ordinary skill in the art that the intermediate orders in the serial chain of transactions would be prevented from execution by parameters set by the first and second ordering parties in the method of Buist in view of the teaching of Minton as a commonplace procedure in the trading of bonds so as to allow for mark-ups of the bond price.

6. (Ground #4) Claims 9, 10 and 13 are rejected under 35 U.S.C. 103(a) as being unpatentable over Cohen.

A discussion as to how Buist in view of Cohen relates to claims 9, 10 and 13 is provided on pages 40-43 of the Request and in the claim chart, Exhibit T, and is herein incorporated by reference.

Regarding claims 9-10, the claimed invention differs from Buist only in that the intermediate orders have a second set of terms (price) different from the first set of terms.

Cohen discloses an electronic bond trading system that allows a broker-dealer, E-Trade, to modify the price term before passing along a sell offer to buyers. A potential buyer can "peruse lists of offerings" and "place a limit order to buy." The offerings include a "markup, the profit tacked on by E-Trade."

It would have been obvious to one of ordinary skill in the art to have allowed for a mark-up in the method of Buist in view of the teaching of Cohen as a commonplace procedure in the trading of bonds.

Application/Control Number: 95/001,049                                    Page 10
Art Unit: 3993

Regarding claim 13, the claimed invention differs from Buist only in that the intermediate orders in the serial chain of transactions cannot be prevented from execution by parameters set by the first and second ordering parties.

Cohen teaches an intermediate order that changes the price term of a seller's order before sending that order onward for potential buyers to accept and execute. In that scenario, the seller's original price (i.e., the parameter set by the first ordering party) does not prevent execution of a trade between the seller's broker-dealer and the buyer at the higher, marked-up price set by the seller's broker-dealer.

It would have been obvious to one of ordinary skill in the art that the intermediate orders in the serial chain of transactions would be prevented from execution by parameters set by the first and second ordering parties in the method of Buist in view of the teaching of Cohen as a commonplace procedure in the trading of bonds so as to allow for mark-ups of the bond price.

7. (Ground #5) Claims 9, 10 and 13 are rejected under 35 U.S.C. 103(a) as being unpatentable over Gutner.

A discussion as to how Buist in view of Gutner relates to claims 9, 10 and 13 is provided on pages 43-45 of the Request and in the claim chart, Exhibit U, and is herein incorporated by reference.

Regarding claims 9-10, the claimed invention differs from Buist only in that the intermediate orders have a second set of terms (price) different from the first set of terms.

The Gutner article discloses an electronic bond trading system that allows a
broker- dealer, E-Trade, to modify the price term before passing along a sell offer to
buyers. A potential buyer can see inventory "from the trading desks at several bond
dealers" and "lists of corporate, agency, U.S. Treasury, municipal, and zero-coupon
bonds, plus certificates of deposit." The offerings may include "a markup of a half-
percent to three-quarters of a percent."

It would have been obvious to one of ordinary skill in the art to have allowed for a
mark-up in the method of Buist in view of the teaching of Gutner as a commonplace
procedure in the trading of bonds.

Regarding claim 13, the claimed invention differs from Buist only in that the
intermediate orders in the serial chain of transactions cannot be prevented from
execution by parameters set by the first and second ordering parties.

Gutner teaches an intermediate order that changes the price term of a seller's
order before sending that order onward for potential buyers to accept and execute. In
that scenario, the seller's original price (i.e., the parameter set by the first ordering party)
does not prevent execution of a trade between the seller's broker-dealer and the buyer
at the higher, marked-up price set by the seller's broker-dealer.

It would have been obvious to one of ordinary skill in the art that the intermediate
orders in the serial chain of transactions would be prevented from execution by
parameters set by the first and second ordering parties in the method of Buist in view of
the teaching of Gutner as a commonplace procedure in the trading of bonds so as to
allow for mark-ups of the bond price.

Application/Control Number: 95/001,049                                      Page 12
Art Unit: 3993

8. (Ground #6) Claims 9, 10 and 13 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Bond Market Association.

A discussion as to how Buist in view of Bond Market Association relates to claims

9, 10 and 13 is provided on pages 43-45 of the Request and in the claim chart, Exhibit

V, and is herein incorporated by reference.

Regarding claims 9-10, the claimed invention differs from Buist only in that the

intermediate orders have a second set of terms (price) different from the first set of

terms.

The Bond Market Association Survey discloses an electronic bond trading

system in which a broker-dealer, Trading Edge, Inc., buys from one party and

immediately resells to another at a markup. "Trading Edge, Inc. will be acting as a

riskless principal in all transactions and plans to disclose markups and markdowns for

each transaction." (Ex. F (Bond Market Association Survey) at 14.)

It would have been obvious to one of ordinary skill in the art to have allowed for a

mark-up in the method of Buist in view of the teaching of Bond Market Association as a

commonplace procedure in the trading of bonds.

Regarding claim 13, the claimed invention differs from Buist only in that the

intermediate orders in the serial chain of transactions cannot be prevented from

execution by parameters set by the first and second ordering parties.

Bond Market Association teaches an intermediate order that changes the price

term of a seller's order before sending that order onward for potential buyers to accept

and execute. In that scenario, the seller's original price (i.e., the parameter set by the

first ordering party) does not prevent execution of a trade between the seller' s broker-dealer and the buyer at the higher, marked-up price set by the seller's broker-dealer.

It would have been obvious to one of ordinary skill in the art that the intermediate orders in the serial chain of transactions would be prevented from execution by parameters set by the first and second ordering parties in the method of Buist in view of the teaching of Bond Market Association as a commonplace procedure in the trading of bonds so as to allow for mark-ups of the bond price.

9. (Ground #7) Claims 1-3, 6, 8, 11, 12, 14 and 15 are rejected under 35 U.S.C. 103(a) as being unpatentable over GAO Report.

A discussion as to how the GAO Report in view of Bond Market Association relates to claims 1-3, 6, 8, 11, 12, 14 and 15 is provided on pages 49-56 of the Request and in the claim chart, Exhibit W, and is herein incorporated by reference.

The GAO Report discloses that, in traditional voice trading, the brokers "call out their bids and offers as received from customers." After the broker calls out the customer's order, the order is "transmitted via computer" to other customers, who can respond by hitting a bid or taking an offer. Hitting a bid or taking an offer means to place an order accepting a bid or offer. The GAO Report further teaches that, during the clearance and settlement of the trade, the broker in a traditional voice trade purchases the security from the seller and resells it to the buyer. Accordingly, there is a transfer of the financial instrument from the buyer to the intermediary and from the intermediary to the seller. When a trade is completed, "the broker firm sends separate written confirmations to the buyer and the seller. The respective confirmations show the broker

Application/Control Number: 95/001,049                    Page 14
Art Unit: 3993

firm as the seller and purchaser of securities, thus maintaining customer anonymity."

The written confirmation is considered to be an identification of a serial chain of

transactions.

The claimed invention differs from the GAO Report only in that the system is

computerized and not a combination of combination of a manual and computerized

system.

It would have been obvious to one of ordinary skill in the art to have

computerized the system in the GAO report as a commonplace automation procedure in

order to improve efficiency and allow more users access to bond trading.

10. (Ground #8) Claims 4, 5, 7, 9, 10 and 13 are rejected under 35 U.S.C. 103(a)

as being unpatentable over the GAO Report in view of Weiss.

Regarding claims 4 and 5, the claimed invention differs from the GAO Report in

the receiving of an indication from the first ordering party to select whether the first order

is a live, executable order or a subject order. Weiss teaches that, in traditional voice

trading, customers may place orders of different types. These orders can be "market

orders," which are live and executable. "A market order is an order to execute at

whatever the market price is when the broker enters the crowd." (See page 59.) The

orders can also be subject to various conditions that must be fulfilled before execution.

For example, an order can be "all or none," which means that "given the time

constraints, such as a day, all of the order must be filled or the client does not have to

accept the execution." (See page 60.)

Application/Control Number: 95/001,049                                    Page 15
Art Unit: 3993

It would have been obvious to one of ordinary skill in the art to have offered a

live, executable order or a subject order in the method of the GAO Report in view of the

teaching of Weiss so as to provide a choice of order types.

Regarding claim 7, the claimed invention differs from the GAO Report only in that

the first order received from the first ordering party is an order subject to satisfaction of

a condition, and the method further comprises executing the order subject to condition

only if the condition is satisfied. Weiss teaches that, in traditional voice trading, orders

can be subject to various conditions that must be fulfilled before execution. For

example, an order can be "all or none," which means that "given the time constraints,

such as a day, all of the order must be filled or the client does not have to accept the

execution." (See page 60.)

It would have been obvious to one of ordinary skill in the art to have offered

orders that can be subject to various conditions which must be fulfilled before execution

in the method of the GAO Report in view of the teaching of Weiss so as a commonplace

business practice.

Regarding claims 9 and 13, the claimed invention differs from the GAO Report in

that the first order received from the first ordering party has a first set of terms, and the

step of receiving intermediate orders comprises receiving intermediate orders having

respective second sets of terms different than the first set of terms and the first set of

terms include a price for one or more transactions in the serial chain of transactions,

and the step of receiving intermediate orders includes receiving intermediate orders

having respective second sets of terms in which a price term has been modified from the first set of terms.

Weiss discloses that broker-dealers "mark up" and "mark down" the prices of orders they receive from others before passing those orders on to others. (See page 278.) "When a customer wants to sell a security in the OTC [i.e., over-the-counter] market, the dealer charges a 'mark-down.' The dealer buys the security from the customer at one price, and sells it to a market maker at a higher price. The difference between the price the broker pays to the customer and what he/she gets from the market maker is the mark-down." Accordingly, the sell order (i.e., the first order) has one price, but the dealer's order (i.e., the intermediate order) has a different, lower price.

It would have been obvious to one of ordinary skill in the art to have allowed for a mark-up in the method of he GAO Report in view of the teaching of Weiss as a commonplace procedure in the trading of bonds.

11.  (Ground #9)  Claims 1-15 are rejected under 35 U.S.C. 103(a) as being unpatentable over the BondExchange Manual.

A discussion as to how the BondExchange Manual relates to claims 1-15 is provided on pages 68-81 of the Request and in the claim chart, Exhibit Y, and is herein incorporated by reference.

The BondExchange Manual discloses that "offerings" are posted on the computerized system for viewing by other users. Users can then view the listed offers. (See page 11.) The offerings can be offers to sell, which list a green "buy" price for the user to click on. They can also be bids to buy, which list a red "sell" price for the user to

Application/Control Number: 95/001,049                                    Page 17
Art Unit: 3993

click on. The BondExchange Manual further discloses that an intermediary can place

multiple intermediate orders at once on a series of bonds. The intermediary can select a

series of bond offerings by marking checkboxes. Through a radio button, the

intermediary can choose whether the intermediate orders are on an "Agency" or

"Principal" basis. The intermediary can also apply mark-ups to the offers and calculate

how those markups will affect the price that he or she is offering his or her customer.

The BondExchange Manual teaches that when an order is "completed," a serial chain is

identified using the first order, intermediate order, and a second order. The Order

Inquiry screen shows an order with a "Filled" status. At that point, the "Filled Dealer" row

shows the first transaction in the chain. BondExchange also discloses that transactions

are marked "confirmed" and "completed".

The claimed invention differs from the BondExchange Manual only in the actual

transfer of the bonds in the clearance and settlement process. It would be obvious to

one of ordinary skill in the art, upon completion of orders, to carry out a transfer of the

bonds as described on the Order Inquiry screen in that transferring bonds is the

purpose of the Order.

**Proposed rejections NOT Adopted**

12. (Ground #9) Claims 1-15 are NOT rejected under 35 U.S.C. 103(a) as being

unpatentable over Buist.

This proposed rejection appears on pages 49- 56 of the Request  The claims are

not considered obvious in view of Buist because Buist anticipates claims 1-8, 11-2 and

14-15 as discussed above in paragraph 2. It is also noted that claims 9,10 and 13 have

Application/Control Number: 95/001,049                                    Page 18
Art Unit: 3993

already been treated as being obvious in view of Buist in combination with either

Harpale, Minton, Cohen, Gutner and Bond Market Association.

     13.    The patent owner is reminded of the continuing responsibility under 37

CFR 1.565(a) to apprise the Office of any litigation activity, or other prior or concurrent

proceeding, involving Patent No. 7,213,363 throughout the course of this reexamination

proceeding. The third party requester is also reminded of the ability to similarly apprise

the Office of any such activity or proceeding throughout the course of this reexamination

proceeding. See MPEP §§ 2207, 2282, 2286 and 2686.

     14.    In order to ensure full consideration of any amendments, affidavits or

declarations, or other documents as evidence of patentability, such documents must be

submitted in response to this Office action. Submissions after the next Office action,

which is intended to be an Action Closing Prosecution (ACP), will be governed by 37

CFR 1.116(b) and (d), which will be strictly enforced.

     15.    Please mail any communications to:


Attn: Mail Stop "Inter Partes Reexam"
Central Reexamination Unit
Commissioner for Patents
P. O. Box 1450
Alexandria VA   22313-1450

Please FAX any communications to:


(571) 273-9900
Central Reexamination Unit

Application/Control Number: 95/001,049                                    Page 19
Art Unit: 3993

Please hand-deliver any communications to:

Customer Service Window
Attn:  Central Reexamination Unit
Randolph Building, Lobby Level
401 Dulany Street
Alexandria, VA  22314

Any inquiry concerning this communication or earlier communications from the
Reexamination Legal Advisor or Examiner, or as to the status of this proceeding, should
be directed to the Central Reexamination Unit at telephone number (571) 272-7705.

Signed:

Matthew C. Graham
CRU Examiner
3993
(571) 272-7116

Conferees: